## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MY JOB MATCHER, INC., *et al.*,[1] | Case No. 25-11280 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS, PURSUANT TO
SECTIONS 105(a), 363, AND 364 OF THE BANKRUPTCY CODE, (A) AUTHORIZING
(I) PAYMENT OF PREPETITION OBLIGATIONS INCURRED IN THE ORDINARY
COURSE OF BUSINESS IN CONNECTION WITH INSURANCE PROGRAMS,
INCLUDING PAYMENT OF POLICY PREMIUMS AND BROKER FEES, AND
(II) CONTINUATION OF INSURANCE PREMIUM FINANCING PROGRAMS;
(B) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK
AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO,
AND (III) SCHEDULING A FINAL HEARING**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") in the

above-captioned chapter 11 cases, hereby submit this motion (this "**Motion**") for the entry of

interim and final orders, substantially in the form attached hereto as Exhibit C (the "**Proposed

Interim Order**") and Exhibit D (the "**Proposed Final Order**," and together with the Proposed

Interim Order, the "**Proposed Orders**"), pursuant to sections 105(a), 363(b), and 364 of title 11

of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), (a) authorizing,

but not directing, the Debtors to (i) continue and, to the extent necessary, renew liability, property,

and other insurance programs and pay policy premiums and broker fees arising thereunder or in

connection therewith, including prepetition obligations arising in the ordinary course of business,

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  My Job Matcher, Inc. (9880); Job.com-HV, Inc. (DE) (5873); Job.com-HV, Inc. (FL) (5873); Job.com-Fortus, Inc. (6145); Job.com-Endevis, Inc. (1956); Job.com-QCI, Inc. (4364); Princeton One-Job.com, Inc. (4752); and Princeton Search L.L.C. (6163).  For purposes of these chapter 11 cases, the Debtors' service address is 1743 Sidewinder Drive, 1st Floor, Park City, Utah 84060.

and (ii) continue the Debtors' insurance premium financing programs and renew or enter into new premium financing programs, as necessary, under substantially similar terms, in the ordinary course of business, (b) authorizing banks and other financial institutions (collectively, the "**Banks**") to honor and process check and electronic transfer requests related to the foregoing, and (c) scheduling a final hearing with respect to the foregoing.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Robert J. Corliss in Support of the Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"),[2] filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105(a), 363(b), and 364 of the Bankruptcy Code and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

17405472

# BACKGROUND

## I.    General

2.    On the date hereof (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in these chapter 11 cases and no request has been made for the appointment of a trustee or an examiner.

3.    Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to the filing of these chapter 11 cases is set forth in the First Day Declaration.

## II.    Insurance Programs[3]

4.    In connection with the operation of their business, the Debtors maintain, among others, insurance programs for directors and officers, employment practices and fiduciary liability, general liability, auto, umbrella and cyber liability, as described below (collectively, the "**Insurance Programs**"), through several different insurance carriers (each, an "**Insurance Carrier**," and collectively, the "**Insurance Carriers**"), including under the insurance contracts listed on Exhibit A attached hereto.[4]

---

[3]    The descriptions of the Insurance Programs and the related PFA (as defined below) provided herein are intended only as a summary, and the actual terms of the foregoing shall govern in the event of any inconsistency with the descriptions set forth herein.

[4]    In addition to the Insurance Programs discussed herein, the Debtors maintain an insurance policy with respect to the Debtors' workers' compensation program (the "**Workers' Compensation Program**"). This policy is described in further detail in the *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy Code, (A) Authorizing the Debtors to Pay and Honor Certain (I) Prepetition Wages, Benefits, and Other Compensation Obligations; (II) Prepetition Employee Business Expenses; and (III) Workers' Compensation Obligations; (B) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (C) Granting Related Relief* (the "**Employee Wage Motion**") filed contemporaneously herewith.  Any relief requested with respect to the Workers' Compensation Program is requested in the Employee Wage Motion.

17405472

### A. Management Liability Insurance Program

5.      As is common with businesses of this kind, the Debtors maintain primary and excess insurance coverage for all of their directors and officers that covers, among other things, defense costs, settlements, and court awards from claims brought by third parties alleging that an insured is liable for an error, misstatement, misleading statement, improper act, omission, neglect, or breach of duty (collectively, the "**Management Liability Insurance Program**").

6.      Prior to the Petition Date, the policies underlying the Management Liability Insurance Program were renewed until March 15, 2026 and May 27, 2026 respectively. The annual premiums for the Management Liability Insurance Program are approximately $161,023 in the aggregate. With the exception of the premiums under the Management Liability Insurance Program that, as set forth more fully below and on Exhibit A attached hereto, have been financed pursuant to the PFA (defined below), the Debtors believe that there are no outstanding amounts under the Management Liability Insurance Program as of the Petition Date.

