## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MY JOB MATCHER, INC., *et al.*,[1] | Case No. 25-11280 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO SECTIONS 105(a), 363(b), 507(a)(4), AND 507(a)(5) OF THE BANKRUPTCY CODE, (A) AUTHORIZING THE DEBTORS TO PAY AND HONOR CERTAIN (I) PREPETITION WAGES, BENEFITS, AND OTHER COMPENSATION OBLIGATIONS; (II) PREPETITION EMPLOYEE BUSINESS EXPENSES; AND (III) WORKERS' COMPENSATION OBLIGATIONS; (B) AUTHORIZING BANKS TO HONOR AND PROCESS CHECKS AND TRANSFERS RELATED TO SUCH OBLIGATIONS; AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") hereby submit this motion (this "**Motion**") for the entry of interim and final orders, substantially in the form attached hereto as Exhibit A (the "**Proposed Interim Order**") and Exhibit B (the "**Proposed Final Order**," and together with the Proposed Interim Order, the "**Proposed Orders**"), pursuant to sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), (a) authorizing, but not directing, the Debtors, in accordance with their stated policies and in their discretion, to (i) pay accrued prepetition Employee (as defined below) wages, salaries, commissions, and other compensation, (ii) pay accrued prepetition obligations owed to Independent Contractors (as defined below), (iii) pay prepetition business expenses incurred by the Employees (as defined below), (iv) make

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: My Job Matcher, Inc. (9880); Job.com-HV, Inc. (DE) (5873); Job.com-HV, Inc. (FL) (5873); Job.com-Fortus, Inc. (6145); Job.com-Endevis, Inc. (1956); Job.com-QCI, Inc. (4364); Princeton One-Job.com, Inc. (4752); and Princeton Search L.L.C. (6163). For purposes of these chapter 11 cases, the Debtors' service address is 1743 Sidewinder Drive, 1st Floor, Park City, Utah 84060.

contributions to prepetition benefit programs and continue such programs in the ordinary course of their business, (v) honor workers' compensation obligations, (vi) make payments for which prepetition payroll deductions were made, (vii) pay processing costs and administrative expenses relating to the foregoing payments and contributions, and (viii) make payments to third parties incident to the foregoing payments and contributions, and (b) authorizing banks and other financial institutions (collectively, the "**Banks**") to honor and process check and electronic transfer requests related to the foregoing.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Robert J. Corliss in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"),[2] filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy Code and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

## BACKGROUND

### I.    General

2.    On the date hereof (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in these chapter 11 cases and no request has been made for the appointment of a trustee or an examiner.

3.    Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to the filing of these chapter 11 cases is set forth in the First Day Declaration.

### II.    The Debtors' Workforce

4.    As of the Petition Date, the Debtors' workforce comprises approximately sixteen (16) full-time, salaried employees (the "**Full-Time Employees**") and one (1) part-time employee that is paid hourly (the "**Part-Time Employee**"), as well as approximately sixty-five (65) employees employed by the Debtors on a seasonal or temporary basis (the "**Supplemental Workers**," together with the Full-time Employees and the Part-Time Employee, the "**Employees**").  The Employees work in various states across the United States and all work is performed remotely.

5.    The Debtors also contract with individuals with specialized expertise as independent contractors based on the Debtors' specific needs (the "**Independent Contractors**" and together with the Employees, the "**Workforce**").  As of the Petition Date, the Debtors work with approximately two (2) Independent Contractors.

6.    The Workforce, as with any business entity, perform a variety of critical functions for the Debtors, and their knowledge, skills, and understanding of the Debtors' infrastructure,

business operations, and customer and vendor relations are essential to, among other things, the success of these chapter 11 cases. Without the continued service and dedication of the Workforce, it will be difficult, if not impossible, to operate the Debtors' business without an unexpected or inopportune interruption, and to prosecute these chapter 11 cases in a manner that will maximize the value of the Debtors' estates.

7.      To successfully accomplish the foregoing, minimize the personal hardship that the Workforce will suffer if prepetition employee-related obligations are not paid when due or as otherwise expected, and maintain employee morale and a focused Workforce during this critical time, the Debtors believe that it is necessary and in the best interest of their estates and all stakeholders to seek the relief requested herein.

