**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MY JOB MATCHER, INC., *et al.*,[1] | Case No. 25-11280 (___) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO OBTAIN POSTPETITION SENIOR SECURED
SUPERPRIORITY FINANCING, (II) AUTHORIZING THE DEBTORS' LIMITED
USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING
CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSES STATUS,
(IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION
SECURED PARTIES, (V) SCHEDULING A FINAL HEARING,
AND (VI) GRANTING RELATED RELIEF**

The above-captioned affiliated debtors and debtors in possession (collectively, the "**Debtors**"), hereby submit motion (the "**Motion**") for entry of an interim order substantially in the form attached hereto as <u>Exhibit A</u> (the "**Interim Order**") and a final order (the "**Final Order**," and together with the Interim Order, the "**DIP Orders**"), (a) authorizing the Debtors to obtain postpetition senior secured financing on the terms set forth in the DIP Documents (as defined below) and use Cash Collateral (as defined below); (b) granting liens and superpriority administrative expense claims with respect to such postpetition financing; (c) granting adequate protection to the Prepetition Secured Parties (as defined below); (d) modifying the automatic stay

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  My Job Matcher, Inc. (9880); Job.com-HV, Inc. (DE) (5873); Job.com-HV, Inc. (FL) (5873); Job.com-Fortus, Inc. (6145); Job.com-Endevis, Inc. (1956); Job.com-QCI, Inc. (4364); Princeton One-Job.com, Inc. (4752); and Princeton Search L.L.C. (6163).  For purposes of these chapter 11 cases, the Debtors' service address is 1743 Sidewinder Drive, 1st Floor, Park City, Utah 84060.

to the extent necessary to effectuate the terms and conditions of the Interim Order; (e) scheduling a final hearing to consider entry of the Final Order; and (f) granting related relief.

## PRELIMINARY STATEMENT[2]

1.      As announced in connection with the commencement of these chapter 11 cases, on July 6, 2025, the Debtors entered into a stalking horse asset purchase agreement (as amended from time to time and including all exhibits thereto, the "**Stalking Horse APA**"), with Job.com Acquisition Co., LLC, an affiliate of the Prepetition Lenders as the stalking horse purchaser (the "**Stalking Horse Purchaser**") and DIP Lenders.

2.      Under the Stalking Horse APA, the Prepetition Lenders have agreed to assume certain liabilities of the Debtors (including contract cure costs).  The Stalking Horse APA and DIP Financing (as defined herein) contemplate (i) new money loans in the aggregate principal amount of approximately $5,965,000, (ii) roll-up loans in the aggregate principal amount of approximately $3,865,000 representing a roll up on a dollar-for-dollar basis of the bridge financing,[3] and (iii) a credit bid for a total purchase price of $35,000,000 in the aggregate consisting of all outstanding obligations under: (a) the DIP Facility (as defined below) and (b) approximately $25,100,000 of the Prepetition Secured Obligations (as defined below).

3.      By this Motion, the Debtors seek authorization to obtain senior secured postpetition financing (the "**DIP Financing**") and use Cash Collateral on an interim and final basis pursuant to the terms and conditions of that certain DIP Note, by and among the Debtors (each a "**Borrower**"

---

[2]     Capitalized terms used in this Preliminary Statement shall have the meanings ascribed below.

[3]     The exact amount of the new money, including success fees for certain professionals, is $ 5,965,171. Further, the exact amount of the roll-up from the bridge financing is $ 3,865,148.  In order to ensure sufficient funding in the event of variances in either income or expenses aggregating $100,000, the Debtors are seeking approval of postpetition financing in the aggregate amount of $9,900,000.

17414769

and, collectively, the "**Borrowers**"), Serengeti Multi-Series Master LLC-Series ARR, GT Partners Private Credit Finance LLC and GT Monterey Cypress Finance LLC (collectively, the "**DIP Lenders**"), and Ankura Trust Company, LLC (the "**DIP Agent**" and, together with the DIP Lenders, the "**DIP Secured Parties**") which provides for a senior secured superpriority priming debtor-in-possession delayed draw term facility in an aggregate principal amount up to $9,900,000 million (the "**DIP Facility,**" and loans made pursuant to the DIP Facility, the "**DIP Loans**," and the commitments to make DIP Loans thereunder, the "**DIP Commitments**").

