## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MY JOB MATCHER, INC., *et al.*,[1] | Case No. 25-11280 (KBO) |
| Debtors. | (Joint Administration Requested) |
| | **Hearing Date: TBD**<br>**Objection Deadline: TBD** |

**DEBTORS' MOTION FOR ENTRY OF (A) AN ORDER (I) SCHEDULING A HEARING ON THE APPROVAL OF THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES OTHER THAN ASSUMED LIABILITIES AND PERMITTED ENCUMBRANCES, AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (II) APPROVING CERTAIN BIDDING PROCEDURES AND ASSUMPTION AND ASSIGNMENT PROCEDURES, AND THE FORM AND MANNER OF NOTICE THEREOF, AND (III) GRANTING RELATED RELIEF; AND (B) AN ORDER (I) APPROVING ASSET PURCHASE AGREEMENT, (II) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES OTHER THAN ASSUMED LIABILITIES AND PERMITTED ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND <u>UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF</u>**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**") hereby submit this motion (this "**Motion**"), pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), for the entry of: (a) an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "**Bidding Procedures Order**"), (i) scheduling a hearing (the "**Sale Hearing**") on approval of the proposed sale (the "**Sale**") of all or substantially all of the Debtors' assets (the "**Assets**"), free and clear of

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: My Job Matcher, Inc. (9880); Job.com-HV, Inc. (DE) (5873); Job.com-HV, Inc. (FL) (5873); Job.com-Fortus, Inc. (6145); Job.com-Endevis, Inc. (1956); Job.com-QCI, Inc. (4364); Princeton One-Job.com, Inc. (4752); and Princeton Search L.L.C. (6163). For purposes of these chapter 11 cases, the Debtors' service address is 1743 Sidewinder Drive, 1st Floor, Park City, Utah 84060.

all Encumbrances other than Assumed Liabilities and Permitted Encumbrances[2] to Job.com Acquisition Co., LLC (the "**Stalking Horse Purchaser**")[3] or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then to the Winning Bidder, and authorizing the assumption and assignment of certain executory contracts and unexpired leases (each, an "**Assumed Contract**," and collectively, the "**Assumed Contracts**") in connection therewith; (ii) authorizing and approving certain bidding procedures for the Sale (collectively, the "**Bidding Procedures**," a copy of which is attached as Exhibit 1 to the Bidding Procedures Order) and certain procedures for the assumption and assignment of the Assumed Contracts (collectively, the "**Assumption and Assignment Procedures**"), and the form and manner of notice thereof; and (iii) granting related relief; and (b) an order, substantially in the form attached hereto as Exhibit B (the "**Sale Order**"), (i) authorizing and approving the Debtors' entry into the Asset Purchase Agreement substantially in the form attached hereto as Exhibit C (the "**Stalking Horse APA**") with the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then an Alternative APA with the Winning Bidder; (ii) authorizing and approving the Sale, free and clear of all Encumbrances other than Assumed Liabilities and Permitted Encumbrances; (iii) authorizing and approving the assumption and assignment of the Assumed Contacts in connection therewith; and (iv) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated as of

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Stalking Horse APA (as defined below) or the Bidding Procedures (as defined below), as applicable.

[3]    The Stalking Horse Purchaser is an affiliate of the Prepetition Lenders and DIP Lenders as such terms are defined in the First Day Declaration (as defined below).

17408212/4

February 29, 2012 (the "**Amended Standing Order**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

## BACKGROUND

3.      On the date hereof (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in these chapter 11 cases and no request has been made for the appointment of a trustee or an examiner.

4.      As set forth in the *Declaration of Robert J. Corliss in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), filed contemporaneously herewith, the Debtors commenced these chapter 11 cases to conduct a sale process for substantially all of their Assets pursuant to section 363 of the Bankruptcy Code (the "**Sale Process**"), which Sale Process is the subject of this Motion.

5.      Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the First Day Declaration.

3

## THE SALE PROCESS

6.      The Debtors have a clear strategy for these chapter 11 cases for the benefit of all stakeholders, including their employees, customers and vendors—the sale of all or substantially all of their Assets through a robust marketing and sale process.  Among other things, the Sale Process will provide a transparent and comprehensive avenue through which the Debtors will seek bids for the Assets.  In connection with the Sale Process, the Stalking Horse Purchaser, which is an entity formed by pre-petition lenders, Serengeti Multi-Series Master LLC—Series ARR, GT Partners Private Credit Finance LLC and GT Monterey Cypress Finance LLC, for the purpose of this transaction (together, "**Serengeti-Ghost Tree**"), has submitted a binding credit bid for the Purchased Assets in the form of the Stalking Horse APA.

7.      The Stalking Horse APA, which is described more fully below, will serve as the baseline for all prospective bidders to negotiate from, and will be subject to higher or otherwise better bids for the Assets pursuant to the Bidding Procedures.  Thus, upon the completion of the Sale Process, the Debtors will have fully market tested the value of their Assets.  To enable the Debtors to fund the administration of these chapter 11 cases and pursue the Sale Process, the Debtors have also negotiated and obtained post-petition financing from Serengeti-Ghost Tree in the form of a $9,900,000 debtor-in-possession financing facility.

8.      As part of the Debtors' efforts to ensure that they secure a value-maximizing transaction for their Assets, prior to the Petition Date, the Debtors retained Configure Partners, LLC ("**Configure**"), an experienced investment banker in the Debtors' industry, to canvass the market for interested buyers.  These chapter 11 cases were then initiated to effectuate the Sale Process, consistent with the milestones (collectively, the "**DIP Financing Milestones**") established by the Debtors' debtor-in-possession financing facility and the Stalking Horse APA.

9.      Shortly after the Petition Date, Configure will commence the formal post-petition marketing process for the Assets by circulating a "teaser" to various prospective strategic, financial and hybrid buyers.  The teaser will include a brief description of the Assets and the Sale Process, and will be accompanied by a form non-disclosure agreement (an "**NDA**").  In addition, shortly after the filing of this Motion, Configure will populate an electronic data room with related diligence information.

10.      In furtherance of Configure's ongoing efforts to actively market the Assets for sale, and consistent with the DIP Financing Milestones and the Stalking Horse APA, the Debtors have filed this Motion seeking authority to proceed with a bidding and auction process to consummate a sale (or series of sales) that the Debtors expect will generate maximum value for their Assets. To facilitate the Sale, the Debtors and their professional advisors have developed certain customary bidding procedures (*i.e.*, the Bidding Procedures) to preserve flexibility in the Sale Process, generate the greatest level of interest in the Assets, and result in the highest or otherwise best value for those Assets.  Among other things, these procedures, in the Debtors' business judgment, create an appropriate timeline for the Sale Process, consistent with the DIP Financing Milestones and the Stalking Horse APA.

## STALKING HORSE APA

11.      The Stalking Horse APA, which the Debtors and the Stalking Horse Purchaser have negotiated in good faith and at arm's length, will serve as a baseline for all prospective bidders for the Assets to negotiate from.  Given the exigencies of the Debtors' financial condition, the timely sale of the Assets, in accordance with the DIP Financing Milestones and the timeline contemplated by the Stalking Horse APA, is the best way to avoid a fire-sale liquidation of the Assets.  Simply put, such a liquidation would be a worst-case scenario for all of the Debtors' economic

5

stakeholders.  The Debtors believe that consummation of the Stalking Horse APA, subject to higher or otherwise better offs, will maximize value for the Debtors' estates, and provide for the continuation of the jobs of a significant portion of the Debtors' employees and afford the Debtors the best possible opportunity to continue to service their customers and maintain and expand their business relationships.