### B. General Liability, Umbrella and Cyber Insurance Programs

7.      The Debtors maintain a general commercial lines liability insurance policy, which insures the Debtors for, among other things, damages to the Debtors' personal and real property, accident, premises, auto, and personal injury liability (the "**General Liability Insurance Program**"). Prior to the Petition Date, the General Liability Insurance Program was renewed until March 15, 2026. The annual premium for the General Liability Insurance Program is approximately $111,500. The Debtors believe that there are no outstanding amounts under the General Liability Insurance Program as of the Petition Date.

8.      The Debtors maintain a cyber liability insurance policy that insures the Debtors for, among other things, certain losses related to damages caused by information technology system

4

failures or breaches and other security or privacy violations (the "**Cyber Insurance Program**"). Prior to the Petition Date, the Cyber Insurance Program was renewed until March 15, 2026. The annual premium for the Cyber Insurance Program is approximately $21,069.00. With the exception of certain premiums under the Cyber Insurance Program that, as set forth more fully below and on <u>Exhibit A</u> attached hereto, have been financed pursuant to the PFA (defined below), the Debtors believe that there are no outstanding amounts under the Cyber Insurance Program as of the Petition Date.

9.      The Debtors maintain an umbrella insurance policy that insures the Debtors for certain losses in excess of the coverage provided by the Debtors' primary insurance policies (the "**Umbrella Insurance Program**"). Prior to the Petition Date, the Umbrella Insurance Program was renewed until April 1, 2026. The annual premium for the Umbrella Insurance Program is approximately $27,247. With the exception of certain premiums under the Umbrella Insurance Program that, as set forth more fully below and on <u>Exhibit A</u> attached hereto, have been financed pursuant to the PFA (defined below), the Debtors believe that there are no outstanding amounts under the Umbrella Insurance Program as of the Petition Date.

10.      The Debtors also maintain a commercial automobile policy ("**Auto Insurance Program**"). The Auto Policy provides coverage for personal injury and physical damage arising from the use of motor vehicles. Prior to the Petition Date, the Auto Insurance Program was renewed until April 1, 2026. With the exception of certain premiums under the Auto Insurance Program that, as set forth more fully below and on <u>Exhibit A</u> attached hereto, have been financed pursuant to the PFA (defined below), the annual premium for the Auto Insurance Program is approximately $16,724. The Debtors believe that there are no outstanding amounts under the Auto Insurance Program as of the Petition Date.

17405472

C.    **Financed Insurance Programs**

11.    It is not economically advantageous for the Debtors to pay the premiums on all of the Insurance Programs on an annualized basis.  Accordingly, from time to time, in the ordinary course of business, the Debtors finance the premiums on certain of the Insurance Programs.  As of the Petition Date, the Debtors were financing the premiums under certain of their various policies pursuant to two premium finance agreements (the "**PFAs**") with National Partners (the "**Premium Financing Company**"), copies of which are collected and attached hereto as Exhibit B.

12.    The following is a summary of the significant terms of the PFAs:

| Financed Policy | Down Payment | Monthly Payment | Number of Monthly Payments | Start Date for Monthly Payments |
|---|---|---|---|---|
| **D&O and Cyberliability** | $29,408.89 | $6,630.65 | 10 | April 15, 2025 |
| **General Liability, Umbrella and Auto** | $62,367.93 | 13,817.81 | 10 | May 1, 2025 |

13.    The Debtors seek authority to continue to make the remaining payments under the PFAs in the ordinary course of business, and to renew or enter into new premium financing programs, as necessary, under substantially similar terms, in the ordinary course of business.

III.    **Broker Fees**

14.    In connection with the Insurance Programs, the Debtors obtain brokerage and risk management services from Founder Shield and Paragon International (the "**Brokers**").  The Brokers assists the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, assisting the Debtors with the design and development of the Insurance Programs, and the procurement and negotiation of the Insurance Programs, and enabling the

6

Debtors to obtain those policies on advantageous terms at competitive rates. As of the Petition Date, the Debtors believe that there are no outstanding amounts on account of fees due to the Brokers for their services ("**Broker Fees**"). To the extent that the Debtors incur Broker Fees on account of postpetition services provided by the Brokers, the Debtors seek authority to pay such Broker Fees in the ordinary course of business.