## RELIEF REQUESTED

8.      By this Motion, the Debtors request that the Court enter the Proposed Orders, authorizing, but not directing, the Debtors, in accordance with their stated policies and in their discretion, to:  (a) pay accrued prepetition Employee wages, salaries, commissions, and other compensation; (b) pay accrued prepetition Independent Contractor obligations; (c) pay prepetition employee business expenses; (d) make contributions to prepetition benefit programs provided to the Employees, the most significant of which are described below, and continue such programs in the ordinary course of business with respect to the Employees; (e) honor workers' compensation obligations; (f) make payments for which prepetition payroll deductions were made; (g) pay processing costs and administrative expenses relating to the foregoing payments and contributions; and (h) make payments to third parties incident to the foregoing payments and contributions (collectively, and as described in greater detail below, the "**Employee Wages and Benefits**").

9.    The Debtors also request the Court to authorize the Banks to honor and process check and electronic transfer requests related to the Employee Wages and Benefits.

### I.    Obligations on Account of Workforce Wages and Other Compensation, Business Expenses, Deductions, and Payroll Taxes

### A.    Unpaid Wages and Other Compensation

10.    Historically, the Debtors' gross aggregate payroll liability is approximately $750,000 per month.  Full-Time Employees, the Part Time Employee, and the Independent Contractors are generally paid wages and salaries on a semi-monthly basis, via direct deposit. Payroll is made on the fifteenth (15th) and the last day of each month for the period ending the prior week (the "**Bi-monthly Payroll**").  The remaining members of the Workforce are paid weekly on Thursday or Friday (the "**Weekly Payroll**", and together with the Bi-monthly Payroll, the "**Payroll**").  The Debtors typically fund Payroll one (1) business day in advance of payment through their third-party payroll processor, discussed in further detail below.

11.    The Debtors' last prepetition Bi-monthly Payroll for the period June 15, 2025, through June 30, 2025, was funded on approximately July 2, 2025, in the amount of approximately $82,443.62.  The Debtors' next Bi-monthly Payroll (for the period July 1, 2025, through July 15, 2025) will be paid on approximately July 18, 2025, and is expected to be approximately $82,443.62.

12.    The Debtors' last prepetition Weekly Payroll (for the period June 22, 2025, through June 29, 2025 was funded on or about July 2, 2025, in the amount of approximately $114,000. The Debtors' next Weekly Payroll (for the period June 30, 2025, through July 6, 2025) will be funded on or about July 9, 2025, and is expected to be approximately $114,000.

13.    Based on historical and estimated payroll figures, the Debtors believe that approximately $155,000 in the aggregate remains outstanding, as of the Petition Date, on account

of unpaid accrued wages, salaries, and other compensation due from the Debtors to the Workforce (collectively, the "**Unpaid Wages**").

14.     The Debtors' failure to remit full payment of the amount that the Debtors believe remains outstanding, as of the Petition Date, on account of Unpaid Wages would inflict great financial hardship on the Workforce, and would damage morale and impair the Debtors' chapter 11 efforts.  The Debtors, therefore, request authority from the Court to satisfy any obligations owed to the Workforce on account of Unpaid Wages.

15.     No individual Employee or Independent Contractor will be paid more than $17,150.00, in the aggregate, for any Unpaid Wages, except with respect to any Employees who are statutorily entitled to pay-out of their accrued but unused Paid Time Off (defined below).

**B.     Employee Commissions**

16.     To promote optimal employee performance and reduce attrition, the Debtors have historically maintained a commission-based incentive program for eligible employees (the "**Commissions**").  Under this program, Employees who actively recruit candidates for placement (the "**Recruiters**") and those who manage the client relationships associated with such placements (the "**Account Managers**") are eligible to earn commissions.   Specifically, Recruiters and Account Managers each receive a placement commission equal to 10% of the total placement fee received by the Debtors upon successfully placing a new contract employee with a client.   In addition, Recruiters receive ongoing commissions for managing the relationship with the placed contract employee, while Account Managers earn continuing commissions for overseeing the client relationship.

17.     Commissions are calculated and paid in accordance with a structured commission plan that incorporates distinct performance tiers.  For Recruiters, the commission percentage increases based on the gross profit they generate or manage, ranging from 3% to 10%.