4.      The DIP Financing and use of Cash Collateral will provide the Debtors with necessary liquidity, on reasonable terms and with customary budget covenants.  The relief sought in this Motion is critical for the Debtors to pay their ordinary-course operating expenses, finance the costs of these chapter 11 cases, and implement sale transactions that will allow the Debtors to avoid a value-destructive liquidation and preserve the business.  It will also protect the interests of the Debtors' employees.

5.      The Debtors' initial budget (the "**Initial DIP Budget**" and any budget thereafter, a "**DIP Budget**") reflecting the anticipated cash receipts and anticipated disbursements for each calendar week during the period from the hereof (the "**Petition Date**") through and including the end of the 13th week following the Petition Date is annexed to the proposed Interim Order as Annex 3.

6.      As of the Petition Date, the Debtors require immediate access to the DIP Financing and authority to use Cash Collateral to ensure that they have sufficient liquidity to operate their business and pursue a sale transaction.

7.      Several reasons justify the relief requested herein:

- The Debtors are entering chapter 11 with severely limited cash on hand. Immediate access to DIP Financing is therefore critical to ensure the

3

Debtors' smooth entry into chapter 11 and their ability to prudently and safely operate their business during the pendency of these chapter 11 cases.

- The Debtors' proposed interim draw of under the DIP Facility is necessary for the Debtors to avoid immediate and irreparable harm to their estates.

- Negotiations with the proposed DIP Secured Parties were conducted at arm's length and were robust, as demonstrated by the terms of the proposed DIP Financing.  The DIP Facility will provide sufficient liquidity on terms that are within market under the circumstances.

- The Debtors expect that vendors, customers, and their employees will be highly focused on whether these chapter 11 cases are appropriately funded to maximize the greatest possibility of success.

8.      For those reasons and the reasons set forth below, the Debtors respectfully request that this Court grant the relief requested herein.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

10.      On the Petition Date, each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in these chapter 11 cases and no request has been made for the appointment of a trustee or an examiner.

11.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of

4

Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

12.     Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to the filing of these chapter 11 cases is set forth in the *Declaration of Robert J. Corliss in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"),[4] filed contemporaneously herewith and incorporated herein by reference.

## RELIEF REQUESTED

13.     By this Motion, pursuant to sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rule 4001-2, the Debtors request (i) entry of an interim order, substantially in the form of the Interim Order annexed hereto as <u>Exhibit A</u> and (ii) following the Final Hearing (as defined herein), entry of a Final Order granting the following relief:

(i)     authorization for the Debtors to obtain up to $9,900,000 under the "**DIP Facility**, which amount includes, subject to entry of a Final Order, a "roll up" on a dollar-for-dollar basis of $3,865,148 that was borrowed and incurred by the Debtors, and is due and owing, as a result of the bridge financing from and after April 25, 2025 under the Prepetition Credit Agreement (as defined below) (the "**Prepetition Credit Agreement Roll-Up**"),[5] on the terms and conditions set forth in this Interim Order and that certain DIP Delayed Draw Term Loan Promissory Note (the "**DIP Note**," substantially in the form attached hereto as <u>Annex 2</u> and together with this Interim Order, and all appendices, exhibits or schedules hereto and to the DIP Note, including, without limitation, the DIP Budget (as defined below), and all other agreements, instruments, pledge agreements, intercreditor agreements, guarantees, fee letters, control agreements, and other ancillary documents related thereto (including any security agreements, intellectual property security agreements, mortgages or notes) as the same may be amended, restated, supplemented, waived or modified from time to time in accordance with the terms hereof and thereof,

---

[4]     Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the First Day Declaration or the DIP Loan Documents (as defined herein), as applicable.