12.     As set forth in the First Day Declaration, since approximately May 7, 2025, the Debtors have managed their pre-petition restructuring efforts through, and with the oversight of, a seasoned and exceptionally qualified disinterested and independent director, David Mack (the "**Independent Director**").  As described more fully in the First Day Declaration, the Independent Director has and will oversee the Company's restructuring process, including the negotiation and documentation of the Stalking Horse APA.  On numerous occasions throughout the process, the Independent Director and the Debtors' independent professional advisors not only reviewed, analyzed, and discussed the proposed stalking-horse bid received from the Stalking Horse Purchaser for the Assets, but also considered and analyzed other strategic alternatives available to the Debtors under the circumstances.  Following weeks of analysis and process, the Independent Director approved the Debtors' entry into the Stalking Horse APA, and determined that pursuing a sale of the Assets pursuant to the Bidding Procedures and executing the Stalking Horse APA provided the best opportunity to maximize value.

13.     As discussed throughout this Motion, the Bidding Procedures were designed with the objective of generating the greatest level of interest in and best value for the Assets, while allowing the Debtors to close the Sale in a timely and efficient manner.  The Debtors and their professional advisors are confident that the Bidding Procedures and the other relief requested herein will facilitate the sale of the Assets for the highest or otherwise best value, preserve as many

jobs as possible for their dedicated employees, afford the Debtors the best possible opportunity to continue their relationships with their customers, and otherwise maximize recoveries for all stakeholders.  Finally, the robust auction and sale process contemplated by the Bidding Procedures will also serve as a market test to ensure that the Stalking Horse APA is a value-maximizing transaction.

14.     Among other things, the Stalking Horse APA contemplates the Stalking Horse Purchaser credit bidding Serengeti-Ghost Tree's secured debt, assuming certain liabilities and executory contracts and unexpired leases of the Debtors, and satisfying cure costs.  The Stalking Horse APA also includes various customary representations, warranties and covenants by and from the Debtors and the Stalking Horse Purchaser, and certain conditions to closing and rights of termination related to the Sale and these chapter 11 cases generally.  The transactions contemplated by the Stalking Horse APA are subject to approval by the Court and entry of the Bidding Procedures Order and the Sale Order.  If the Stalking Horse Purchaser is not the Winning Bidder, it has agreed to serve as the Back-Up Bidder if designated as such in accordance with the Bidding Procedures.

15.     Certain material terms of the Stalking Horse APA, and certain provisions of the Stalking Horse APA that are required to be highlighted pursuant to Local Rule 6004-1, are described below:[4]

---

[4]     Any summary of the Stalking Horse APA contained herein is qualified in its entirety by the actual terms and conditions of the Stalking Horse APA.  To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Stalking Horse APA, the actual terms and conditions of the Stalking Horse APA shall control.

17408212/4

| Key Terms of the Stalking Horse APA | |
|---|---|
| **Stalking Horse Purchaser (APA, page 1)** | Job.com Acquisition Co., LLC, an entity formed by Serengeti-Ghost Tree for the purpose of this transaction. |
| **Purchase Price (APA § 2.06)** | Credit bid of $35,000,000, comprised of (x) the balance outstanding under the DIP Credit Agreement and (y) a portion of the amount due under the Existing Credit Agreement on the closing date. |
| **Purchased Assets (APA § 2.01)** | All of Debtors' properties, rights, claims, and assets (other than the Excluded Assets) of every kind and description, wherever situated or located, real, personal, or mixed, tangible or intangible, whether identifiable or contingent, owned, leased, licensed, used, or held for use in or relating to the business, whether or not reflected on the books and records of the Debtors, as the same shall exist on the Closing Date (the "**Purchased Assets**"). Without limiting the generality of the prior sentence, such Purchased Assets shall include, whether they relate exclusively to the business or not (except where so noted in the following list or in any definition used in the following list) all of the following:<br><br>(i) all inventory of any kind or nature, merchandise and goods, related to the business or Purchased Assets and maintained, held or stored by or for the Debtors on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same, including all disposables and consumables used, or held for use, in connection with the Business, including any goods in transit ("**Inventory**");<br>(ii) all Equipment;<br>(iii) all Assumed Contracts;<br>(iv) all Leased Real Property (and any agreement and rights related thereto or under the applicable Lease to the extent that such agreement or Lease is an Assumed Contract), in each case, together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;<br>(v) any rights of the Debtors to the warranties and licenses received from manufacturers and the Debtors of the Equipment, Improvements or any component thereof;<br>(vi) to the extent transferable, all Permits that relate to the Business or the Purchased Assets, to the extent assignable, including those designated as "Transferred Permits" on Schedule 2.01(f) of the Stalking Horse APA;<br>(vii) all Intellectual Property excluding any Intellectual Property that Debtors license pursuant to a contract that is not an Assumed Contract;<br>(viii) all Accounts Receivable; |

|  | (ix) all Pre-Paid Expenses;<br><br>(x) all goodwill, customer, and referral relationships, other intangible property and all privileges, set-offs, indemnification rights, causes of action, actions, Claims, demands, and rights of any kind as against others (whether by contract or otherwise) relating to, arising from, or associated with any of the Purchased Assets (including the Intellectual Property), the Assumed Liabilities, and the business;<br><br>(xi) to the extent permitted by Legal Requirements, all Documents and other books and records (including financial, accounting, and personnel files), correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape, or other media, and including all computerized data), drawings, engineering, and other technical information and data, and all other business and other records, in each case, that are used or useful in, held for use in or intended to be used in, or that arise in any way out of or are related to, the Purchased Assets, the Assumed Liabilities, or the Business;<br><br>(xii) all claims, interests, rights, rebates, abatements, remedies, recoveries, and benefits of Debtors, and all claims and causes of action, arising under or relating to any of the Purchased Assets, the Assumed Liabilities, or the business, including those arising out of Assumed Contracts, express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors, or others to the extent relating to the operation of the Business or affecting the Equipment, Inventory, or other tangible Purchased Assets or ordered by Debtors prior to the Closing Date (and in any case, any component thereof);<br><br>(xiii) all Avoidance Actions; provided, however, that such Avoidance Actions against current directors, officers, and advisors of Debtors shall have been waived effective as of the Closing Date;<br><br>(xiv) all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments, and investments of the Debtors; provided, however, that prepaid deposits related to professional fee retainers and cash borrowed pursuant to the DIP Credit Agreement to fund the Wind Down Expenses shall not be included;<br><br>(xv) all third-party property and casualty insurance proceeds, to the extent receivable by the Stalking Horse Purchaser or Debtors in respect of the business or the Purchased Assets after the Closing Date;<br><br>(xvi) all rights, but not obligations, under non-disclosure or confidentiality, non-compete, or non-solicitation agreements or key employee retention plans or similar arrangements with (or for the benefit of) employees and agents of Debtors or with third parties (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreements or any key employee |
|---|---|