## RELIEF REQUESTED

15. By this Motion, the Debtors request that the Court enter the Proposed Orders, (a) authorizing, but not directing, the Debtors to (i) continue and, to the extent necessary, renew the Insurance Programs and pay policy premiums, and Broker Fees arising thereunder or in connection therewith, including such prepetition obligations arising in the ordinary course of business, and (ii) continue the Financed Insurance Programs and enter into new premium financing programs, as necessary, under substantially similar terms, in the ordinary course of business, (b) authorizing the Banks to honor and process check and electronic transfer requests related thereto, and (c) scheduling a final hearing with respect to the foregoing.

## BASIS FOR RELIEF

**I.    The Court Should Authorize, But Not Direct, the Debtors, in Their Discretion, to Make Necessary Payments Related to the Insurance Programs to Maintain Existing Insurance Coverage**

16. Maintaining the Debtors' insurance coverage under the Insurance Programs is a crucial ordinary-course-of-business transaction. Authority to pay any prepetition amounts that may be due and owing related to the Insurance Programs—to the extent that the Debtors determine that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of the coverage, benefits, or proceeds provided under the Insurance Programs—is necessary, as the insurance coverage provided under the Insurance Programs is essential for preserving the value of the Debtors' assets and, in most cases, such

17405472

coverage is required by the various contracts and state and federal laws that govern the Debtors. *See, e.g.*, 28 U.S.C. § 959(b) (chapter 11 debtor obligated under federal law to operate chapter 11 business according to the laws of the states where business and properties are located). Further, under the chapter 11 operating guidelines issued by the United States Trustee for Region 3 pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain during these chapter 11 cases certain types of insurance coverage, which coverage is provided by certain of the policies included in the Insurance Programs.

17. In addition, the Debtors may need to renew or replace certain of their Insurance Programs during the pendency of these chapter 11 cases. The nonpayment of any premiums, deductibles, or related fees under any of the Insurance Programs could result in one or more of the Insurance Carriers increasing future insurance premiums, declining to renew the insurance policies or refusing to enter into new insurance agreements with the Debtors. If the Insurance Programs lapse without renewal, the Debtors may be exposed to substantial liability for first party property claims and third party liability claims, to the detriment of all parties in interest.

18. Similarly, the services provided by the Brokers are critical to ensuring that the Debtors obtain the necessary insurance coverage on advantageous terms at competitive rates, and the Brokers have a significant amount of institutional knowledge regarding the Debtors' insurance needs. If the Debtors were forced to replace the Brokers, the Debtors would necessarily be required to spend time, energy, and resources getting a new insurance broker up to speed on the Debtors' insurance needs.

19. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy court may use its equitable powers under section 105 of the

17405472

Bankruptcy Code to permit a debtor in possession to pay prepetition claims when payment is necessary to effectuate a debtor's bankruptcy goals and essential to the continued operation of the business. *See Miltenberger v. Logansport. C. & S.W.R. Co.*, 106 U.S. 286 (1882); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981); *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) (under necessity of payment doctrine prepetition claims may be paid if essential to the continued operation of the business during reorganization); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 192 (Bankr. D. Del. 1994) (recognizing that necessity of payment doctrine authorizes payment of prepetition claims when "such payment is essential to the continued operation of the business").

20.      In addition, the Court may authorize the Debtors to pay prepetition premiums to maintain insurance coverage under section 363(b) of the Bankruptcy Code. In particular, section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Thus, under this section, a court may authorize a debtor to pay certain prepetition claims. *See Ionosphere Clubs*, 98 B.R. 174, 175-77 (S.D.N.Y. 1989) (affirming lower court order authorizing payment of prepetition wages pursuant to section 363(b) of the Bankruptcy Code); *In re UAL Corp.*, Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 9, 2002) (authorizing payment of prepetition claims under section 363 of the Bankruptcy Code as an out-of-the-ordinary-course transaction); *In re Jillian's Entm't Holdings, Inc.*, Case No. 04-33192 (DTS) (Bankr. W.D. Ky. June 22, 2004).

21.      Furthermore, reflecting the recognition that payment of prepetition claims associated with a debtor's insurance program is critical to a debtor's chapter 11 efforts, courts in this District have routinely granted the relief requested herein in other chapter 11 cases.