Commissions are paid in the ordinary course of payroll, alongside each employee's regularly scheduled paycheck.

18.     Account Managers are subject to a similar commission structure, though they are eligible to earn higher commission rates.  Depending on the level of revenue generated from the accounts under their management, Account Managers may receive commissions ranging from 4% to 24%.

19.     As of the Petition Date, the Debtors estimate that approximately $1,500 may be owed on account of accrued Commissions in 2025 to current employees (the "**Unpaid Commissions**").  By this Motion the Debtors seek authority, but not direction, to pay all outstanding amounts owed on account of 2025 Commissions due to current employees, and to continue honoring and paying Commissions in the ordinary course of business during the pendency of these chapter 11 cases for current employees.[3]

### C.     Payroll Processor

20.     The Debtors retain ADP, Inc. (the "**Payroll Processor**"), a third-party payroll processor, to administer their payroll.  The Payroll Processor's services are crucial to the smooth functioning of the Debtors' payroll process, and therefore to the Debtors' business operations generally.  The Debtors pay the Payroll Processor approximately $3,000 per month in fees (the "**Payroll Processor Fees**") for its services.  The specific amount owed to the Payroll Processor varies based on the particular services that are provided by the Payroll Processor when running a particular payroll.  The Payroll Processor is paid through an automatic draft.

---

[3]     The Debtors believe that certain current and former employees have asserted amounts for Unpaid Commissions for periods prior to 2025.  For the avoidance of doubt, the Debtors are not seeking authority to pay these outstanding amounts pursuant to this Motion.

21.     The Debtors estimate that, as of the Petition Date,  there are no outstanding amounts due and owing to the Payroll Processor on account of prepetition services, however in an abundance of caution, the Debtors request authority to pay any outstanding amounts due to the Payroll Processor in the ordinary course of business to ensure that the Debtors' payroll process continues to function in a timely and efficient manner and without interruption.

### D.     Employee Expenses

22.     Prior to the Petition Date, and in the ordinary course of the Debtors' business, the Employees incurred various expenses on behalf of the Debtors in the scope of their employment, including, without limitation, expenses for meals, travel, mileage, and other business-related expenses (collectively, the "**Employee Expenses**").  All such expenses are incurred with the applicable Employee's understanding that he or she will be reimbursed by the Debtors in accordance with the Debtors' reimbursement policy.  Pursuant to the reimbursement policy, employees must obtain pre-approval of the expenses to be incurred, complete a reimbursement form, and submit any applicable receipts.  The Debtors, in their sole discretion, may reimburse an Employee for non-standard expenses incurred.

23.     Certain of the Debtors' Employees initially incur the Employee Expenses using personal credit cards, debit cards, or funds and subsequently seek reimbursement from the Debtors. Additionally, certain Employees incur the Employee Expenses through corporate credit cards issued by CenterCard (the "**Corporate Cards**").

24.     The Employee Expenses were incurred on the Debtors' behalf and with the understanding that the Employees would be reimbursed for any and all such amounts.  Therefore, to avoid harming the Employees who incurred the Employee Expenses, the Debtors seek authorization, but not direction, to continue reimbursing the Employees for the Employee

Expenses in the ordinary course of business and in accordance with their prepetition practices and policies, regardless of when such obligations accrued.

25.     It is difficult for the Debtors to determine the exact amount of Employee Expenses outstanding as of the Petition Date because, among other things, the Employees may have expenses that they have yet to submit to the Debtors for reimbursement.  On average, over the past year, the Debtors have paid approximately $5,000 per month on account of the Employee Expenses.[4]

### E.     Wage Deductions, Trust Fund Taxes, and Payroll Taxes

26.     During each applicable pay period, the Debtors routinely deduct certain amounts from the Workforce's compensation that represent earnings that judicial or government authorities, or the Workforce, have designated for deduction, including, but not limited to: (a) garnishments, child support, and similar deductions, and (b) other pre-tax and after-tax deductions payable pursuant to certain of the Workforce benefit plans discussed herein, such as health care benefits, insurance premiums, legally ordered deductions, and other miscellaneous deductions (collectively, the "**Wage Deductions**"), and forward those amounts to various third-party recipients.  On average, the Debtors have historically deducted, in the aggregate, approximately $70,000 semi-monthly in Wage Deductions from the Workforce's pay.  The Debtors do not believe that, as of the Petition Date, there are any amounts that have not been remitted to the various third-party recipients on account of the Wage Deductions for current employees for 2025.