[5]     The Prepetition Credit Agreement Roll-Up is subject to entry of a Final Order.

collectively, the "**DIP Loan Documents**"),[6] among the Borrowers and the DIP Secured Parties;

(ii)     authorization for the Debtors to execute and deliver the DIP Loan Documents and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

(iii)    authorization for the Debtors to borrow up to $2,000,000 of DIP Loans (the "**Interim Amount**") to be available and funded immediately following the entry of the Interim Order to avoid immediate and irreparable harm to the Debtors and their estates;

(iv)    authorization for the Debtors to grant security interests, liens, and superpriority claims to the DIP Agent, on behalf of itself and the other DIP Secured Parties, to secure all obligations of the Debtors under and with respect to the DIP Facility (collectively, the "**DIP Obligations**");

(v)     authorization for the Debtors, pursuant to sections 105, 361, 362, 363, and 507 of the Bankruptcy Code to use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**");

(vi)    authorization for the Debtors to pay the principal, interest, premiums, fees, Agency Fees, expenses, and other amounts payable under the DIP Loan Documents as such become earned, due and payable; and

(vii)   that this Court (a) hold an interim hearing (the "**Interim Hearing**") to consider the relief sought in the Motion and entry of the proposed Interim Order, and (b) schedule a final hearing (the "**Final Hearing**") to consider entry of the Final Order granting the relief requested in the Motion on a final basis.

**CONCISE STATEMENTS REGARDING DIP FACILITY**
**PURSUANT TO BANKRUPTCY RULE 4001(B) AND LOCAL RULE 4001-2**[7]

14.     In accordance with Bankruptcy Rules 4001(b)–(d) and Local Rule 4001-2(a), the below chart attached hereto as Exhibit B summarizes the significant terms of the proposed Interim Order and the other DIP Loan Documents.

---

[6]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to those terms in the DIP Loan Documents.

[7]     The following summary of the DIP Facility is qualified in its entirety by reference to the applicable provisions of the DIP Note and/or the Interim Order, as applicable. To the extent there are any inconsistencies between this summary and the provisions of the DIP Note or the Interim Order, the provisions of the Interim Order shall control. Any capitalized terms used but not otherwise defined in this summary shall have the respective meanings

17414769

## PREPETITION INDEBTEDNESS

15.     As of the Petition Date, the Debtors had outstanding obligations as summarized below.

16.     *Prepetition Credit Agreement*.  On November 4, 2022, the Debtors entered into that certain Credit and Security Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time through the date hereof, the "**Prepetition Credit Agreement**", and collectively with all other agreements, instruments and documents executed or delivered in connection therewith or otherwise evidencing or securing any Prepetition Secured Obligations (as defined below), each as may be amended, restated, supplemented, or otherwise modified from time to time (collectively, the "**Prepetition Credit Agreement Documents**"), by and among, *inter alia*, (a) My Job Matcher, Inc. as borrower (the "**Prepetition Borrower**"), (b) Debtors Job.com-HV, Inc. (Delaware), Job.com-HV, Inc. (Florida), Job.com-Fortus, Inc., Job.com-Endevis, Inc., Princeton One-Job.com, Inc., Job.com-QCI, Inc., Princeton Search L.L.C., and other subsidiaries of the Prepetition Borrower from time to time party thereto as guarantors (the "**Guarantors**" and, together with the Prepetition Borrower, the "**Prepetition Credit Agreement Loan Parties**"), (c) Ankura Trust Company, LLC, as administrative agent (in such capacity, together with any successor thereto, the "**Prepetition Credit Agreement Agent**"), and (d) Serengeti Multi-Series Master LLC-Series ARR, GT Partners Private Credit Finance LLC and GT Monterey Cypress Finance LLC (collectively, the "**Prepetition Lenders**," and together with the Prepetition Administrative Agent, collectively, the "**Prepetition Secured Parties**"), pursuant

---

ascribed to such terms in the DIP Note or the Interim Order, as applicable.  The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001–2 herein.

17414769

to which the Prepetition Credit Agreement Lenders provided senior secured term loans to the Prepetition Borrower (the "**Prepetition Credit Agreement Loans**").