| | |
|---|---|
| | retention plans or similar arrangements entered into in connection with or in contemplation of the auction contemplated by the Bidding Procedures); |
| | (xvii) all telephone and facsimile numbers, domain names, and directory listings; |
| | (xviii) all assets, if any, listed on Schedule 2.01(s) of the Stalking Horse APA; (regardless of whether such assets are covered by any of the foregoing); and |
| | (xix) all rights to refunds, credits, or other benefits with respect to Taxes paid by Debtors, including those arising under the Assumed Contracts, which refunds are attributable to Pre-Closing Tax Periods, Claims related thereto. |
| **Excluded Assets (APA § 2.02)** | For all purposes of and under this Agreement, the term "**Excluded Assets**" shall consist of only the following items, assets and properties: |
| | (i) the assets, if any, listed on Schedule 2.02(a) of the Stalking Horse APA; |
| | (ii) any Excluded Benefit Plan, and any asset in respect thereof; |
| | (iii) any shares of capital stock or other equity interest in or issued by Debtors or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by Debtors or any records regarding same (including minute books or stock or membership interest certificates); |
| | (iv) subject to Section 2.01(l) of the Stalking Horse APA, the limited liability company, partnership and corporate books and records of internal limited liability company, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers, Tax records, work papers and other records of Debtors as they pertain to ownership, organization, qualification to do business or existence of Debtors; provided, however, that copies of the foregoing items (including copies of Tax records and work papers of Debtors) shall be made available by Debtors to Stalking Horse Purchaser; |
| | (v) Documents that Debtors are required by Legal Requirements to retain; |
| | (vi) any Contract or other obligation of Debtors that is not an Assumed Contract; |
| | (vii) any prepaid deposits related to professional fee retainers and all cash used to fund the Wind Down Expenses; |
| | (viii) all current and prior director and officer insurance policies of Debtors and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries; and |
| | (ix) any rights, claims or causes of action of Debtors under this Agreement or any other Transaction Document. |
| **Assumed Liabilities (APA § 2.03)** | Subject to entry of the Sale Order, upon the terms and subject to the conditions of the Stalking Horse APA, on the Closing Date, Stalking Horse Purchaser shall, effective at the time of the |

| | |
|---|---|
| | Closing, assume and agree to discharge and perform when due, the following Liabilities (the "**Assumed Liabilities**"):<br><br>(i) all Liabilities from and after the Closing from or relating to the Purchased Assets and the ownership and operation thereof;<br>(ii) all Liabilities arising from or relating to the Assumed Contracts and all Cure Costs relating to Assumed Contracts;<br>(iii) all Liabilities arising from and after the Closing with respect to Stalking Horse Purchaser's employees (including those arising under the Assumed Benefit Plans arising from and after the Closing);<br>(iv) all Transfer Taxes; and<br>(v) all outstanding Trade Payables related to the Purchased Assets incurred in the ordinary course of business after the Petition Date and during these chapter 11 cases. |
| **Excluded Liabilities (APA § 2.04)** | The Stalking Horse Purchaser is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of the Debtors of whatever nature, whether presently in existence or arising hereafter.  All such other Liabilities shall be retained by and remain Liabilities of the Debtors (all such Liabilities not being assumed being herein referred to as the "**Excluded Liabilities**"). |
| **Record Retention (APA § 5.06); Local Rule 6004-1(b)(IV)(J)** | The Debtors will provide the Stalking Horse Purchaser, its counsel, financial advisors, auditors and other authorized representatives with reasonable access to the offices, properties, books and records, financial and operating data and other information relating to the Debtors' business as set forth in the Stalking Horse APA. |
| **Assignment of Contracts and Rights (APA § 2.05)** | Schedule 2.05(a) of the Stalking Horse APA sets forth a list of all executory contracts to which the Debtors are a party and that are to be included in the Purchased Assets (the "**Assumed Contracts**"). From and after the date of execution of the Stalking Horse APA until the earlier of (i) the date that is one (1) day prior to the Auction and (ii) if there is no Auction, Closing Date, Debtors shall make such deletions to Schedule 2.05(a) as the Stalking Horse Purchaser shall request in writing. Any such deleted contract shall be deemed to no longer be an Assumed Contract, and for the avoidance of doubt, the Stalking Horse Purchaser shall not be responsible for any related Liabilities of the Stalking Horse Purchaser that must be paid or otherwise satisfied, pursuant to Section 365(b) of the Bankruptcy Code, to cure all of the Stalking Horse Purchaser's defaults under the Assumed Contracts at the time of the assumption by and assignment to the Stalking Horse Purchaser of such Assumed Contracts as provided in the Stalking Horse APA (the "**Cure Costs**"). All contracts of the Debtors that are not listed on Schedule 2.05(a) shall not be considered an Assumed Contract or Purchased Asset and shall be deemed "**Excluded Contracts**" provided, that the Stalking Horse Purchaser has the right at any time before the Closing to (x) amend Schedule 2.05(a) to designate any other contract that has not been rejected by the |

Debtors or that has not expired or terminated in accordance with the terms of such contract to be an Assumed Contract, and (y) to remove from Schedule 2.05(a) any Assumed Contract for any reason. The Stalking Horse Purchaser's designation of any Assumed Contract as an Excluded Contract shall not reduce the Purchase Price.

The Debtors shall take all actions reasonably required to assume and assign the Assumed Contracts to the Stalking Horse Purchaser (other than payment of Cure Costs, if so required), including taking all actions reasonably required to obtain an order, which may be the Sale Order, containing a finding that the proposed assumption and assignment of the Assumed Contracts to the Stalking Horse Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code.

If prior to the Closing Date there are contracts or leases that have not been designated as an Assumed Contract or an Excluded Contract, the Debtors shall not assume or reject any such contract or lease pursuant to Section 365 of the Bankruptcy Code and any order of the Court, until the earlier of the date the Stalking Horse Purchaser so directs the Debtors and the Closing Date.

At Closing, (x) the Debtors shall, pursuant to the Sale Order and an assignment and assumption agreement in customary form reasonably acceptable to the parties to the Stalking Horse APA (the "**Assignment and Assumption Agreement**"), assume and assign to the Stalking Horse Purchaser (the consideration for which is included in the Purchase Price) each of the Assumed Contracts that is capable of being assumed and assigned and (y) subject to the terms and conditions of the Stalking Horse APA, the Stalking Horse Purchaser shall pay promptly all Cure Costs (if any) in connection with such assumption and assignment (as agreed to among the Stalking Horse Purchaser and the Debtors or as determined by the Court) and assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Sale Order and the Assignment and Assumption Agreement.

Notwithstanding anything contained in the Stalking Horse APA to the contrary, the Stalking Horse APA shall not constitute an agreement to assign or transfer any contract or any permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof or in any way adversely affect any of the rights of the Stalking Horse Purchaser, as the assignee or transferee of such contract or permit (as the case may be) thereunder. If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and

| | |
|---|---|
| | the commercially reasonable efforts of the Debtors, such consent or approval is required but not obtained with respect to an Assumed Contract or a permit, neither the Debtors nor the Stalking Horse Purchaser shall be in breach of the Stalking Horse APA nor shall the Purchase Price be adjusted nor shall the Closing be delayed in respect of the Assumed Contracts or the permits; provided, however, if the Closing occurs, then, with respect to any Assumed Contract or permit for which consent or approval is required but not obtained, for a period of sixty (60) days from and after the Closing, the Debtors shall cooperate, without further consideration, with the Stalking Horse Purchaser in any commercially reasonable arrangement the Stalking Horse Purchaser may request to provide Stalking Horse Purchaser with all of the benefits of, or under, the applicable Assumed Contract or applicable permit, including enforcement for the benefit of Stalking Horse Purchaser of any and all rights of the Debtors against any party to the applicable Assumed Contract or applicable permit arising out of the breach or cancellation thereof by such party; provided, however, to the extent that any such arrangement has been made to provide Stalking Horse Purchaser with the benefits of, or under, the applicable Assumed Contract or applicable permit, from and after Closing, the Stalking Horse Purchaser shall be responsible for, and shall promptly pay all payment and other Liabilities under such Assumed Contract or permit (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Assumed Contract or permit had been assigned or transferred at Closing with respect to Assumed Contracts and permits, and at such applicable later date specified in this Section 2.05(e) with respect to any additional Assumed Contracts. Any assignment to the Stalking Horse Purchaser of any Assumed Contract or permit that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any person for such assignment as aforesaid shall be made subject to such consent or approval being obtained. |
| **Authorization to Credit Bid Local Rule 6004-1(b)(iv)(N)** | Purchase Price includes credit bit of the DIP Obligations, DIP Liens, DIP Superpriority Claim, and all or a portion of the Prepetition Secured Obligations, each as defined in the DIP Order. |
| **Auction and Competitive Bidding Local Rule 6004-1(b)(iv)(D)** | An Auction is contemplated in these chapter 11 cases.   The Debtors will be soliciting competing offers for the Assets and will not otherwise limit shopping of the Assets. |
| **Sale of Unexpired Leases Free and Clear;   Local   Rule   6004-1(b)(iv)(M)** | None. |