**II.    The Court Should Authorize, But Not Direct, the Debtors, in Their Discretion, to Make Necessary Payments Under the PFA and Renew the PFA and/or Enter Into New Premium Financing Agreements in the Ordinary Course of Business**

22.    If the Debtors are unable to continue making payments under the PFA, the Premium Financing Company may be permitted to terminate the Financed Insurance Programs.  The Debtors would then be required to obtain replacement insurance on an expedited basis and likely at a significantly increased cost.  If the Debtors are required to obtain replacement insurance and to pay a lump sum premium for such insurance in advance, this payment may be the same or greater than what the Debtors currently pay to the Premium Financing Company under the PFA.  Even if the Premium Financing Company is not permitted to terminate the Financed Insurance Programs, any interruption of payments would severely and adversely affect the Debtors' ability to finance premiums for future policies.  Thus, in view of the importance of maintaining the related insurance coverage and preserving their cash flow by financing the insurance premiums, the Debtors believe that it is in the best interest of their estates and creditors for the Court to authorize the Debtors to honor the obligations under the PFA.  Any other alternative would likely require considerable cash expenditures and would be detrimental to the Debtors' chapter 11 efforts.

23.    Generally, the PFA grants the Premium Financing Company a security interest in the Financed Insurance Programs, including any unearned premium, return premium, dividend, and loss payments thereof.  Security interests created by premium finance arrangements generally are recognized as secured claims in bankruptcy to the extent of the amount of unearned premiums financed pursuant to such agreements.  *See TIFCO, Inc. v. U.S. Repeating Arms Co.* (*In re U.S. Repeating Arms Co.*), 67 B.R. 990, 994-95 (Bankr. D. Conn. 1986); *Drabkin v. A.I. Credit Corp.* (*In re Auto-Train Corp.*), 9 B.R. 159, 164-66 (Bankr. D.D.C. 1981).  Therefore, if the Debtors fail to make the required payments under the PFA, the Premium Financing Company could seek relief from the automatic stay, either to cancel the Financed Insurance Programs in accordance with the

10

terms of the PFA or to seek adequate protection of its investment. *See Universal Motor Express*, 72 B.R. 208, 211 (Bankr. W.D.N.C. 1987) (recognizing that a default under the financing arrangement and the resulting decline in value of the unearned premiums justified relief from the automatic stay).  Accordingly, the practical solution from the Debtors' perspective is to continue making the premium financing payments required under the PFA.

24.     In addition, the Court should also authorize the Debtors to renew or enter into new premium finance agreements postpetition in the ordinary course of business.

25.     Section 363(c)(1) of the Bankruptcy Code provides that "the trustee [or a debtor in possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).  Section 363(b)(1) of the Bankruptcy Code provides that, "[t]he trustee [or debtor in possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

26.     The Debtors submit that the renewal of the PFA and/or the execution of new premium finance agreements constitute transactions in the ordinary course of business, within the meaning of section 363(c)(1) of the Bankruptcy Code, that do not require prior bankruptcy court approval.

27.     Neither the Bankruptcy Code nor its legislative history provide a framework for analyzing whether a transaction is in the ordinary course of business.  The Third Circuit, however, has developed a two-part inquiry, including a "horizontal dimension" test and a "vertical dimension" test, for determining whether a transaction is in the ordinary course of business under section 363(c)(1).  *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992); *see, e.g., In re*

11

*Nellson Nutraceutical, Inc.*, 369 B.R. 787, 791 (Bankr. D. Del. May 24, 2007); *Braunstein v. McCabe*, 571 F. 3d 108, 124-25 (1st Cir. 2009). The horizontal dimension test focuses on whether, from an industry wide perspective, the transaction is "of the sort commonly undertaken by companies in that industry." *In re Roth Am., Inc.*, 975 F.2d 202 at 953. The vertical dimension test (or creditor's expectation test) focuses on the vantage point of a hypothetical creditor and inquires whether the transaction subjects the creditor to economic risk of a nature different from those the creditor accepted when it decided to extend credit to the debtor. *Id.*

28.     The Debtors believe that the renewal of the PFA and/or the execution of new premium finance agreements satisfies the "horizontal dimension" test because maintaining insurance coverage and entering into related premium financing agreements is a common industry practice. *Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153, 1154 (Fed. Cir. 1986) (Such a premium financing agreement is a "common commercial arrangement."). The "vertical dimension" test is also satisfied because the maintenance of insurance under premium finance agreements does not subject estate creditors to any economic risk, but rather, serves to protect them from economic risk. Accordingly, the renewal of the PFA and/or the execution of new premium finance agreements constitute "ordinary course" uses of estate property under section 363(c)(1) of the Bankruptcy Code. *See In re Roth Am.*, 975 F.2d at 952 n.4 (citing *U.S. v. Estate of Deutscher*, 115 B.R. 592, 598-99 (M.D. Tenn. 1990), for the proposition that "trustee's use of fund to . . . reinstate insurance was in ordinary course of business").