---

[4]     The Debtors believe that certain current and former employees have asserted amounts for Employee Expenses for periods prior to 2025.  For the avoidance of doubt, the Debtors are not seeking authority to pay these outstanding amounts pursuant to this Motion.

27.     The Debtors seek authority to continue to forward prepetition Wage Deductions to the applicable third-party recipients on a postpetition basis in the ordinary course of their business, as routinely done prior to the Petition Date, for current employees.

28.     Furthermore, the Debtors are required by law to withhold from the Workforce's pay certain amounts related to, among other things, federal, state, and local income taxes and social security and Medicare taxes (collectively, the "**Trust Fund Taxes**") for remittance to the appropriate federal, state, or local taxing authorities.  The Debtors must then match from their own funds for social security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "**Payroll Taxes**").  The Debtors remit Trust Fund Taxes and Payroll Taxes to the Payroll Processor after each payroll, and the Payroll Processor holds such amounts until they are paid to the appropriate authority.

29.     The Debtors believe that, as of the Petition Date, there are no outstanding amounts on account of 2025 Trust Fund Taxes and the Payroll Taxes for the Debtors' current Employees. The Debtors seek to remit and pay such amounts for current Employees in the ordinary course of business, for the reasons set forth herein.

30.     By this Motion, the Debtors seek authority, but not the direction, to remit Wage Deductions, Trust Fund Taxes, and Payroll Taxes for current Employees in the ordinary course of business, including, without limitation, amounts determined to be related to the period immediately prior to the Petition Date.[5]

---

[5]     The Debtors have outstanding obligations totaling approximately $1,648,597 related to unpaid employee wage taxes, 401(k) contributions, and other benefit contributions that were not remitted in 2024.  For the avoidance of doubt, the Debtors are not seeking authority to pay these outstanding prepetition amounts pursuant to this Motion.

## II.    Employee Benefits

31.    In the ordinary course of business, the Debtors provide their eligible Employees, directly or indirectly, a number of benefits, including, but not limited to:  (a) medical, dental, and vision insurance; (b) paid sick days, vacation days, holidays, bereavement leave, and other paid time off; (c) a 401(k) retirement plan; and (d) certain other miscellaneous employee benefits, including, but not limited to, life and accidental death & dismemberment insurance, short-term and long-term disability insurance, and certain benefits to certain former Employees after their termination, retirement, or disability leave, including, but not limited to, benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**") (the "**Employee Benefits**").

32.    By this Motion, the Debtors seek authority, but not direction, to: (a) continue to provide the Employee Benefits for their Employees in the ordinary course of business; (b) continue to honor obligations related to the Employee Benefits, including, but not limited to, any premiums and administrative fees; and (c) pay amounts owed related to the Employee Benefits to the extent that they remain unpaid as of the Petition Date.  Certain of the Employee Benefits are discussed below.

### A.    Health Benefits

33.    The Debtors sponsor several health and welfare benefit plans, including medical (including employer contributions to participating Employees' health savings accounts), dental, and vision, for eligible Employees (collectively, the "**Health Benefits**").  The Debtors provide their Employees with a medical plan administered by Blue Cross Blue Shield.  In addition, the Debtors offer dental and vision plans, which are administered by Mutual of Omaha.

34.    Some of the eligible Employees make contributions in connection with the Health Benefits, which are withheld from their wages every payroll cycle.  The Debtors pay an aggregate

amount of approximately $27,500 per month on account of the Health Benefits pursuant to a variety of contracts with third-party insurance administrators and carriers. Certain of these amounts are attributable to the administrative costs of third-party insurance administrators. In addition, the Debtors fund premiums on account of COBRA coverage. The costs of COBRA coverage very from month to month depending on how many Employees are receiving COBRA benefits. Presently, only two (2) Employees are receiving COBRA benefits.

35.    As of the Petition Date, the Debtors estimate that there are no amounts currently due in connection with the Health Benefits and COBRA payments, including any premiums, estimated claims, and administrative costs.