17.    *Prepetition Secured Obligations.*  As of the Petition Date, the Prepetition Credit Agreement Loan Parties were indebted and liable to the Prepetition Secured Parties, without defense, counterclaim, or offset of any kind under the Prepetition Credit Agreement Loans, in an aggregate principal amount of not less than $42,244,997, plus any other accrued and accruing unpaid interest, fees and expenses owing thereunder (including legal fees and expenses) of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the applicable agreements or applicable law, including all loans, advances, debts, liabilities, principal, interest, fees, charges, expenses, and obligations for the performance of covenants, tasks, or duties or for the payment of monetary amounts owing to the Prepetition Secured Parties by the Prepetition Borrower, of any kind or nature, whether or not evidenced by any note, agreement, or other instrument (collectively, the "**Prepetition Secured Obligations**").

18.    *Prepetition Credit Agreement Guarantees.*  Pursuant to the Prepetition Credit Agreement Documents, the Guarantors unconditionally and irrevocably guaranteed, on a joint and several basis, each as a primary obligor and not merely as a surety, the repayment of Prepetition Secured Obligations to the Prepetition Credit Agreement Agent for the benefit of the Prepetition Secured Parties.

19.    *Prepetition Credit Agreement Liens.*  Pursuant to the Prepetition Credit Agreement Documents, the Prepetition Secured Obligations are secured by legal, valid, binding, perfected, enforceable and nonavoidable first priority security interests in and liens upon (the "**Prepetition Liens**") the Collateral (as defined in the Prepetition Credit Agreement and referred to in this Motion and the Interim Order as the "**Prepetition Collateral**").

20.     *Venture Debt Loans.*  Certain of the Debtors are party to the: (a) Business Loan and Security Agreement dated July 26, 2024 with Venture Debt, LLC ("**Venture Debt**") and (b) Business Loan and Security Agreement dated July 30, 2024 with Venture Debt (together, the "**Venture Debt Loans**").  Non-debtor MJM Tech and certain of its non-Debtor affiliates are also borrowers and/or guarantors of the Venture Debt Loans.  The Venture Debt Loans provided short-term financing to the Debtors in the original principal amount of $2,324,040.  As of the Petition Date, the Debtors owe Venture Debt approximately $1,500,000 on account of the Venture Debt Loans.

21.     *Merchant Cash Advances.*  Prior to the Petition Date, the Debtors entered into certain merchant cash advance agreements (collectively, the "**MCA Agreements**") with Gold Capital USA, Cedar Advance LLC, and Capital Assist, LLC (collectively, the "**MCAs**").  Pursuant to the MCA Agreements, the MCAs advanced certain amounts in exchange for a promise to repay a greater amount as and when the Debtors collected certain future receipts.  The various MCA Agreements are styled as a sale of future receipts, but the Debtors believe that they are loans.  As of the Petition Date, approximately $608,000 remains outstanding under the MCA Agreements.

22.     *SOJA Notes.*  Debtors Job.com and PrincetonOne are parties to note purchase agreements with SOJA Ventures LLC and certain of its affiliates ("**SOJA**")[8] dated as of February 15, 2022 and March 7, 2024 (the "**SOJA Notes**").  Non-debtor MJM Tech is a co-borrower on certain of the SOJA Notes.  As of the Petition Date, the total amount of principal and interest owed by the Debtors on account of the SOJA Notes is approximately $2,459,000.  According to available records, the SOJA Notes are unsecured since the collateral rights purportedly granted thereunder are contingent upon not violating the Prepetition Credit Agreement Documents and the SOJA

---

[8]     SOJA holds certain warrants in non-Debtor MJM Tech.

Notes would do so.  Therefore, to the extent the SOJA Notes are valid obligations of the Debtors (which the Debtors assert that they are not), they are unsecured.

23.     *Trade and Other Unsecured Debt.*  The Debtors also have other unsecured claims outstanding as of the Petition Date, including ordinary course trade claims.  As of the Petition Date, the Debtors estimate these unsecured claims total approximately $20 million.

### DEBTORS' IMMEDIATE NEED FOR DIP FINANCING AND ACCESS TO CASH COLLATERAL

24.     As stated in the First Day Declaration, the Debtors require immediate access to debtor-in-possession financing and Cash Collateral to ensure sufficient working capital to: (a) operate their business and to administer the estates; (b) timely pay administrative expenses incurred during these chapter 11 cases; and (c) deliver a positive message to the Debtors' employees, vendors, suppliers, and customers regarding their ability to achieve their goals in these chapter 11 cases.  Without additional financing and the ability to use Cash Collateral, the Debtors will not have the liquidity needed to operate their business.  Thus, the Debtors require immediate access to the proceeds of the DIP Financing and authority to use Cash Collateral to ensure they have sufficient liquidity to operate their business as a going concern and to avoid immediate and irreparable harm to their estates.