13

| | |
|---|---|
| **No Successor Liability (APA § 5.10); Local Rule 6004-1(b)(iv)(L)** | The Debtors are seeking to sell the Purchased Assets free and clear of successor liability claims. |
| **Sale to Insider** **Local Rule 6004-1(b)(iv)(A)** | The Stalking Horse Purchaser is not an "insider" of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code. |
| **Agreements with Management; Local Rule 6004-1(b)(iv)(B)** | None. |
| **Releases; Local Rule 6004-1(b)(iv)(C)** | None. |
| **Good Faith Deposit; Local Rule 6004-1(b)(iv)(F)** | None. |
| **Interim Arrangements with Stalking Horse Purchaser; Local Rule 6004-1(b)(iv)(G)** | None. |
| **Use of Proceeds; Local Rule 6004-1(b)(iv)(H)** | None. |
| **Tax Exemption; Local Rule 6004-1(b)(iv)(I)** | None. |
| **Conditions to Close and Closing Deadline (APA §§ 7.01 and 7.02); Local Rule 6004-1(b)(iv)(E)** | Conditions to the Obligations of the Debtors. The obligations of the Debtors to consummate the transactions contemplated by the Stalking Horse APA are subject to the satisfaction (unless waived in writing by the Debtors) of each of the following conditions on or prior to the Closing Date: <br><br> (i) the representations and warranties of the Stalking Horse Purchaser contained in the Stalking Horse APA shall be true and correct in all material respects on and as of the Closing Date. The Debtors shall have received a certificate of the Stalking Horse Purchaser to such effect signed by a duly authorized officer thereof; <br> (ii) the Stalking Horse Purchaser shall have performed and complied in all material respects with all covenants and obligations under the Stalking Horse APA to be performed or complied with by it on or prior to the Closing Date. The Debtors |

14

17408212/4

|  | shall have received a certificate of the Stalking Horse Purchaser to such effect signed by a duly authorized officer thereof; <br><br> (iii) no governmental authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the Closing; and <br><br> (iv) the Court shall have entered the Sale Order and such Sale Order shall not be subject to a stay pending appeal; provided however that the Stalking Horse Purchaser may, in its sole discretion, deem this condition to be satisfied notwithstanding any such stay pending appeal. <br><br> <u>Conditions to the Obligation of the Stalking Horse Purchaser</u>. The obligation of the Stalking Horse Purchaser to consummate the transactions contemplated by the Stalking Horse APA is subject to the satisfaction (unless waived in writing by the Stalking Horse Purchaser) of each of the following conditions on or prior to the Closing Date: <br><br> (i) the representations and warranties of the Debtors contained in the Stalking Horse APA, except for any failure to be true and correct that, together with all other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect. The Stalking Horse Purchaser shall have received a certificate of the Debtors to such effect signed by a duly authorized officer thereof; <br><br> (ii) each Debtor shall have performed and complied with all covenants and obligation under the Stalking Horse APA, except for any failure to perform and comply that, together with all other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect (as defined in the Stalking Horse APA). The Stalking Horse Purchaser shall have received a certificate of the Debtors to such effect signed by a duly authorized officer thereof; <br><br> (iii) no governmental authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the Closing; and <br><br> (iv) the Court shall have entered the Sale Order and such Sale Order shall not be subject to a stay pending appeal. |
|---|---|
| **Sale of Avoidance Actions; (APA § 2.01); Local Rule 6004-1(b)(iv)(K)** | The Debtors seek to sell all Avoidance Actions, provided, however, that such Avoidance Actions against current directors, officers, and advisors of the Debtors shall have been waived effective as of the Closing Date |
| **Relief from Bankruptcy Rule 6004(h); Local Rule 6004-1(b)(iv)(O)** | To maximize the value received for the Assets, the Debtors seek to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtors request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d). |

15

16.     The Debtors have also agreed that, as set forth below in the Bidding Procedures, the initial minimum overbid amount shall be at least $250,000 (the "**Initial Minimum Overbid**"), and each subsequent overbid shall be at least $100,000 (the "**Minimum Overbid Amount**").

## BIDDING PROCEDURES[5]

17.     The Debtors are in the process of soliciting bids for all of the Assets in accordance with the Bidding Procedures.  The Bidding Procedures describe, among other things, (i) the Assets available for sale, (ii) the manner in which bids become "qualified," (iii) the coordination of diligence efforts among the bidders and the Debtors, (iv) the receipt and negotiation of bids received, (v) the conduct of any Auction, and (vi) the selection and approval of the Winning Bidder and the selection of the Back-Up Bidder.  The Bidding Procedures reflect the Debtors' objective of conducting the Sale Process in an orderly, fair and open manner, while ensuring that the highest or best bid is generated for the Assets.

18.     Certain of the key terms of the Bidding Procedures, which shall apply to Potential Bidders, Qualifying Bidders, the submission, receipt, and analysis of all bids relating to the Sale, and the conduct of the Sale and the Auction, are included below:

(a)     **Assets to be Sold:** The Debtors shall offer for sale the Assets, provided that the Debtors, in consultation with the Consultation Parties, determine that the aggregate consideration offered by any bid, or combination of bids, for the Assets, satisfies the requirements set forth in these Bidding Procedures.  Potential Bidders may bid on all or any number or combination of the Assets.

(b)     **Participation Requirements**:  Any person or entity that wishes to participate in the bidding process for the Assets (each, a "**Potential Bidder**") must first become a "**Qualifying Bidder**".  To become a Qualifying Bidder, and thus being able to conduct due diligence and gain access to the Debtors' confidential electronic data

---

[5]  Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order.  To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order, the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order shall control.

room concerning the Assets (the "**Data Room**"), a Potential Bidder must submit to the Debtors and their advisors:

i. documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

ii. an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors;

iii. a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with the Consultation Parties, that the interested party has a *bona fide* interest in consummating a sale transaction; and

iv. sufficient information, as determined by the Debtors, after consultation with the Consultation Parties, to allow the Debtors to determine that the interested party (x) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtors in their discretion), and (y) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder to consummate its contemplated transaction.

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) the Stalking Horse Purchaser shall be considered a Qualifying Bidder, and the Stalking Horse APA shall be considered a Qualifying Bid; and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

(c) **Bankruptcy Court Jurisdiction**: By participating in the Sale process, any Potential Bidders and Qualifying Bidders shall: (a) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of such parties; (b) bring any such action or proceeding in the Court; (c) accepts service of all notices and pleadings via electronic mail, and (d) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such

final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

(d)  **Form of Agreement**: Potential Bidders should reference the Stalking Horse APA in connection with their bids.  As set forth below, Potential Bidders intending to submit bids must include with their bids:

    i.  a statement that such Potential Bidder offers to (i) purchase the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the Stalking Horse APA, if applicable; and

    ii.  a clean and duly executed asset purchase agreement (an "**Alternative APA**") and a marked copy of the Alternative APA that reflects any variations from the Stalking Horse APA.

(e)  **Due Diligence**:  The Debtors will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances.  All additional due diligence requests shall be directed to: (a) Configure Partners, LLC, Jay Jacquin (404-448-0010 x101; jjacquin@configurepartners.com), and Matt Guill (404-448-0010 x110; mguill@configurepartners.com); and/or (b) counsel for the Debtors, Jeffery R. Waxman, Esq. (302-888-5842; jwaxman@morrisjames.com) and Vincent Cannizzaro, Esq. (302-888-6867; VCannizzaro@morrisjames.com).