29.     Indeed, the Debtors submit that it may be outside the ordinary course of business for them to fail to renew the PFA or enter into new premium finance agreements to obtain insurance coverage. *See In re Lavigne*, 114 F.3d 379, 383-84 (2d Cir. 1994) (cancellation of insurance policy was not in the ordinary course of business). Nevertheless, out of an abundance

12

of caution, the Debtors have filed this Motion seeking entry of the Proposed Orders, to the extent necessary, approving, under section 363 of the Bankruptcy Code, the Debtors' postpetition renewal of the PFA and/or the execution of new premium finance agreements.

30.    The Court may also authorize the Debtors to enter into new premium finance agreements pursuant to section 364(c)(2) of the Bankruptcy Code.    Section 364(c)(2) of the Bankruptcy Code authorizes, after notice and a hearing, a debtor in possession to obtain debt secured by a lien on property of the estate.    *See* 11 U.S.C. § 364(c)(2).    Under any new premium finance agreement, the counterparty would likely require that the Debtors grant a security interest in the unearned premiums under the financed policies.    *See generally In re Schwinn Bicycle Co.*, 200 B.R. 980, 982 (Bankr. N.D. Ill. 1996) (describing insurance premium financing agreements).

31.    Section 364(c) authorizes a debtor, in the exercise of its business judgment, to incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estates.    *See, e.g.*, *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125-26 (Bankr. S.D.N.Y. May 14, 2009) (granting motion for postpetition financing upon finding that (a) "no comparable credit [was] available on more favorable terms"; (b) that the debtors needed postpetition financing to "to preserve [their] assets and continue their operations; and (c) that the terms and conditions of the DIP Documents had been negotiated in good faith); *In re Budget Group, Inc.*, Case No. 02-12152, 2002 Bankr. LEXIS 1050 (Bankr. D. Del. Aug, 1, 2002) (authorizing funding of acquisition of property on a secured basis where acquired property was necessary to maintain operations and debtor could not obtain such funding on an unsecured basis); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").    Because a borrowing to maintain essential insurance coverage is in

13

the best interests of the Debtors' estates, the Court should authorize the Debtors to renew the PFA and/or execute new premium finance agreements postpetition.

### III.    The Court Should Authorize the Banks to Honor and Process the Debtors' Payments Related to the Insurance Programs, the PFA, and the Broker Fees

32.    The Debtors also request the Court to authorize the Banks, when requested by the Debtors, in their discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations described herein, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Debtors further request that all of the Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

### SATISFACTION OF BANKRUPTCY RULE 6003(b)

33.    Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one (21) days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm."  As set forth throughout this Motion, any disruption of the Insurance Programs, including the Financed Insurance Programs and the related PFA, and the related services received by the Debtors from the Brokers would substantially diminish or impair the Debtors' efforts in these chapter 11 cases to preserve and maximize the value of their estates.

34.    For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied, and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

35.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As provided herein, and to implement the foregoing successfully, the Debtors request that the Proposed Orders include a finding that the Debtors have established cause to exclude such relief from the fourteen (14)-day stay period under Bankruptcy Rule 6004(h).

36.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14)-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Orders.

## RESERVATION OF RIGHTS

37.     Nothing in the Proposed Orders or this Motion:  (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; or (c) shall be construed as a promise to pay a claim.

## NOTICE

38.     Notice of this Motion has been provided to:  (i) the U.S. Trustee; (ii) the Debtors' twenty (20) largest unsecured creditors; (iii) counsel to the Debtors' Secured Lenders; (iv) the office of the attorney general for each of the states in which the Debtors operate; (v) the Office of the United States Attorney for the District of Delaware; (vi) the Internal Revenue Service; (vii) the United States Department of Justice (g) the Banks; (h) the Insurance Carriers and the Premium

15

Financing Company; and (i) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Rule 9013-1(m) of the Local Rules of the United States Bankruptcy Court for the District of Delaware.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors request entry of the Proposed Orders, granting the relief requested herein and such other and further relief as is just and proper.

Dated: July 6, 2025
Wilmington, Delaware

**MORRIS JAMES LLP**

*/s/ Carl N. Kunz, III*
Carl N. Kunz, III (DE Bar No. 3201)
Jeffrey R. Waxman (DE Bar No. 4159)
Christopher M. Donnelly (DE Bar No. 7149)
Samantha L. Rodriguez (DE Bar No. 7524)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail:  ckunz@morrisjames.com
         jwaxman@morrisjames.com
         cdonnelly@morrisjames.com
         srodriguez@morrisjames.com

*Proposed Counsel for Debtors and Debtors-in-Possession*

17405472