36.    By this Motion, the Debtors seek authority to: (a) continue to provide the Health Benefits and COBRA coverage to the current Employees in the ordinary course of business; (b) continue making contributions and payments to such benefit programs; (c) continue to pay amounts related thereto, including administrative costs (including, without limitation, those of third party insurance administrators); and (d) pay such amounts to the extent that they remain unpaid on the Petition Date.

**B.    Paid Time Off**

37.    The Debtors provide, subject to certain company guidelines, sick days, vacation time, holidays, and other miscellaneous reasons, to all qualifying Employees as a paid-time-off benefit ("**Paid Time Off**"). The amount of Paid Time Off an Employee receives each year depends on the years of service, ranging from twenty (20) to thirty (30) Paid Time Off days. A maximum of five (5) days of Paid Time Off may be rolled over to the following calendar year. Upon termination, there is no payout regarding any unused or outstanding Paid Time Off, unless required by applicable local, state, or federal law.

38.    Subject to the Court's approval of the requested relief, the Debtors intend to comply with their policies and applicable local, state, and federal law related to Paid Time Off.  Through this Motion, the Debtors request authority, but not direction, from the Court to continue to honor their Paid Time Off policies, to comply with applicable local, state, and federal law in the ordinary course of business, and to honor and pay, in their discretion, prepetition amounts related thereto.  On an Interim basis, the Debtors will not pay prepetition obligations in excess of the section 507(a)(4) cap, including on account of Paid Time Off in excess of $17,150.00 in the aggregate, unless required by applicable local, state, or federal law.

### C.    Additional Employee Benefits

### i.    401(k) Plan

39.    The Debtors offer a 401(k) plan for the benefit of their eligible Employees (the "**401(k) Plan**"), which is administered through ADP and Pentegra.  The 401(k) Plan permits Employees to defer a portion of their wages into the 401(k) Plan.  All Employees are eligible to participate in the 401(k) Plan.

40.    On behalf of current Employees enrolled in the 401(k) Plan, subsequent to each pay period, the Company remits to ADP each enrolled Employee's applicable contribution into the 401(k) Plan.

41.    As of the Petition Date, the Debtors believe approximately $5,000 may be owed by the Debtors on account of the 401(k) Plan for current Employees for 2025.  The Debtors seek authorization, but not direction, to continue to pay in the ordinary course of business amounts associated with the 401(k) Plan, including any prepetition amounts determined to be owed for current Employees in 2025 and amounts owed to any 401(k) Plan fiduciaries on behalf of current Employees for 2025.

> ii.     *Life and AD&D Insurance and Disability Benefits*

42.     The Debtors offer basic life and accidental death & dismemberment insurance ("**Life and AD&D Insurance**"), to all eligible Employees through Mutual of Omaha.  The Life and AD&D Insurance are fully funded by the Company and provided to the Employees at no cost.  The Debtors also offer optional short-term and long-term disability insurance ("**Disability Benefits**"), which are fully Employee-paid through payroll deductions.

43.     As of the Petition Date, the Debtors estimate that, inclusive of unpaid premiums and administrative costs, approximately $9,000 in the aggregate is currently owed on account of the Life and AD&D Insurance and the Disability Benefits.  The Debtors seek authorization, but not direction, to continue to pay in the ordinary course of business amounts associated with the Life and AD&D Insurance and the Disability Benefits, including prepetition amounts determined to be owed.

### III.     Workers' Compensation Program

44.     Under applicable state law, the Debtors are required to maintain worker's compensation insurance programs to provide their Employees with workers' compensation insurance coverage for claims arising from or related to their employment with the Debtors (the "**Workers' Compensation Program**").  The Debtors maintain the Workers' Compensation Program through QBE Insurance Companies (the "**WC Policy**").  The Debtors' annual cost of administering the Workers' Compensation Program is approximately $230,000, and the WC Policy was most recently renewed on March 1, 2025.  Premiums under the WC Policy are paid in monthly installments.  The Debtors estimate that approximately $11,000 will become due and owing under the Workers' Compensation Program during the first twenty-one (21) days of these chapter 11 cases.