25.     In consultation with their advisors, the Debtors reviewed and analyzed the Debtors' projected cash flows to determine the amount of debtor-in-possession financing needed to fund these chapter 11 cases.  Based on the cash-flow forecast, the Debtors, in consultation with their advisors, compiled the Initial DIP Budget.  The liquidity provided under the proposed DIP Financing, as reflected in the Initial DIP Budget, will enable the Debtors to preserve their value as a going concern, meet their ongoing day-to-day obligations, fund the operational and

administrative costs of these chapter 11 cases, and satisfy working capital requirements and other operational expenses, all of which will preserve the value of the Debtors' estates for the benefit of their stakeholders.

**DEBTORS' EFFORTS TO OBTAIN POSTPETITION FINANCING**

26.    In May 2025, the Prepetition Credit Agreement Agent provided notice to non-debtor subsidiary MJM Tech, Ltd. ("**MJM Tech**") that it was exercising its voting and other rights of ownership with respect to the stock of MJM Tech.  The Prepetition Credit Agreement Agent then removed all then-existing members of the Debtors' board of directors with immediate effect, appointed a sole independent director (the "**Independent Director**") of each of the Debtors' boards, and appointed a new Chief Executive Officer.  Following these changes to the Debtors' governing body, the Debtors engaged in negotiations with the Prepetition Lenders to fund the Debtors' immediate liquidity constraints.  Such negotiations resulted in crucial bridge financing.

27.    Subsequently, the Debtors, with the assistance of their advisors, explored various restructuring or transactional opportunities to stabilize the Debtors' capital structure and allow the business to continue as a growing concern and grow as a viable enterprise.  The Debtors and their advisors ultimately concluded that commencing these chapter 11 cases and a court-approved sale process (the "**Sale Process**") was the only viable path to preserving and maximizing the value of the Debtors' assets.  In furtherance thereof, the Debtors retained Configure Partners, LLC, an experienced investment banking firm, to assist with the Sale Process.  The Debtors also engaged in discussions with the Prepetition Lenders regarding the Sale Process and the commencement of these chapter 11 cases, which culminated in the execution the Stalking Horse APA and the DIP Facility.

17414769

28.     After extensive, arm's-length negotiations with the Independent Director and the Prepetition Secured Parties, these discussions culminated in an agreement between the Debtors, and the Stalking Horse Purchaser, an affiliate of the Prepetition Lenders, which will serve as the stalking horse bidder in a Sale Process pursuant section 363 of the Bankruptcy Code, subject to Court approval.  As part of the purchase price, the Prepetition Lenders have also agreed to assume certain liabilities (including contract cure costs).  The key components of the DIP Financing and the Stalking Horse APA include (i) new money loans in the aggregate principal amount of approximately $5,965,000, (ii) roll-up loans in the aggregate principal amount of approximately $3,865,000 representing a roll up on a dollar-for-dollar basis of the bridge financing, (iii)  a credit bid for a total purchase price of $35,000,000 consisting of: (a) all outstanding obligations under the DIP Facility and (b) a portion of the Prepetition Secured Obligations.  It is unlikely that the Debtors could obtain this level of credit on more attractive terms.  Accordingly, the DIP Financing, taken as a whole, is reasonable under the facts and circumstances and is the Debtors' best option.

## RELIEF REQUESTED SHOULD BE GRANTED

### A.     Entry into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment

29.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Note, obtain access to the proceeds of the DIP Facility, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the

17414769

business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at \*14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, among other things, an exercise of "sound and reasonable business judgment"); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

30.     Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re*

*Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007).