The due diligence period shall extend through and including the Bid Deadline.  The Debtors, in their business judgment, may, but shall not be obligated to, furnish any due diligence information after the Bid Deadline.

The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determines is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder.  The Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors.  The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and the Sale.

(f)    **Bid Requirements**:

    i.    To be deemed a "**Qualifying Bid**,"[6] a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "**Bid Requirement**"):

        a.    be in writing;

        b.    fully disclose the identity of the Qualifying Bidder (and to the extent that the Qualifying Bidder is a newly formed acquisition entity or the like, the identity of the Qualifying Bidder's parent company or sponsor), and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wishes to discuss the bid submitted by the Qualifying Bidder;

        c.    set forth the purchase price to be paid by such Qualifying Bidder;

        d.    not propose payment in any form other than cash (excluding the Stalking Horse Purchaser);

        e.    state the liabilities proposed to be paid or assumed by such Qualifying Bidder;

        f.    specify the Assets that are included in the bid and state that such Qualifying Bidder offers to (i) purchase the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtors and their estate than, the terms set forth in the Stalking Horse APA;

        g.    be accompanied by an Alternative APA that reflects any variations from the Stalking Horse APA;

        h.    state that such Qualifying Bidder's offer is formal, binding and unconditional and is irrevocable until two (2) business days after the closing of the Sale;

        i.    state that such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Alternative APA and provide written evidence in support thereof;

        j.    contain such financial and other information to allow the Debtors to make a reasonable determination, after consultation with the Consultation Parties, as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the

---

[6]    The Stalking Horse APA is a Qualifying Bid for all purposes under these Bidding Procedures.

Alternative APA, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtors to serve such information on any counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale within one (1) business day after the Debtors' receipt of such information. To the extent that the Qualifying Bidder is a newly formed acquisition entity or the like, the financial and other information supporting the Qualifying Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Qualifying Bidder's parent company or sponsor;

k.      identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the transactions contemplated by the Alternative APA;

l.      a commitment to close the transactions contemplated by the Alternative APA by no later than **October 3, 2025;**

m.     not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of fee or payment;

n.      the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) the Purchase Price, and (B) the Minimum Overbid Amount[7];

o.      not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval or due diligence;

p.      contain written evidence satisfactory to the Debtors that the Qualifying Bidder has a commitment for financing or other evidence of the ability to close the transactions contemplated by the Alternative APA, with appropriate contact information for such financing sources;

---

[7]     The minimum Initial Overbid Amount shall be the Purchase Price plus $250,000 and each successive Overbid Amount shall be at least $100,000.

q.    contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale;

r.    sets forth (i) a statement or evidence that the Qualifying Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings, and (ii) any regulatory and third-party approvals required for the Qualifying Bidder to close the transactions contemplated by the Alternative APA, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Qualifying Bidder's Alternative APA, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); provided that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with the Debtors' legal counsel to discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Alternative APA; provided, further that the offer contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

s.    provides for the Qualifying Bidder to serve as a backup bidder (the "**Back-Up Bidder**") if the Qualifying Bidder's bid is the next highest and best bid (the "**Back-Up Bid**") after the Winning Bid, in accordance with the terms of the Alternative APA;

t.    includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Alternative APA;

u.    provides a good faith cash deposit (the "**Deposit**") in an amount equal to ten percent (10%) of the purchase price provided for in the

Alternative APA (or such additional amount as may be determined by the Debtors in their reasonable discretion); provided, however, that the Stalking Horse Purchaser is not required to make a cash deposit; and

v.       provides that in the event of the Qualifying Bidder's breach of, or failure to perform under, the Alternative APA, the Debtors and their estates shall be entitled to retain the Deposit as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a Qualifying Bid. The Debtors reserve the right to work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

ii.     *Bid Deadline*

A Qualifying Bidder, other than the Stalking Horse Purchaser, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Bidding Procedures Notice Parties and the Consultation Parties so as to be received on or before **September 17, 2025 at 4:00 p.m. (ET) (the "Bid Deadline");** provided that the Debtors may extend the Bid Deadline without further order of the Court. To the extent that the Bid Deadline is extended for all parties, the Debtors shall file a notice on the docket of these chapter 11 cases indicating the same. **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

iii.    *Evaluation of Qualifying Bids*.

Debtors, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid.

No later than **September 22, 2025 at 4:00 p.m. (ET)**, the Debtors shall: (i) notify all Qualifying Bidders whether their bids have been determined to be a Qualifying Bid; and (ii) determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid

for purposes of constituting the opening bid of the Auction (the "**Baseline Bid**" and the Qualifying Bidder submitting the Baseline Bid, the "**Baseline Bidder**"), and shall promptly notify any Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid.

iv.    *No Qualifying Bids*.  If no timely Qualifying Bids other than any Stalking Horse Purchaser's Qualifying Bid are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall request at the Sale Hearing that the Court approve the Stalking Horse APA and the transactions contemplated thereunder.

(g)    <u>**Auction**</u>:  If the Debtors timely receive one or more Qualifying Bids other than the Stalking Horse Purchaser's Qualifying Bid, then the Debtors shall conduct an auction (the "**Auction**").  Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding and non-exhaustive factors:  (a) the number, type and nature of any changes to the Stalking Horse APA requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors and their estates of such modifications or delay; (c) the total consideration to be received by the Debtors and their estates; (d) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtors' estates; and (f) any other factors the Debtors may reasonably deem relevant.

The Auction shall be governed by the following procedures:

i.    the Auction shall be held on <u>**September 23, 2025 at 10:00 a.m. (ET)**</u> at the offices of Morris James LLP, 500 Delaware Avenue, Suite 500 Wilmington, DE 19801 or virtually via telephone and/or video conference pursuant to information to be provided by the Debtors to the Auction Participants (as defined below);

ii.    only the Stalking Horse Purchaser and the other Qualifying Bidders with Qualifying Bids (together, the "**Auction Bidders**"), shall be entitled to make any subsequent bids at the Auction;

iii.    the Auction Bidders shall appear at the Auction, or through a duly authorized business representative;

iv.    only the Debtors, the Auction Bidders, the Consultation Parties, the Prepetition Lenders and the DIP Lenders (collectively the "**Lenders**"), and any creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction (collectively, the "**Auction Participants**"); provided that any such creditors provide counsel for the

Debtors written notice of their intent to attend the Auction no later than 10:00 a.m. (ET) the day prior to the Auction;

v. the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed;

vi. the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction or the Sale;

vii. bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of at least $100,000, provided that: (i) each such successive bid must be a Qualifying Bid; and (ii) the Debtors shall retain the right to modify the bid increment requirements at the Auction;

viii. the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

ix. all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid;

x. the Debtors and their professional advisors may employ and announce at the Auction additional procedural rules that the Debtors determine are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent bids) for conducting the Auction;

xi. the Auction Bidders shall have the right to make additional modifications to the Stalking Horse APA or any Alternative APA, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of the Stalking Horse APA, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Winning Bid or the Back-Up Bid, which shall remain binding as provided for herein;

xii. the Debtors and the Consultation Parties shall have the right to request any additional financial information that will allow the Debtors and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions

24

contemplated by the Stalking Horse APA or any Alternative APA, as applicable, as may be amended during the Auction, and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

xiii.    upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest or best from among the Qualifying Bids submitted at the Auction (the "**Winning Bid**"). In making this decision, the Debtors shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the assumption of liabilities, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Stalking Horse APA or any Alternative APA submitted with the Winning Bid, as applicable, requested by each bidder, and the net benefit to the Debtors' estate. The bidder submitting such Winning Bid at the Auction shall become the "**Winning Bidder**," and shall have such rights and responsibilities of the purchaser as set forth in the Stalking Horse APA or any Alternative APA, as applicable. The Debtors may, in their business judgment, designate the Back-Up Bid (and the corresponding Back-Up Bidder) to purchase the Assets in the event that the Winning Bidder does not close the Sale;

xiv.    within one (1) business day of the close of the Auction, in the event the Stalking Horse Purchaser is not the Winning Bidder, the Winning Bidder shall supplement the Winning Bidder's Deposit such that the Deposit shall be equal to an amount that is ten (10%) percent of the Winning Bid; and

xv.    prior to the Sale Hearing, the Winning Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Winning Bid was made.