45.     To ensure that claims incurred under the Workers' Compensation Program are resolved, the Debtors must pay outstanding prepetition liabilities associated with the Workers' Compensation Program, as well as outstanding WC Policy premiums, as such amounts become due and owing.  For the claims administration process in these chapter 11 cases to operate as efficiently as is possible, and to ensure that the Debtors comply with state law requirements, the Workers' Compensation Program must continue in the ordinary course of business.

46.     Accordingly, the Debtors request authority, but not direction, in their discretion, to continue to maintain the Workers' Compensation Program in the ordinary course of business, and to pay prepetition amounts related thereto, including, without limitation, outstanding premiums, deductibles, and fees owed for administrative costs and other amounts required in connection with the program, as such amounts become due in the ordinary course of the Debtors' business.

## BASIS FOR RELIEF

### I.     The Court Should Authorize, but Not Direct, the Debtors, in Their Discretion, to Pay or Otherwise Honor the Employee Wages and Benefits

47.     The Debtors seek the relief requested herein because any delay in paying or otherwise honoring the Employee Wages and Benefits could severely disrupt the Debtors' relationship with the Workforce and irreparably impair the Workforce's morale at a time when their continued dedication, confidence, and cooperation are most critical to the Debtors and the success of these chapter 11 cases.  The Debtors face the risk that the success of these cases and their ability to operate their business without any unexpected or inopportune interruption may be severely jeopardized if the Debtors are not immediately granted authority to pay the Employee Wages and Benefits.

48.     The Workforce is crucial to the operation of a company's business and it is crucial to the success of a chapter 11 case.  The Debtors simply cannot risk the substantial disruption of

their business and affairs that would, in all likelihood, accompany any decline in Workforce morale attributable to the Debtors' failure to pay the Employee Wages and Benefits in the ordinary course of business.  Absent the requested relief, the Workforce would suffer great hardship and, in many instances, financial difficulties, since these monies are needed to enable them to meet their personal obligations.  Additionally, without the requested relief, the Debtors' stability would be undermined by the potential threat that the otherwise loyal Workforce at all levels would seek other employment.

49.    Pursuant to section 507(a)(4) of the Bankruptcy Code, each Employee may be granted a priority claim for:

> allowed unsecured claims, but only to the extent of $17,150 for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for–
>
> > (A)    wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual; or
> >
> > (B)    sales commissions earned by an individual or by a corporation with only 1 employee, acting as an independent contractor in the sale of goods or services for the debtor in the ordinary course of the debtor's business if, and only if, during the 12 months preceding that date, at least 75 percent of the amount that the individual or corporation earned by acting as an independent contractor in the sale of goods or services was earned from the debtor.
>
> 11 U.S.C. § 507(a)(4).

50.    Likewise, under section 507(a)(5) of the Bankruptcy Code, the Workforce may ultimately be granted priority claims for:

> allowed unsecured claims for contributions to an employee benefit plan–

(A)     arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B)     for each such plan, to the extent of–

(i)     the number of employees covered by each such plan multiplied by $17,150; less

(ii)     the aggregate amount paid to such employees under paragraph (4) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

11 U.S.C § 507(a)(5).

51.     The Debtors believe that the Unpaid Wages are entitled to priority status under section 507(a)(4) of the Bankruptcy Code, to the extent such wages do not exceed $17,150.00 per Employee.  The Debtors would therefore be required to pay these claims in full to confirm any chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for wages, salaries, and commissions, and certain allowed unsecured claims for contributions to an employee benefit plan).  Thus, granting the relief requested herein would only affect the timing, and not the amount, of the payment of such amounts to the extent that they constitute priority claims.

52.     Moreover, the vast majority of the Workforce rely exclusively on their full compensation or reimbursement of their wages or expenses to continue to pay their daily living expenses, and these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to pay Unpaid Wages.  Additionally, the Debtors believe that if they are unable to honor such obligations, the morale and loyalty of the Workforce will be jeopardized at a time

when such support is critical to, among other things, their chapter 11 efforts and their ability to effectively prosecute these chapter 11 cases.