31.     In determining whether the Debtors have exercised sound business judgment in entering into the DIP Loan Documents, the Court should consider the economic terms of the DIP Financing under the totality of circumstances.  *See* Hr'g Tr. at 734:23-35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. February 27, 2009) (recognizing that "the terms that are now available for DIP financings in the current economic environment aren't as desirable" as they once were previously); *Unsecured Creditors Comm. v. First Nat'l Bank & Tr. (In re Elingsen McLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard" bargains to acquire funds for its reorganization), *aff'd*, 834 F.2d 599 (6th Cir. 1987). Moreover, the Court may appropriately take into consideration noneconomic benefits to the Debtors offered under the proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.   That which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

32.     The Debtors' decision to enter into the DIP Note is an exercise of their sound business judgment.  As further discussed in the First Day Declaration, the DIP Financing is the product of arm's-length negotiations.  Given the Debtors' current cash position, absent access to

14

the proceeds of the DIP Facility, the only alternative path available to the Debtors is liquidation, which would be detrimental to all stakeholders.  In light of the foregoing, the Debtors and their advisors determined that the DIP Financing was the best path forward under the totality of circumstances, and the Debtors believe that they have obtained the best financing available. Moreover, the DIP Financing facilitated the Debtors' entry into the Stalking Horse APA, which provides the Debtors with a pathway through these chapter 11 cases.

33.     Accordingly, the Debtors submit that entry into the DIP Note and DIP Facility is in the best interests of the Debtors' estates, is necessary to preserve the value of estate assets, and is a reasonable exercise of their business judgment.

**B.     Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

34.     The Debtors propose to obtain DIP Financing by providing security interests and liens as set forth in the DIP Loan Documents and described above.  The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to incur secured or superpriority debt under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien . . . .

11 U.S.C. § 364(c).

17414769

35.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (finding that secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon a showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co.*, 789 F.2d, at 1088; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (finding that superpriority administrative expenses should be authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley Inc.*, 99 B.R. 117 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (finding that credit was unavailable absent a senior priming lien because the debtor had made unsuccessful contact with other financial institutions in the relevant geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact that two national banks refused to grant unsecured loans was sufficient to support the conclusion that the requirements of section 364 were met); *In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and finding that debtor made reasonable efforts to satisfy the requirements of section 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

36. Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (*i.e.*, by allowing a lender only an administrative claim);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*, 115 B.R. at 37–40; *Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

37. As described above and in the First Day Declaration, the Debtors do not believe alternative financing is presently available on more favorable terms. Thus, the Debtors determined that the DIP Financing provided the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases. Therefore, approving superpriority claims and liens under sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code in favor of the DIP Lenders and to the extent set forth in the DIP Orders is reasonable and appropriate.

38. Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately

17414769

protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the prepetition secured parties support the priming or (b) the prepetition secured parties' interests in collateral are adequately protected.

39.     Most importantly, here, the priming is consensual. The Prepetition Lenders support the priming of their Prepetition Collateral in exchange for an adequate protection package. Further, the Debtors do not believe any available financing on equal or better terms from the DIP Lenders would be available absent the granting of first-priority priming liens on the Prepetition Collateral. Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code—that alternative credit on more favorable terms be unavailable to the Debtors—is satisfied.

### C.     Interests of the Prepetition Lender Are Entitled to Adequate Protection

40.     Parties with an interest in cash collateral are entitled to adequate protection. *See* 11 U.S.C. § 363(e). Adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement or additional liens or administrative claims. Thus, what constitutes adequate protection is decided on a case-by-case basis. *See, e.g.*, *RTC v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

17414769

41.     The Adequate Protection provided to the Prepetition Lenders is consensual and appropriately safeguards the Prepetition Lenders from the diminution in the value (if any) of their interests in the Prepetition Collateral.  The Debtors submit that its provision of Adequate Protection to the Prepetition Lenders is fair and reasonable and is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**D.    Debtors Should Be Authorized to Use Cash Collateral**

42.     For the reasons set forth herein, the Debtors require use of the Cash Collateral for working capital and to fund their chapter 11 cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

43.     Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See, e.g., In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d at 564; *In re Satcon Tech. Corp.*,

2012 WL 6091160, at *6; *In re N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *14; *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2; *see also In re Dynaco Corp.*, 162 B.R. at 394 (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

44.    As noted above, the Prepetition Lenders have consented to the use of Cash Collateral and the Debtors are providing the Prepetition Lender with adequate protection that (i) is fair and reasonable and (ii) adequately protects the Prepetition Lender's interests in the Prepetition Collateral.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

45.    Pursuant to the DIP Note, the DIP Secured Parties will have a first priority, priming security interest in and lien pursuant to section 364(d)(1) of the Bankruptcy Code on all Prepetition Collateral over any other existing liens or claims, including Prepetition Liens subject only to the Carve-Out and Permitted Prior Senior Liens (as defined in the Interim Order) to which the DIP Secured Parties will have a junior priority lien.