**THE WINNING BID AND ANY BACK-UP BID AND THEIR RELATED PURCHASE AGREEMENTS SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE WINNING BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT THE WINNING BID OR THE BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**

(h)    **Sale Hearing**: The Winning Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA) will be subject to approval by the Court. The Debtors are requesting that the Sale Hearing to approve the Winning Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then

the Stalking Horse APA) shall take place on **September 29, 2025.**  The Sale Hearing may be adjourned by the Debtors, from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of these chapter 11 cases.

At the Sale Hearing, the Debtors will seek entry and of a sale order substantially in the form attached to the Bidding Procedures Motion.

(i)     **Backup Bidder**:  Notwithstanding any of the foregoing, in the event that the Winning Bidder fails to close the Sale on or before October 6, 2025 (or such date as may be extended by the Debtors), the Back-Up Bid will be deemed to be the Winning Bid, the Back-Up Bidder will be deemed to be the Winning Bidder, and the Debtors shall be authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties.

(j)     **Return of Deposits**:  All Deposits shall be returned to each bidder not selected by the Debtors as the Winning Bidder no later than five (5) business days following the closing of the Hearing.  The deposit of the Winning Bidder or, if the Sale is concluded with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale.  If the Winning Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale,  then, subject to the terms of the Alternative APA or any Stalking Horse APA or any Alternative APA, as applicable, the Debtors and their estates shall be entitled to retain the Deposit of the Winning Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.  For the avoidance of doubt, the Debtors' retention of a Deposit shall not constitute a waiver of any of the Debtors' legal or equitable rights relating to a Winning Bidder's or Back-Up Bidder's breach or failure to perform, and all such rights and remedies are preserved.

(k)     **Notice and Consultation Parties**:

    i.     Prior to the Sale Hearing, the Winning Bidder shall complete and execute The term "**Bidding Procedures Notice Parties**" as used in these Bidding Procedures shall mean: (i) the Debtors, 1743 Sidewinder Drive, 1st Floor, Park City, Utah 84060, Attn: Robert J. Corliss, Chief Executive Officer (rjcorliss@corlissmoore.com); (ii) proposed counsel to the Debtors, Jeffrey R. Waxman, Esq. (302-888-5842; jwaxman@morrisjames.com) and Vincent Cannizzaro, Esq. VCannizzaro@morrisjames.com)); and (iv) counsel to the Stalking Horse Purchaser, the DIP Lenders, and Prepetition Lenders, Geoffrey T. Raicht, PC, 99 Biltmore Ave., Rye, NY  10580, Attn: Geoffrey T. Raicht, Esq. (graicht@raichtlawpc.com) and Chipman Brown Cicero & Cole, LLP, 1313 N. Market Street, Suite 5400, Wilmington, DE

19801, Attn: William E. Chipman Jr., Esq. (chipman@chipmanbrown.com).

    ii.    The term "**Consultation Parties**" as used in these Bidding Procedures shall mean any official committees appointed in these chapter 11 cases, including any official committee of unsecured creditors (the "**Creditors' Committee**").

In the event that any Consultation Party or any member of any Creditors' Committee or an affiliate of any of the foregoing submits a bid that is a Qualifying Bid, any obligation of the Debtors to consult with the bidding party established under these Bidding Procedures will be waived without further action; provided that the bidding party will have the same rights as any other Qualifying Bidder set forth above.

If a member of any Creditors' Committee submits a Qualifying Bid, any Creditors' Committee will continue to have consultation rights as set forth in these Bidding Procedures; provided that any Creditors' Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets and shall not provide any information regarding the sale of the Assets to such member.

    (l)    <u>**Reservation of Rights**</u>:

Notwithstanding any of the foregoing, the Debtors and their estates reserve the right to, after consultation with the Lenders and the Consultation Parties, modify the Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing.

    19.    The following is a summary of the key dates established by the Bidding Procedures and the Assumption and Assignment Procedures:

| <u>**DATE**</u> | <u>**DEADLINE/EVENT**</u> |
|---|---|
| **August 25, 2025** | Assumption Notice Deadline |
| **September 17, 2025 at 4:00 p.m. (ET)** | Bid Deadline |
| **September 19, 2025 at 12:00 p.m. (ET)** | Deadline for Debtors to Designate Qualifying Bids and Baseline Bid |

17408212/4

| | |
|---|---|
| **September 22, 2025 at 4:00 p.m. (ET)** | Sale Objection Deadline; Contract Objection Deadline[8] |
| **September 23, 2025 at 10:00 a.m. (ET)** | Auction |
| **September 24, 2025 at 4:00 p.m. (ET) or 4:00 p.m. (ET) the first business day after the conclusion of the Auction** | Deadline to File and Serve Notice of Winning Bidder |
| **September 26, 2025 at noon (ET)** | Adequate Assurance Objection Deadline for Winning Bidder Other Than the Stalking Horse Purchaser |
| **September 26, 2025 at 11:59 p.m. (ET)** | Debtors' Deadline to Reply to Sale Objections |
| **September 29, 2025 (requested)** | Sale Hearing |
| **October 3, 2025** | Sale Closing |

20.     The Debtors respectfully submit that the timeline set forth in the Bidding Procedures is reasonable and necessary under the circumstances of these chapter 11 cases. Such timeline provides an approximately 13-week period between the filing of this Motion and the Bid Deadline, which will allow parties in interest sufficient time to formulate bids for the Assets. Moreover, relevant information regarding the Debtors' business will be made available in the Data Room, allowing potential bidders (subject to the execution of an NDA) to immediately conduct diligence on the Debtors' Assets, and the Debtors and their advisors began marketing the Assets prior to the filing of this Motion.

---

[8]     The Sale Objection Deadline and Contract Objection Deadline apply to all objections to the sale of the Assets and the assumption and assignment of the Assumed Contracts (including adequate assurance of future performance by the Stalking Horse Purchaser), with the exception of objections related to adequate assurance of future performance by a Winning Bidder *other than* the Stalking Horse Purchaser.

17408212/4

## NOTICE PROCEDURES FOR THE SALE,
## BIDDING PROCEDURES, AUCTION, AND SALE HEARING

21.     The Debtors also request approval of the sale notice (the "**Sale Notice**"), substantially in the form attached to the Bidding Procedures Order as Exhibit 2.

22.     Upon entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice by regular mail on:  (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to the Stalking Horse Purchaser and the Lenders; (3) all parties known by the Debtors to assert a lien or encumbrances on any of the Assets; (4) all persons known or reasonably believed to have asserted an interest in or claim to any of the Assets; (5) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date; (6) the Office of the United States Attorney for the District of Delaware; (7) the Office of the Attorney General in each state in which the Debtors have operated; (8) the Office of the Secretary of State in each state in which the Debtors have operated; (9) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtors have or may have any tax liability; (10) all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency; (11) the Federal Trade Commission; (12) the United States Attorney General/Antitrust Division of Department of Justice; (13) all non-Debtor parties to any of the Assumed Contracts; (14) all of the Debtors' other known creditors and equity security holders; and (15) all other parties that have filed a notice of appearance and demand for service of papers in these chapter 11 cases as of the service date (collectively, the "**Sale Notice Parties**").