53.     Additionally, the Wage Deductions, Trust Fund Taxes, and Payroll Taxes principally represent portions of the Employees' pay that governments (in the case of the Trust Fund Taxes and Payroll Taxes), the Employees (in the case of the voluntary Wage Deductions), and certain authorities (in the case of the involuntarily Wage Deductions) have designated for deduction from the Employees' pay.  The Debtors' failure to pay these amounts could result in hardship to certain Employees and an administrative burden for the Debtors.  Indeed, the Debtors would expect inquiries from garnishors regarding any failure by the Debtors to submit, among other things, child support and alimony payments that are not the Debtors' property but, rather, have been withheld from the Employees' pay on such parties' behalf.  Moreover, if the Debtors cannot remit these amounts, the Employees may face legal action due to the Debtors' failure to submit such payments.

54.     The Workforce is essential, among other things, to the orderly and successful prosecution of these chapter 11 cases and to avoid any unexpected or inopportune interruption of the Debtors' business operations.  They have an intimate knowledge of the Debtors' infrastructure and operations, and any deterioration in the Workforce's morale and welfare at this critical time undoubtedly would adversely impact the Debtors and the success of these chapter 11 cases.

55.     Finally, maintaining the Workers' Compensation Program is justified because applicable state law mandates this coverage.  Furthermore, with respect to any claims related to the Workers' Compensation Program, the risk that eligible claimants will not receive timely payments with respect to employment-related injuries could have a devastating effect on the financial well-being and morale of the Employees and their willingness to remain in the Debtors'

employ.  Entry of the Proposed Orders will alleviate any such concerns, as it will allow the Debtors to avoid any unexpected or inopportune interruptions to their business operations and enable them to maximize the value of the estates for the benefit of all stakeholders.

56.     For these reasons, the Debtors submit that the relief requested herein is necessary, prudent, and in the best interests of the Debtors, their estates, and creditors, and should therefore be granted.

## II.     The Court Should Authorize the Banks to Honor and Process the Debtors' Payments on Account of the Employee Wages and Benefits

57.     The Debtors also request the Court to authorize the Banks, when requested by the Debtors, in their discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations described herein, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Debtors further request that all of the Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

## SATISFACTION OF BANKRUPTCY RULE 6003(b)

58.     Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one (21) days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  The Debtors believe that, among other things, the success of their chapter 11 efforts will require the continued focus and dedication of the Workforce, as any deterioration in employee morale or significant loss in workforce will have an adverse impact on the Debtors' ability, among other things, to continue to operate their business without any unexpected or inopportune interruption and to successfully

prosecute these chapter 11 cases.  Thus, if the relief requested herein is not granted, the failure to satisfy the Employee Wages and Benefits would cause the Debtors' estates immediate and irreparable harm by detracting from, and potentially derailing, the Debtors' chapter 11 efforts.

59.     For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied, and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

60.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As provided herein, and to implement the foregoing successfully, the Debtors request that the Proposed Orders include a finding that the Debtors have established cause to exclude such relief from the fourteen (14)-day stay period under Bankruptcy Rule 6004(h).

61.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14)-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Orders.

### RESERVATION OF RIGHTS

62.     Nothing in the Proposed Orders or this Motion:  (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; or (c) shall be construed as a promise to pay a claim.

## NOTICE

63.     Notice of this Motion has been provided to: (i) the U.S. Trustee; (ii) the Debtors' twenty (20) largest unsecured creditors; (iii) counsel to the Debtors' Secured Lenders; (iv) the office of the attorney general for each of the states in which the Debtors operate; (v) the Office of the United States Attorney for the District of Delaware; (vi) the Internal Revenue Service; (vii) the United States Department of Justice (vii) the Banks; and (viii) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Rule 9013-1(m) of the Local Rules of the United States Bankruptcy Court for the District of Delaware.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors request entry of the Proposed Orders, granting the relief requested herein and such other and further relief as is just and proper.

Dated: July 6, 2025
Wilmington, Delaware

**MORRIS JAMES LLP**

*/s/ Carl N. Kunz, III*
Carl N. Kunz, III (DE Bar No. 3201)
Jeffrey R. Waxman (DE Bar No. 4159)
Christopher M. Donnelly (DE Bar No. 7149)
Samantha L. Rodriguez (DE Bar No. 7524)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail:  ckunz@morrisjames.com
        jwaxman@morrisjames.com
        cdonnelly@morrisjames.com
        srodriguez@morrisjames.com

*Proposed Counsel for Debtors and Debtors-in-Possession*

17416710