**E.    The Prepetition Credit Agreement Roll-Up Is Appropriate**

46.    The Debtors submit that the Prepetition Credit Agreement Roll-Up, particularly in the broader context of the DIP Financing, is appropriate and reasonable. As discussed in the First Day Declaration, the Prepetition Lenders made it evident in negotiations with the Debtors that the inclusion of roll-up loans was a required part of any DIP facility, and the Prepetition Lenders' commitments to extend such funds to the Debtors provided the financial bridge necessary to reach the broader consensus that made the DIP Financing possible – and indeed, the Prepetition Credit

17414769

Agreement Roll-Up seeks only to roll those amounts advanced to the Debtors from and after May 7, 2025, and is subject to entry of the Final Order.

47.    Given the thorough negotiations with the DIP Lenders and the Debtors' assessment that they were unlikely to find better alternatives given their circumstances, agreeing to the Prepetition Credit Agreement Roll-Up was a reasonable exercise of the Debtors' business judgment.

### F.    Carve-Out Is Appropriate

48.    The liens granted pursuant to the DIP Facility, adequate protection claims, and the superpriority claims of the Prepetition Lenders and the DIP Lenders are subject and subordinate to the Carve-Out and, where relevant, Permitted Prior Senior Liens (as defined in the Interim Order).  The Carve-Out contains similar terms to others that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.

49.    Without the Carve-Out, the Debtors' estates may be deprived of possible rights and powers because the services for which professionals may be paid in these cases is restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees, notwithstanding the grant of superpriority claims and replacement liens as part of the adequate protection of the Prepetition Lender's interests in the Prepetition Collateral.

17414769

**G.     Debtors Should Be Authorized to Pay the Fees Due Under the DIP Loan Documents**

50.     As described herein, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Secured Parties, including any fees payable to the DIP Agent by the Borrowers (collectively, the "**DIP Fees**"), in exchange for their providing, agenting, and/or arranging the DIP Facility.  The terms of the DIP Loan Documents, including the fees, imposed thereunder, are fair and reasonable under these circumstances, are within the market for comparable debtor-in-possession financing, and were negotiated at arm's length.  The Debtors considered the DIP Fees when determining in their sound business judgment whether entry into the DIP Loan Documents constituted the best terms on which the Debtors could obtain sufficient financing for these chapter 11 cases.  The Debtors believe paying these fees in order to obtain the DIP Financing is in the best interests of the Debtors' estates.  Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

**H.     DIP Lenders Should Be Deemed Good Faith Lender Under Section 364(e)**

51.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or the grant of such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

52.     Here, the Debtors believe the DIP Financing embodies the most favorable terms on which the Debtors could obtain postpetition financing.  All negotiations of the DIP Note with the DIP Lenders were conducted in good faith and at arms' length.  The terms and conditions of the DIP Loan Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Orders and the other DIP Loan Documents and in accordance with the DIP Budget (subject to permitted variances).  Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein and in the First Day Declaration.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lenders thus are entitled to all of the protections afforded by that section.

### I.     Modification of Automatic Stay Is Warranted

53.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to, among other things, (a) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default, subject to the "Remedies Notice Period" as set forth in the proposed DIP Orders, for the DIP Secured Parties to exercise any remedies available to them; and (c) implement the terms of the proposed DIP Orders, including payment of all amounts referred to in the DIP Loan Documents.  In the Debtors' business judgment, such relief is reasonable and fair under the present circumstances.

54.     Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances.  *See, e.g.*, *In re Exide Holdings, Inc.*, Case No. 20-11157 (CSS) (Bankr. D. Del.