23.     The Debtors will also cause the Sale Notice to be published once in the national edition of *USA Today* or similar national publication and post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent.

17408212/4

## ASSUMPTION AND ASSIGNMENT PROCEDURES

24.     To facilitate the Sale, the Debtors seek authority to assume and assign to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then to the Winning Bidder, the Assumed Contracts in accordance with the Assumption and Assignment Procedures.

25.     The Assumption and Assignment Procedures are as follows:

(a)     On or before August 25, 2025 (the "**Assumption Notice Deadline**"), the Debtors shall file with the Court and serve on each counterparty (each, a "**Counterparty**," and collectively, the "**Counterparties**") to an Assumed Contract a notice, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> (the "**Assumption Notice**").

(b)     The Assumption Notice shall include, without limitation, the cure amount (each, a "**Cure Amount**"), if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Assumed Contracts.  If a Counterparty objects to (i) the assumption and assignment of the Counterparty's Assumed Contract, (ii) the Cure Amount for its Assumed Contract or (iii) the provision of adequate assurance of future performance, the Counterparty must file with the Court and serve on the Objection Notice Parties a written objection (a "**Contract Objection**") on or before the applicable objection deadline set forth in these Assumption and Assignment Procedures.

(c)     The Debtors shall provide the Adequate Assurance Information for the Stalking Horse Purchaser to any Counterparties whose Assumed Contracts are included in the Stalking Horse APA and that are the subject of the Assumption Notice upon request.

(d)     Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 **on or before 4:00 p.m. (ET) on, September 19, 2025** (the "**Contract Objection Deadline**"), and proof of service of such Contract Objection upon the Objection Notice Parties shall be filed with the Court as and when required by the Local Rules; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Assumed Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

17408212/4

> ***Any objections to adequate assurance of performance by the Stalking Horse Purchaser shall be filed by the Contract Objection Deadline.****

> ****Any objections to adequate assurance of future performance by a Winning Bidder other than the Stalking Horse Purchaser shall be filed in accordance with subparagraph (g) below.*****

(e) The "**Objection Notice Parties**" are as follows: (i) proposed counsel to the Debtors, Morris James, LLP, Proposed counsel for the Debtors, attn: Jeffrey R. Waxman, Esq. (302-888-5842; jwaxman@morrisjames.com) or Vincent Cannizzaro, Esq. (302-888-6867; VCannizzaro@morrisjames.com); (ii) counsel to any official committee of unsecured creditors appointed in these chapter 11 cases; (iii) counsel to the Stalking Horse Purchaser, the DIP Lenders, and Prepetition Lenders, Geoffrey T. Raicht, PC, 99 Biltmore Ave., Rye, NY 10580, Attn: Geoffrey T. Raicht, Esq. (graicht@raichtlawpc.com) and Chipman Brown Cicero & Cole, LLP, 1313 N. Market Street, Suite 5400, Wilmington, DE 19801, Attn: William E. Chipman Jr., Esq. (chipman@chipmanbrown.com); and (iv) the Office of the United States Trustee for the District of Delaware, 855 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Hannah McCollum, Esq. (Hannah.McCollum@usdoj.gov).

(f) As soon as reasonably practicable after the completion of the Auction, the Debtors shall file with the Court a notice identifying the Winning Bidder (a "**Notice of Winning Bidder**"), which shall set forth, among other things, (i) the Winning Bidder and Back-Up Bidder (if any) and the amount of each of the Winning Bid and the Back-Up Bid (if any), (ii) the Selected Assumed Contracts, and (iii) the proposed assignee(s) of such Selected Assumed Contracts.

(g) As soon as reasonably practicable after the completion of the Auction, the Debtors will cause to be served by overnight mail and, if available, electronic mail, upon each affected Counterparty and its counsel (if known) the Notice of Winning Bidder.

> ****In the event the Stalking Horse Purchaser is not the Winning Bidder, the Counterparties shall file any Contract Objections <u>solely</u> on the basis of adequate assurance of future performance not later than <u>September 26, 2025 at noon (ET)</u>.****

(h) At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then to the Winning Bidder, of only those Assumed Contracts that have been selected by the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then the Winning Bidder, to be assumed and assigned (each, a "**Selected Assumed Contract**," and collectively, the "**Selected Assumed Contracts**"). The Debtors and their estates reserve any and all rights with respect to any Assumed Contracts that are not ultimately designated as Selected Assumed Contracts.

(i)     If no Contract Objection is timely received with respect to a Selected Assumed Contract: (i) the Counterparty to such Selected Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then to the Winning Bidder, of the Selected Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then the Winning Bidder); (ii) any and all defaults under the Selected Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Assumed Contract against the Debtors and their estates or the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then the Winning Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

(j)     To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "**Cure Dispute**"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors, in consultation with the Winning Bidder, or fixed by the Court; *provided*, *however*, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assumed Contract may be assumed by the Debtors and assigned to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then to the Winning Bidder, provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors or the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then the Winning Bidder, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(k)     Notwithstanding anything to the contrary herein, if after the Sale Hearing or the entry of the Sale Order additional executory contracts or unexpired leases of the Debtors are determined to be Assumed Contracts, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections not later than fourteen (14) days thereafter. If no Contract Objection is timely received, the Debtors shall be authorized to assume and assign such Assumed Contracts to the Stalking Horse Purchaser or, in the event the

Stalking Horse Purchaser is not the Winning Bidder, then to the Winning Bidder, without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

## RELIEF REQUESTED

26.     By this Motion, the Debtors seek entry of: (a) the Bidding Procedures Order, (i) scheduling a date for the Sale Hearing, (ii) authorizing and approving the Bidding Procedures and the Assumption and Assignment Procedures, and the form and manner of notice thereof, and (iii) granting related relief; and (b) the Sale Order, (i) authorizing and approving the Debtors' entry into the Stalking Horse APA or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then an Alternative APA with the Winning Bidder, (ii) authorizing and approving the Sale, free and clear of all Encumbrances other than Assumed Liabilities and Permitted Encumbrances, (iii) authorizing and approving the assumption and assignment of the Assumed Contacts to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then to the Winning Bidder; and (iv) granting related relief.

## BASIS FOR RELIEF

**A.      Sufficient Business Justification Exists for Consummation of the Sale Under Sections 105(a) and 363(b) of the Bankruptcy Code**

27.     Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor. *See*, *e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation

omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

28.     The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

29.     The Debtors submit that their decision to consummate the Sale represents a reasonable exercise of the Debtors' business judgment, and accordingly the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code.  The Debtors will continue to conduct an extensive and fulsome process to market the Assets.  The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or best value available for the Assets by allowing the market to dictate the value of the Assets, and will provide a greater recovery than would be provided by any other available alternative.  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Stalking Horse Purchaser or, in the event the

34

Stalking Horse Purchaser is not the Winning Bidder, then the Winning Bidder, and establish that the Debtors and such bidder have proceeded in good faith.

30.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Stalking Horse APA, the Bidding Procedures, the Auction, the Sale Hearing, and the Sale to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

31.     The Sale, conducted in accordance with the Bidding Procedures, will generate significant value for the Debtors' estates, and represents the best path forward for maximizing recoveries in connection with these chapter 11 cases.  The Debtors submit that ample business justification exists for the consummation of the Sale, and therefore request that this Court approve such Sale.