17414769

May 21, 2020) [D.I. 123]; *In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. January 17, 2019) [D.I. 222]; *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Oct. 9, 2018) [D.I. 184]; *In re NORDAM Grp., Inc.*, No. 18-11699 (MFW) (Bankr. D. Del. July 25, 2018) [D.I. 85]; *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018) [D.I. 130]; *In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 13, 2017) [D.I. 93].

**J.    Debtors Require Immediate Access to DIP Financing and Cash Collateral**

55.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, Courts generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

56.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances. *See, e.g.*, *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr. D. Del. July 29, 2016) (Docket No. 46) (authorizing debtors to obtain postpetition financing on an interim basis); *In re Aspect Software Parent, Inc.*, No. 16-10597 (MFW) (Bankr D. Del. Mar. 11, 2016) (Docket No. 65) (same); *In re Allied Nev. Gold Corp.*, No. 15-10503 (MFW) (Bankr. D. Del. Mar. 12, 2015) (Docket No. 70) (same); *In re QCE Finance LLC*, No. 14-10543 (PJW) (Bankr. D. Del. Mar. 17, 2014) (Docket No. 39) (same); *In re AbitbiBowater, Inc.*, No. 09-11296 (KJC) (Bankr. D. Del. Apr. 17, 2009) (Docket No. 64) (same); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) (Docket No. 88) (same).

57.     As described in the First Day Declaration, as of the Petition Date, absent authority to enter into and access the proceeds of the DIP Facility, even for a limited period of time, the Debtors will be unable to continue operating their business, resulting in a deterioration of value and immediate and irreparable harm to the Debtors' estates.  Thus, the Debtors require immediate access to the proceeds of the DIP Facility, as well as access to Cash Collateral, to finance their operations and continue operating as a going concern during the pendency of these chapter 11 cases.

**K.     Request for Final Hearing**

58.     As stated above, the Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).  The Debtors request a date which is no later than 30 days after the Petition Date to hold a hearing to consider the relief requested herein on a final basis.

## BANKRUPTCY RULE 4001(a)(3) SHOULD BE WAIVED

59.     The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3).  Bankruptcy Rule 4001(a)(3) provides that "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  As explained herein, access to the DIP Facility is essential to prevent irreparable damage to the Debtors' estates.  Accordingly, ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such applies.

## DEBTORS HAVE SATISFIED BANKRUPTCY RULE 6003(b)

60.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use,

25

sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before 21 days after filing of the petition.  Fed. R. Bankr. P. 6003(b).  As described above and in the First Day Declaration, the Debtors risk a significant disruption in business operations and substantial harm to their enterprise absent an immediate infusion of liquidity via the DIP Financing and use of Cash Collateral.  The Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain important customer and vendor relationships, meet payroll, and satisfy working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## REQUEST FOR BANKRUPTCY RULES 6004(a) AND (h) WAIVERS

61.    To implement the foregoing successfully, the Debtors seek waivers of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## RESERVATION OF RIGHTS

62.    Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the

17414769

Debtors, (c) an agreement or obligation to pay any claims, (d) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (e) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any appropriate party in interest's rights to subsequently dispute such claim.

<u>**NOTICE**</u>

63.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors; (iii) counsel to the Prepetition Agent and DIP Agent; (iv) the office of the attorney general for each of the states in which the Debtors operate; (v) the Office of the United States Attorney for the District of Delaware; (vi) the Internal Revenue Service; (vii) the Banks; (viii) the United States Department of Justice; (ix) all known parties with liens of record on assets of the Debtors as of the Petition Date; and (x) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

17414769

## CONCLUSION

WHEREFORE the Debtors request entry of the DIP Orders granting the relief requested herein and such other and further relief as is just and proper.

Dated:  July 6, 2025
        Wilmington, Delaware

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Carl N. Kunz, III (DE Bar No. 3201)
Jeffrey R. Waxman (DE Bar No. 4159)
Christopher M. Donnelly (DE Bar No. 7149)
Samantha L. Rodriguez (DE Bar No. 7524)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail:  ckunz@morrisjames.com
         jwaxman@morrisjames.com
         cdonnelly@morrisjames.com
         srodriguez@morrisjames.com

*Proposed Counsel for Debtors and Debtors-in-Possession*

17414769