**B.      The Sale of the Assets Free and Clear of All Encumbrances Is Authorized Under Section 363(f) of the Bankruptcy Code**

32.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

17408212/4

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

33.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests.  *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens.  *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

34.    The Debtors submit that, in the interest of attracting the best offers, it is appropriate to sell the Assets on a final "as is" basis, free and clear of any and all Encumbrances other than Assumed Liabilities and Permitted Encumbrances (and except as otherwise expressly set forth in the Sale Order), in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to such Sale.  In particular, the Debtors believe that section 363(f)(2) of the Bankruptcy Code will be met because the Prepetition Agent is secured by the Assets and has consented to the Sale to the Stalking Horse Purchaser pursuant to the Stalking Horse APA, subject to higher or better terms as set forth in an Alternative APA.

35.    Moreover, with respect to any other party asserting a lien, claim, encumbrance or the like against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.  In particular, known lienholders

17408212/4

will receive notice and will be given sufficient opportunity to object to the relief requested. Such lienholders that do not object to the Sale should be deemed to have consented. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same). Consistent with the foregoing, the Bidding Procedures Order provides that the absence of a timely objection to the sale of the Assets in accordance therewith shall be "consent" to such sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

36.     Furthermore, the Debtors propose that any Encumbrances asserted against the Assets be transferred to, and attach to, the proceeds of the Sale, and application of the proceeds generated by the Sale will be subject to any applicable provisions of that certain *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expenses Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "**DIP Order**").

## C.     The Sale Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code

37.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to

an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m). In approving the Sale free and clear of Encumbrances other than Assumed Liabilities and Permitted Encumbrances, the Debtors request that the Court find and hold that all purchasers of Assets purchased in accordance with the Bidding Procedures, including, without limitation, the Stalking Horse Purchaser, are entitled to the protections afforded by section 363(m) of the Bankruptcy Code. Such relief is appropriate in that selection of the Winning Bidder will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction. *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

**D.**     **The Court Should Approve the Bidding Procedures**

38.     The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same). Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

39.     The Debtors and their professional advisors have designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors' estates and creditors. The Bidding Procedures will allow the Debtors to conduct the Auction in an orderly, fair and open fashion, which will encourage participation by financially capable bidders,

thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets.  Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors and their fiduciaries and professional advisors to review, analyze and compare any bids received to determine which bids are in the best interests of the Debtors' estates and their creditors.  The Debtors' investment banker in connection with the Sale Process, Configure, believes that the Bidding Procedures are appropriately crafted to, and will maximize, the value of the Assets.  Moreover, the Debtors are required under the DIP Order to complete the auction and sale process on the timetable set forth therein and contemplated by the Bidding Procedures, which timetable is fair and reasonable in light of the circumstances of these chapter 11 cases.

40.     The Debtors submit that the Bidding Procedures are necessary and transparent and will derive the highest or best bids for the Assets.  Therefore, the Debtors request the Court to approve the Bidding Procedures.

**E.     The Assumption and Assignment of the Assumed Contracts in Connection with the Sale Satisfies Section 365 of the Bankruptcy Code**

41.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The Second Circuit has stated that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'"  *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

42.     The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard.  *See In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice).  As described above, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'"  *Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Van Gorkom*, 488 A.2d at 872).  Indeed, "the sole issue is whether the rejection benefits the estate."  *In re HQ Global*, 290 B.R. at 511.

43.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing.  *See id.*; *see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").  Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease.  *See, e.g.*, *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate."); *see also N.L.R.B. v. Bildisco &*

*Bildisco*, 465 U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42–43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424–25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

44.     Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Assumed Contracts is in the best interests of the Debtors and their estates, and accordingly the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. *See, e.g.*, *In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182–83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

45.     As set forth above, the Sale will provide significant benefits to the Debtors' estates. To that end, the assumption, assignment and sale of the Assumed Contracts is necessary for the Debtors to obtain the benefits of the Stalking Horse APA or an Alternative APA, as applicable.  In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k).  Thus, following an assignment to the Winning Bidder of any Assumed Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

46.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtors propose to file with the Court, and serve on each Counterparty to an Assumed Contract, an Assumption Notice that indicates the proposed Cure Amount for each such contract.  As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment to the Winning Bidder and to the proposed Cure Amount, if applicable.  Moreover, the payment or reserve of the applicable Cure Amount, as provided for in the Bidding Procedures, will be a condition to the Debtors' assumption and assignment of any Assumed Contract.

47.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2).  The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.  *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

48.     Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re*

*Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

49.    Here, the Winning Bidder will have provided adequate assurance of future performance with respect to any Assumed Contract.  For its bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "**Adequate Assurance Information**"), including:  (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; and (b) a contact person for the proposed assignee that the Counterparty may directly contact in connection with the adequate assurance of future performance.  To the extent that the Qualifying Bidder is a newly formed acquisition entity or the like, the financial and other information supporting the Qualifying Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Qualifying Bidder's parent company or sponsor.  Furthermore, given that the Debtors will submit evidence that all requirements for the assumption and assignment of such contracts at the Sale Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of each Winning Bidder to provide adequate assurance of future performance.

50.    Therefore, the Debtors respectfully request the Court to (a) approve the proposed assumption and assignment of the Assumed Contracts, and (b) find that all anti-assignment provisions of such contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[9]

---

[9]    Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the

**F.      The Prepetition Credit Agreement Agent and the DIP Agent Should Be Authorized to Credit Bid on the Assets under Section 363(k) of the Bankruptcy Code**

51.      Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the full face value of its claim and does not limit the credit bid to the claim's economic value. *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459–60 (3d Cir. 2006).

52.      As a result, the Debtors propose that the Prepetition Credit Agreement Agent and the DIP Agent, in their capacity as such under the DIP Order, which hold claims that are secured by valid, binding, enforceable, non-avoidable and perfected liens on and security interests in substantially all of the Assets as provided for in the DIP Order, be entitled to credit bid all or a portion of the amounts then outstanding under: (a) the DIP Facility and (b) all or a portion of the Prepetition Secured Obligations, each as defined in the DIP Order or any part thereof, under section 363(k) of the Bankruptcy Code and as provided for in the DIP Order and the Bidding Procedures.

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)**

53.      Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the

---

trustee may assign such contract or lease..." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d). Any delay in the Debtors' ability to consummate the Sale on the timeline contemplated by the Bidding Procedures would be detrimental to the Debtors, their creditors and estates.

54.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h) and 6006(d), to the extent applicable.

## NOTICE

55.     Notice of this Motion has been provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' twenty (20) largest unsecured creditors; (iii) counsel to the Prepetition Agent and DIP Agent; (iv) the office of the attorney general for each of the states in which the Debtors operate; (v) the Office of the United States Attorney for the District of Delaware; (vi) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtors have or may have any tax liability; (vii) the United States Department of Justice; (viii) all parties known by the Debtors to assert a lien or encumbrance on any of the Assets; (ix) all persons known or reasonably believed to have asserted an interest in or claim to any of the Assets; (x) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date; (xi) the Office of the Secretary of State in each state in which the Debtors have operated; (xii) all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency; (xiii) the Federal Trade Commission; (xiv) the United States Attorney

General/Antitrust Division of Department of Justice; and (xv) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **CONCLUSION**

WHEREFORE, the Debtors request entry of the Bidding Procedures Order and the Sale Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated:  July 8, 2025
Wilmington, Delaware

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Carl N. Kunz, III (DE Bar No. 3201)
Jeffrey R. Waxman (DE Bar No. 4159)
Christopher M. Donnelly (DE Bar No. 7149)
Samantha L. Rodriguez (DE Bar No. 7524)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail:  ckunz@morrisjames.com
         jwaxman@morrisjames.com
         cdonnelly@morrisjames.com
         srodriguez@morrisjames.com

*Proposed Counsel for Debtors and Debtors-in-Possession*