# **EXHIBIT C**

Stalking Horse APA

ASSET PURCHASE AGREEMENT

DATED AS OF

JULY [＿], 2025

BY AND AMONG

MY JOB MATCHER, INC.

JOB.COM - HV, INC. (DE)

JOB.COM-FORTUS, INC.

JOB.COM-ENDEVIS, INC.

JOB.COM-QCI, INC.

PRINCETON ONE - JOB.COM, INC.

JOB.COM - HV, INC. (FL)

PRINCETON SEARCH L.L.C

AS SELLERS

AND

JOB.COM ACQUISITION CO., LLC

AS BUYER

## TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ...................................................................................1
    SECTION 1.01. Definitions..............................................................................1
    SECTION 1.02. *Other Definitions and Interpretative Matters* ........................9

ARTICLE 2 PURCHASE AND SALE......................................................................10
    SECTION 2.01. *Purchase and Sale* ...............................................................10
    SECTION 2.02. *Excluded Assets*....................................................................12
    SECTION 2.03. *Assumed Liabilities* ..............................................................13
    SECTION 2.04. *Excluded Liabilities* .............................................................13
    SECTION 2.05. *Assignment of Contracts and Rights.* ...................................13
    SECTION 2.06. *Purchase Price.* ....................................................................15
    SECTION 2.07. *The Closing* ..........................................................................15

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLERS ...............17
    SECTION 3.01. *Organization and Qualification* ...........................................17
    SECTION 3.02. *Authorization* ........................................................................17
    SECTION 3.03. *Enforceability* .......................................................................17
    SECTION 3.04. *Noncontravention* .................................................................17
    SECTION 3.05. *Intellectual Property.* ............................................................18
    SECTION 3.06. *Contracts* ..............................................................................18
    SECTION 3.07. *Litigation* ..............................................................................19
    SECTION 3.08. *Properties.* .............................................................................19
    SECTION 3.09. *Title to the Purchased Assets* ...............................................19
    SECTION 3.10. *Tax Matters.* ..........................................................................20
    SECTION 3.11. *Compliance with Laws* .........................................................20
    SECTION 3.12. *[Intentionally Omitted]* ........................................................20
    SECTION 3.13. *Employee Benefits.* ...............................................................20
    SECTION 3.14. *Environmental Condition* .....................................................21
    SECTION 3.15. *Employee and Labor Matters*................................................22

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER..................23
    SECTION 4.01. *Existence and Power* .............................................................23
    SECTION 4.02. *Authorization*........................................................................23
    SECTION 4.03. *Execution and Delivery* ........................................................23
    SECTION 4.04. *No Conflicts* ..........................................................................23
    SECTION 4.05. *Adequate Assurances Regarding Assumed Contracts* ..........23
    SECTION 4.06. *Inspections; No Other Representations* ................................23

ARTICLE 5 COVENANTS........................................................................................24
    SECTION 5.01. *Commercially Reasonable Efforts; Further Assurances*........24
    SECTION 5.02. *Public Announcements* .........................................................25
    SECTION 5.03. *Assurances Regarding Assumed Contracts; Payment of Cure*
                *Costs; Performance of Assumed Contracts* ................................25
    SECTION 5.04. *Bankruptcy Court Matters.* ...................................................25
    SECTION 5.05. *Conduct of the Business.* .......................................................26

i

SECTION 5.06. *Access to Information* .................................................................27
SECTION 5.07. *Notices of Certain Events* ..........................................................27
SECTION 5.08. *Sale Free and Clear* ...................................................................27
SECTION 5.09. *Casualty Loss* ............................................................................28
SECTION 5.10. *No Successor Liability* ...............................................................28
ARTICLE 6 EMPLOYEE MATTERS ............................................................................28
SECTION 6.01. *Buyer Employees* .......................................................................28
SECTION 6.02. *Employment Tax Reporting* ........................................................29
SECTION 6.03. *Benefits* .....................................................................................29
SECTION 6.04. *Third Party Beneficiary* ............................................................29
ARTICLE 7 CONDITIONS TO CLOSING .....................................................................29
SECTION 7.01. *Conditions to the Obligations of Sellers* ...................................29
SECTION 7.02. *Conditions to the Obligation of Buyer* .......................................30
ARTICLE 8 TAX MATTERS ........................................................................................31
SECTION 8.01. *Tax Cooperation; Allocation of Taxes* .......................................31
SECTION 8.02. *Purchase Price Allocation* ........................................................31
ARTICLE 9 SURVIVAL ...............................................................................................32
SECTION 9.01. *Survival* .....................................................................................32
ARTICLE 10 TERMINATION ........................................................................................32
SECTION 10.01. *Grounds for Termination* .........................................................32
SECTION 10.02. *Effect of Termination* ...............................................................33
ARTICLE 11 MISCELLANEOUS ...................................................................................34
SECTION 11.01. *Notices* .....................................................................................34
SECTION 11.02. *Amendments and Waivers* .........................................................35
SECTION 11.03. *Successors and Assigns* ............................................................35
SECTION 11.04. *Governing Law* .........................................................................35
SECTION 11.05. *Jurisdiction* ..............................................................................35
SECTION 11.06. *WAIVER OF JURY TRIAL* .......................................................36
SECTION 11.07. *Counterparts; Third Party Beneficiaries* .................................36
SECTION 11.08. *Specific Performance* ...............................................................36
SECTION 11.09. *Entire Agreement* ......................................................................36
SECTION 11.10. *Bulk Sales Laws* .......................................................................36
SECTION 11.11. *No Strict Construction* .............................................................36
SECTION 11.12. *Non-Recourse* ...........................................................................36
SECTION 11.13. *Severability* ..............................................................................37
SECTION 11.14. *Fees and Expenses* ...................................................................37

17410114/5

**Page**

SCHEDULES

| Schedule | 1.01(a) | Assumed Benefit Plans |
| Schedule | 1.01(b) | Permitted Encumbrances |
| Schedule | 2.01(f) | Transferred Permits |
| Schedule | 2.01(r) | Scheduled Assets |
| Schedule | 2.02(a) | Scheduled Excluded Assets |
| Schedule | 2.05(a) | Assumed Contracts |
| Schedule | 3.04 | Noncontravention |
| Schedule | 3.05(a) | Intellectual Property |
| Schedule | 3.05(b) | Intellectual Property Infringements |
| Schedule | 3.05(c) | Purchased Assets |
| Schedule | 3.06 | Contracts |
| Schedule | 3.07 | Litigation |
| Schedule | 3.08(a) | Properties |
| Schedule | 3.08(b) | Lessor Leases |
| Schedule | 3.08(c) | Leases |
| Schedule | 3.10 | Tax Matters |
| Schedule | 3.13 | Benefit Plans |
| Schedule | 3.13(h) | Employee Payments |
| Schedule | 3.14 | Environmental Condition |
| Schedule | 3.15(a) | Employee and Labor Matters |
| Schedule | 3.15(b) | Employee Settlement Agreements |
| Schedule | 5.05 | Conduct of the Business |

EXHIBITS
| Exhibit A | Bidding Procedures |
| Exhibit B | Bidding Procedures Order |
| Exhibit C | Sale Order |

17410114/5

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT dated as of July **[__]**, 2025 (this "**Agreement**"), is made by and among My Job Matcher, Inc., a Delaware corporation ("**My Job Matcher**"), Job.com - HV Inc., a Delaware corporation ("**HV Delaware**"), JOB.COM-FORTUS INC., a Delaware corporation ("**Fortus**"), JOB.COM-ENDEVIS INC., a Delaware corporation ("**Endevis**"), JOB.COM-QCI INC., a Delaware corporation ("**QCI**"), Princeton One - Job.com Inc., a Delaware corporation ("**PrincetonOne**"), Job.com - HV Inc., a Florida corporation ("**HV Florida**") and Princeton Search L.L.C, a New Jersey limited liability company ("**Princeton Search,**" and together with My Job Matcher, HV Delaware, Fortus, Endevis, QCI, PrincetonOne, HV Florida, and Princeton Search, each, a "**Seller**" and collectively, "**Sellers**"), and Job.com Acquisition Co. LLC, a Delaware limited liability company (the "**Buyer**").  Capitalized terms used in this Agreement have the meaning set forth in <u>Section 1.01</u>.

### W I T N E S S E T H:

**WHEREAS**, Sellers own the Purchased Assets;

**WHEREAS**, on July ___ 2025 (the "**Petition Date**"), Sellers have sought relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") by filing cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"); and

**WHEREAS**, Buyer desires to purchase the Purchased Assets pursuant to Sections 363 and 365 of the Bankruptcy Code, free and clear of Encumbrances other than Assumed Liabilities and Permitted Encumbrances, upon the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the parties to this Agreement agree as follows:

### ARTICLE 1

### DEFINITIONS

SECTION 1.01.  Definitions.

(a)  The following terms, as used herein, have the following meanings:

"**Accounts Receivable**" means accounts receivable representing money owed to Sellers.

"**Action**" means any action, suit, petition, plea, charge, claim, demand, hearing, inquiry, arbitration, complaint, grievance, summons, litigation, mediation, proceeding (including any civil, criminal, administrative, investigative, or appellate proceeding), prosecution, contest, inquest, audit, examination, investigation, or similar matter by or before any Governmental Authority.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person.

"**Alternative Transaction**" means any transaction for the sale of the Purchased Assets other than the transactions contemplated by the Transaction Documents.

"**Assumed Benefit Plans**" means the Benefit Plans set forth on Schedule 1.01(a) that are assumed by Buyer pursuant to this Agreement.

"**Assumed Contracts**" means those agreements, contracts, leases, licenses, consensual obligations, promises, and undertakings set forth on Schedule 2.05.

"**Assignment and Assumption Agreement**" means an assignment and assumption agreement in customary form reasonably acceptable to the Parties.

"**Avoidance Action**" means any claim, right, or cause of action of any Seller arising under Chapter 5 of the Bankruptcy Code and any analogous state law claims relating to the Purchased Assets or the Business.

"**Backup Bidder**" has the meaning set forth in the Bidding Procedures.

"**Benefit Plans**" means (i) any employee benefit plan, program, policy, agreement or arrangement within the meaning of Section 3(3) of ERISA and (ii) any other retirement, deferred compensation, employment, consulting, severance, retention, change in control, cash incentive, equity or equity-based incentive, health, welfare or fringe benefit plan, program, policy, agreement, or arrangement, whether formal or informal, or written or oral, that is sponsored, maintained or contributed to (or obligated to be contributed to), by the Sellers or any of the Sellers' Affiliates, or with respect to which the Sellers or any of their Affiliates or Subsidiaries has any liability, contingent or otherwise.

"**Bidding Procedures**" means bid procedures in the form attached hereto as Exhibit A (with other changes approved by Buyer and Sellers), to be approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"**Bidding Procedures Order**" means an Order of the Bankruptcy Court in the form attached hereto as Exhibit B (with other changes approved by Buyer and Sellers).

"**Bill of Sale**" means a bill of sale in customary form reasonably acceptable to the Parties.

"**Business**" means the business and operations of Sellers (wherever such business and operations are situated or conducted) as such business and operations exist as of the date of this Agreement, including the business and operations related to technology development and services in connection with employee staffing, recruitment, and hiring.

"**Business Day**" means a day other than Saturday, Sunday, or other day on which commercial banks in New York, New York are authorized or required by law to close.

"**Claim**" means a claim as defined in Section 101 of the Bankruptcy Code.

"**Closing Date**" means the date of the Closing.

2

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contract**" means any agreement, contract, obligation, promise, undertaking, lease (including Leases), sublease, purchase order, arrangement, license, commitment, insurance policy, or other binding arrangement or understanding (in each case whether written or oral), and any amendments, modifications, or supplements thereto.

"**Copyrights**" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"**Cure Costs**" means the Liabilities of Sellers that must be paid or otherwise satisfied, pursuant to Section 365(b) of the Bankruptcy Code, to cure all of Sellers's defaults under the Assumed Contracts at the time of the assumption by and assignment to Buyer of such Assumed Contracts as provided herein.

"**DIP Credit Agreement**" means that certain Senior Secured Super Priority Debtor-In-Possession Credit Agreement dated on or about the date hereof, by and among the lenders identified on the signature pages thereof, Ankura Trust Company, LLC, a Delaware limited liability company, as administrative agent and collateral agent for each member of the Lender Group (as defined therein), and Sellers, as in effect on the date hereof and as further amended, restated, supplemented, or otherwise modified from time to time.

"**Documents**" means all of the documents that are used or useful in, held for use in, or intended to be used in, or that arise in any way out of, the Business of Sellers.

"**Employees**" employees of Sellers as of the date hereof.

"**Encumbrance**" means any charge, Lien, Claim, right, demand, mortgage, lease, debt, losses, damage, demand, fine, judgment, penalty, liability, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, rights of others, easement, restrictive covenant, right of way, preemptive right, conditional sale, servitude, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition or otherwise), encroachment, encumbrance, third party interest, or other restriction or limitation of any kind, whether imposed by Contract, Legal Requirement, equity, or otherwise.

"**Environmental Laws**" means any statutes, laws, regulations, and rules relating to pollution or protection of the environment.

"**Equipment**" means all furniture, fixtures, equipment, computers, machinery, vehicles, apparatus, appliances, implements, telephone systems, signage, supplies, and all other tangible personal property of every kind and description, and Improvements and tooling used, or held for use, in connection with the operation of the Business, wherever located, including communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means (a) any Person whose employees are treated as employed by the same employer as the employees of Sellers or their Affiliates under Code Section 414(b), (b) any trade or business whose employees are treated as employed by the same employer as the employees of Sellers or their Affiliates under Code Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the Code, any organization that is a member of an affiliated service group of which Sellers or any of their Affiliates is a member under Code Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the Code, any Person that is a party to an arrangement with Sellers or any of their Affiliates and whose employees are aggregated with the employees of Sellers or their Affiliates under Code Section 414(o).

"**Excluded Benefit Plans**" means all Benefit Plans other than the Assumed Benefit Plans.

"**Existing Credit Agreement**" means that certain Credit Agreement, dated as of November 4, 2022, by and among Sellers, the lenders from time to time party thereto, and Ankura Trust Company, LLC, in its capacity as administrative agent and collateral agent, as in effect on the date hereof and as further amended, restated, supplemented, or otherwise modified from time to time.

"**Governmental Authority**" means any federal, state, local, or foreign government, any governmental, regulatory, or administrative authority, agency, or commission, or any court, tribunal, or judicial or arbitral body.

"**Hazardous Materials**" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances, explosives, or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"**Improvements**" means the buildings, structures, fixtures, systems, facilities, easements, rights-of-way, privileges, improvements, property, plant and equipment, licenses, hereditaments, appurtenances, and all other rights and benefits appurtenant or in any way related to or demised under any lease of, or other contract or agreement for the use of, the Leased Real Property.

"**Income Tax**" means any federal, state, local, or non-U.S. tax based on or measured by reference to net income, including any interest, penalties, or additions thereto, whether disputed or not.

"**Income Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Income Taxes, including any schedule or attachment thereto.

4

"**Intellectual Property**" means all intellectual property, including all Copyrights, Patents, Trademarks, and Trade Secrets that are owned, used, or licensed by Sellers and used or held for use in the Business or the Purchased Assets.

"**Knowledge of Sellers**" or any other similar knowledge qualification in this Agreement means to the actual knowledge of Robert Corliss, Bobby Corliss, and Ben Gross.

"**Lease**" means any Contract for the rental of Leased Real Property.

"**Leased Real Property**" means the real property and real property interests leased or subleased by Sellers, as tenant, subtenant, lessee, or sublessee, all buildings and other structures, facilities, or Improvements located thereon, all fixtures attached or appurtenant thereto, and all easements, licenses, rights, and appurtenances relating to the foregoing (and any present or future rights, title, and interests arising from or related to the foregoing).

"**Legal Requirement**" means any federal, state, provincial, local, municipal, foreign, international, or multinational law (statutory or common), constitution, treaty, convention, ordinance, equitable principle, code, rule, regulation, or Order enacted, adopted, promulgated, or applied by any Governmental Authority.

"**Liability**" means Claim or Encumbrance of any kind or nature whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"**Lien**" means "any "interest" as that term is used in Section 363(f) of the Bankruptcy Code, mortgage, deed of trust, pledge, assignment, security interest, encumbrance, easement, condition, covenant, reservation, lien, mechanics lien, claim, charge, hypothecation, deemed trust, action, easement, charge, or otherwise, or claim of any kind or nature whatsoever in respect of any property, other than any license of Intellectual Property, including any of the foregoing created by, arising under, or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of a financing statement naming the owner of the property as to which such lien relates as the debtor under the Uniform Commercial Code or any comparable Legal Requirement in any other jurisdiction.

"**Material Adverse Effect**" means any event, condition, circumstance, development, or change or effect that, individually or in the aggregate with all other events, changes, conditions, circumstances, developments, and effects (a) has had or could reasonably be expected to have a material adverse effect on the value, operation, or condition (financial or otherwise) of the Business, the Purchased Assets, or the Assumed Liabilities, considered as a whole or (b) has or could reasonably be expected to prevent or materially impair the ability of Sellers to consummate the transactions contemplated hereby; provided, however, that the following shall not constitute a Material Adverse Effect and shall not be taken into account in determining whether or not there has been or would reasonably be expected to be a Material Adverse Effect:  (i) changes in general economic conditions or securities or financial markets in general that do not disproportionately impact Sellers; (ii) any changes in law applicable to Sellers or any of Sellers's properties or assets or interpretations thereof by any governmental authority that do not have a disproportionate effect

on Sellers; (iii) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism that do not have a disproportionate effect on Sellers; (iv) any changes to the extent resulting from the announcement or the existence of, or compliance with, this Agreement and the transactions contemplated hereby; (v) any changes in accounting practices or policies that Sellers are required to adopt after the date of this Agreement; (vi) matters occurring in, or arising from the Chapter 11 Cases of Sellers, including any events, occurrences, or other actions taken as a result thereof; (vii) any changes resulting from actions of Sellers expressly agreed to or requested by Buyer; and (viii) any event, circumstance, development, change, occurrence, or effect to the extent resulting from, arising out of, or relating to any epidemic, pandemic or disease outbreak; provided, however, that, in the case of clauses (i), (ii), (iii), (vi) and (viii), such effects shall be taken into account in determining whether a Material Adverse Effect has occurred to the extent that any such effects have a disproportionate adverse effect on the Business, the Purchased Assets, or the Assumed Liabilities as compared to other similarly situated businesses.

"**Order**" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree, or similar determination or finding entered, issued, made or rendered by any Governmental Authority or an arbitrator, mediator, or other judicially sanctioned Person.

"**Parties**" means the Persons that are party to this Agreement.

"**Patents**" means United States and foreign patents and patent applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

"**Permits**" means any and all permits, licenses, approvals, consents, waivers, franchises, filings, accreditations, registrations, certifications, certificates of occupancy, easements, rights of way, notifications, exemptions, clearances, and authorizations, together with all modifications, renewals, amendments, supplements, and extensions thereof and applications therefor, of or from any Governmental Authority or any other Person that are held by Sellers in connection with Sellers's ownership of the Purchased Assets or operation of the Business as currently conducted as well as any surety bonds or other financial assurances related thereto.

"**Permitted Encumbrances**" means Encumbrances (i) created pursuant to any Assumed Contracts; (ii) set forth on Schedule 1.01(a); (iii) for Taxes, assessments and similar charges that are not yet due or are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP and that are listed on Schedule 1.01(b); and (iv) that are mechanic's, materialman's, carrier's, supplier's, vendor's, repairer's, or other similar Encumbrances arising in the ordinary course of business and securing amounts that are not delinquent or are being contested in good faith.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust, or other entity or organization, including a government or political subdivision, or an agency or instrumentality thereof.

17410114/5

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"**Pre-Paid Expenses**" means all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone, or otherwise), advances, pre-paid expenses, prepayments, rights under warranties or guarantees, vendor rebates, and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent) except professional fee retainers.

"**Proceeding**" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"**Sale Hearing**" means the hearing to consider the entry of the Sale Order.

"**Sale Motion**" means the motion filed by Sellers pursuant to, *inter alia*, Sections 363 and 365 of the Bankruptcy Code to obtain the Bidding Procedures Order and the Sale Order and approve the transactions contemplated by this Agreement.

"**Sale Order**" means an Order of the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, inter alia, the sale of the Purchased Assets to Buyer on the terms and conditions set forth herein, free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances), and the assumption and assignment of the Assumed Contracts to Buyer.

"**Subsidiary**," as to any Person, means any corporation, partnership, limited liability company, joint venture, trust or estate of or in which more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time capital stock of any other class of such corporation may have voting power upon the happening of a contingency), (b) the interest in the capital or profits of such partnership, limited liability company, or joint venture, or (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled through one or more intermediaries, or both, by such Person.

"**Tax** or **Taxes**" means (i) any federal, state, local, or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code § 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis in any other manner, including any interest, penalty, or addition thereto, whether disputed or not, or (ii) liability for the payment of any amounts of the type described in clauses (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person, or as transferee, successor, guarantor, surety, or otherwise.

"**Tax Return**" means any return, declaration, report, claim for return, or information return or statement relating to Taxes, including any Schedule or attachment thereto, and including any amendment thereof.

"**Taxing Authority**" means a Governmental Authority responsible for the administration or imposition of any Tax.

"**Trade Payables**" means accounts payable obligations of Sellers incurred at any time, solely to the extent that such obligations (i) relate to the Purchased Assets and (ii) will not be payable by Buyer following the Closing pursuant to any Assumed Contract.

"**Trade Secrets**" means trade secrets and other confidential and proprietary information and know-how.

"**Trademarks**" means United States, foreign, and common law trademarks, service marks, logos, slogans, trade dress and trade names, Internet domain names, and any other similar designations of source of goods or services, whether registered or unregistered together with any registrations and pending applications to register the foregoing and all goodwill related to or symbolized by the foregoing.

"**Transaction Documents**" means this Agreement, the Assignment and Assumption Agreement, the Bill of Sale and any other agreements, instruments or documents entered into at the Closing pursuant to this Agreement.

"**Waiver**" means a written waiver signed by Buyer at Closing waiving all existing or potential Avoidance Actions against any current directors, officers, employees, Affiliates, and advisors of Sellers.

"**Wind Down Expenses**" means the out-of-pocket administrative costs and expenses that Sellers expect to incur in connection with winding down their bankruptcy estates after the Closing Date, in each case, as, and solely to the extent, set forth in a budget approved by the DIP Lender.

"**Winning Bid**" has the meaning set forth in the Bidding Procedures.

"**Winning Bidder**" has the meaning set forth in the Bidding Procedures.

(b)     Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
| --- | --- |
| Agreement | Preamble |
| Allocation Statement | Section 8.02 |
| Assumed Liabilities | Section 2.03 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Period | Section 11.05 |
| Buyer | Preamble |
| Buyer Designee | Section 2.01 |

8

| | |
|---|---|
| Buyer Employees | Section 6.01 |
| Buyer Plans | Section 6.03 |
| Chapter 11 Cases | Recitals |
| Closing | Section 2.07 |
| Credit Bid and Release | Section 2.06(a)(i) |
| Credit Bid and Release Instrument | Section 2.07 |
| Excluded Assets | Section 2.02 |
| Excluded Liabilities | Section 2.04 |
| Inventory | Section 2.01(a) |
| Lessor Leases | Section 3.08(b) |
| Outside Date | Section 10.01(a)(ii) |
| HV Delaware | Preamble |
| Fortus | Preamble |
| Endevis | Preamble |
| QCI | Preamble |
| PrincetonOne | Preamble |
| HV Florida | Preamble |
| Princeton Search | Preamble |
| Purchase Price | Section 2.06(a) |
| Purchased Assets | Section 2.01 |
| Sellers | Preamble |
| Transfer Taxes | Section 8.01(b) |

SECTION 1.02.  *Other Definitions and Interpretative Matters*.  Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(a)    When calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.  Any reference in this Agreement to days (but not Business Days) means calendar days.

(b)    Any reference in this Agreement to $ means U.S. dollars.

(c)    Unless the context otherwise requires, all capitalized terms used in the Exhibits, Annexes, and Schedules shall have the meaning assigned in this Agreement.  All Exhibits, Annexes and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(d)    Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(e)    The provision of a table of contents, the division of this Agreement into Articles, Sections, and other subdivisions, and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All

17410114/5

references in this Agreement to any "**Section**" or "**Article**" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(f)     Words such as "**herein**," "**hereof**," and "**hereunder**" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(g)     The word "**including**" or any variation thereof means "**including, without limitation,**" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(h)     References to laws, rules, and regulations shall include such laws, rules, and regulations as they may from time to time be amended, modified, or supplemented through the date as of which such reference is made.

(i)     Reference to a given agreement or instrument shall be a reference to that agreement or instrument as modified, amended, supplemented, or restated through the date as of which such reference is made.

(j)     References to any Governmental Authority shall include any Person succeeding to its functions and capacities.

ARTICLE 2

PURCHASE AND SALE

SECTION 2.01.  *Purchase and Sale*.  Except as otherwise provided below, upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase from Sellers and Sellers agree to sell, convey, transfer, assign, and deliver, or cause to be sold, conveyed, transferred, assigned, and delivered, to Buyer and one or more other Persons designated by Buyer (a "**Buyer Designee**") at the Closing, free and clear of all Encumbrances and Claims pursuant to Section 363 of the Bankruptcy Code, other than Assumed Liabilities and Permitted Encumbrances, all of Sellers's properties, rights, claims, and assets (other than the Excluded Assets) of every kind and description, wherever situated or located, real, personal, or mixed, tangible or intangible, whether identifiable or contingent, owned, leased, licensed, used, or held for use in or relating to the Business, whether or not reflected on the books and records of Sellers, as the same shall exist on the Closing Date (the "**Purchased Assets**").  Without limiting the generality of the prior sentence, such Purchased Assets shall include, whether they relate exclusively to the Business or not (except where so noted in the following list or in any definition used in the following list) all of the following:

(a)     all inventory of any kind or nature, merchandise and goods, related to the Business or Purchased Assets and maintained, held or stored by or for Sellers on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same, including all disposables and consumables used, or held for use, in connection with the Business, including any goods in transit ("**Inventory**");

(b)     all Equipment;

(c)    all Assumed Contracts;

(d)    all Leased Real Property (and any agreement and rights related thereto or under the applicable Lease to the extent that such agreement or Lease is an Assumed Contract), in each case, together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(e)    any rights of Sellers to the warranties and licenses received from manufacturers and Sellers of the Equipment, Improvements or any component thereof;

(f)    to the extent transferable, all Permits that relate to the Business or the Purchased Assets, to the extent assignable, including those designated as "Transferred Permits" on Schedule 2.01(f) (the "**Transferred Permits**");

(g)    all Intellectual Property excluding any Intellectual Property that Sellers license pursuant to a contract that is not an Assumed Contract;

(h)    all Accounts Receivable;

(i)    all Pre-Paid Expenses;

(j)    all goodwill, customer, and referral relationships, other intangible property and all privileges, set-offs, indemnification rights, causes of action, actions, Claims, demands, and rights of any kind as against others (whether by contract or otherwise) relating to, arising from, or associated with any of the Purchased Assets (including the Intellectual Property), the Assumed Liabilities, and the Business;

(k)    to the extent permitted by Legal Requirements, all Documents and other books and records (including financial, accounting, and personnel files), correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape, or other media, and including all computerized data), drawings, engineering, and other technical information and data, and all other business and other records, in each case, that are used or useful in, held for use in or intended to be used in, or that arise in any way out of or are related to, the Purchased Assets, the Assumed Liabilities, or the Business;

(l)    all claims, interests, rights, rebates, abatements, remedies, recoveries, and benefits of Sellers, and all claims and causes of action, arising under or relating to any of the Purchased Assets, the Assumed Liabilities, or the Business, including those arising out of Assumed Contracts, express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors, or others to the extent relating to the operation of the Business or affecting the Equipment, Inventory, or other tangible Purchased Assets or ordered by Sellers prior to the Closing Date (and in any case, any component thereof);

(m)    all Avoidance Actions; [provided, however, that such Avoidance Actions against current directors, officers, and advisors of Sellers shall have been waived effective as of the Closing Date by execution of the Waiver;]

(n)     all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments, and investments of Sellers; provided, however, that prepaid deposits related to professional fee retainers and cash borrowed pursuant to the DIP Credit Agreement to fund the Wind Down Expenses shall not be included;

(o)     all third party property and casualty insurance proceeds, to the extent receivable by Buyer or Sellers in respect of the Business or the Purchased Assets after the Closing Date;

(p)     all rights, but not obligations, under non-disclosure or confidentiality, non-compete, or non-solicitation agreements or key employee retention plans or similar arrangements with (or for the benefit of) employees and agents of Sellers or with third parties (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreements or any key employee retention plans or similar arrangements entered into in connection with or in contemplation of the auction contemplated by the Bidding Procedures);

(q)     all telephone and facsimile numbers, domain names, and directory listings;

(r)     all assets, if any, listed on Schedule 2.01(r) (regardless of whether such assets are covered by any of the foregoing); and

(s)     all rights to refunds, credits, or other benefits with respect to Taxes paid by Sellers, including those arising under the Assumed Contracts, which refunds are attributable to Pre-Closing Tax Periods, Claims related thereto.

SECTION 2.02.  *Excluded Assets*.

Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer, and Sellers shall retain all right, title, and interest to, in, and under, and all Liabilities with respect to, the Excluded Assets. For all purposes of and under this Agreement, the term "**Excluded Assets**" shall consist of only the following items, assets and properties:

(a)     the assets, if any, listed on Schedule 2.02(a);

(b)     any Excluded Benefit Plan, and any asset in respect thereof;

(c)     any shares of capital stock or other equity interest in or issued by Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by Sellers or any records regarding same (including minute books or stock or membership interest certificates);

(d)     subject to Section 2.01(l), the limited liability company, partnership and corporate books and records of internal limited liability company, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers, Tax records, work papers and other records of Sellers as they pertain to ownership, organization, qualification to do business or existence of Sellers; provided, however, that copies of the foregoing items (including copies of Tax records and work papers of Sellers) shall be made available by Sellers to Buyer;

(e)      Documents that Sellers are required by Legal Requirements to retain;

(f)      any Contract or other obligation of Sellers that is not an Assumed Contract;

(g)      any prepaid deposits related to professional fee retainers and all cash used to fund the Wind Down Expenses;

(h)      all current and prior director and officer insurance policies of Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries; and

(i)      any rights, claims or causes of action of Sellers under this Agreement or any other Transaction Document.

SECTION 2.03. *Assumed Liabilities*.  Subject to entry of the Sale Order, upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer shall, effective at the time of the Closing, assume and agree to discharge and perform when due, the Liabilities of Sellers (and only those Liabilities of Sellers) that are enumerated in this Section 2.03 (the "**Assumed Liabilities**"). Except to the extent that any of the following are specified in Section 2.04, the following Liabilities of Sellers (and only the following Liabilities) shall constitute, without duplication, the Assumed Liabilities:

(a)      all Liabilities arising from and after the Closing from or relating to the Purchased Assets and the ownership and operation thereof;

(b)      all Liabilities arising from or relating to the Assumed Contracts and all Cure Costs relating to Assumed Contracts,

(c)      all Liabilities arising from and after the Closing with respect to Buyer Employees (including those arising under the Assumed Benefit Plans arising from and after the Closing);

(d)      all Transfer Taxes; and

(e)      all outstanding Trade Payables related to the Purchased Assets incurred in the ordinary course of business after the Petition Date and during the Chapter 11 Cases.

SECTION 2.04.  *Excluded Liabilities*. Notwithstanding any provision in this Agreement to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of Sellers of whatever nature, whether presently in existence or arising hereafter.  All such other Liabilities shall be retained by and remain Liabilities of Sellers (all such Liabilities not being assumed being herein referred to as the "**Excluded Liabilities**").

SECTION 2.05.  *Assignment of Contracts and Rights*.

(a)      Schedule 2.05(a) sets forth a list of all executory Contracts to which Sellers are a party and that are to be included in the Purchased Assets (the "Assumed Contracts"). From and after the date hereof until the earlier of (i) the date that is one (1) day prior to the Auction and (ii) if there is no Auction, Closing Date, Buyer shall make updates to Schedule 2.05(a) to reflect the

13

Assumed Contracts. Any such deleted Contract shall be deemed to no longer be an Assumed Contract, and for the avoidance of doubt, Buyer shall not be responsible for any related Cure Costs. All Contracts of Sellers that are not listed on Schedule 2.05(a) shall not be considered an Assumed Contract or Purchased Asset and shall be deemed "Excluded Contracts" provided, that Buyer has the right at any time before the Closing to (x) amend Schedule 2.05(a) to designate any other Contract that has not been rejected by Sellers or that has not expired or terminated in accordance with the terms of such Contract to be an Assumed Contract, and (y) to remove from Schedule 2.05(a) any Assumed Contract for any reason.  Buyer's designation of any Assumed Contract as an Excluded Contract shall not reduce the Purchase Price.

(b)     Sellers shall take all actions reasonably required to assume and assign the Assumed Contracts to Buyer (other than payment of Cure Costs, if so required), including taking all actions reasonably required to obtain an Order, which may be the Sale Order, containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code.

(c)     If prior to the Closing Date there are Contracts or Leases that have not been designated as an Assumed Contract or a Excluded Contract, Sellers shall not assume or reject any such Contract or Lease pursuant to Section 365 of the Bankruptcy Code and any order of the Bankruptcy Court, until the earlier of the date Buyer so directs Sellers and the Closing Date.

(d)     At Closing, (x) Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement, assume and assign to Buyer (the consideration for which is included in the Purchase Price) each of the Assumed Contracts that is capable of being assumed and assigned and (y) subject to the terms and conditions of this Agreement, Buyer shall pay promptly all Cure Costs (if any) in connection with such assumption and assignment (as agreed to among Buyer and Sellers or as determined by the Bankruptcy Court) and assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Sale Order and the Assignment and Assumption Agreement.

(e)     Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Contract or any Permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof or in any way adversely affect any of the rights of Buyer, as the assignee or transferee of such Contract or Permit (as the case may be) thereunder. If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the commercially reasonable efforts of Sellers, such consent or approval is required but not obtained with respect to an Assumed Contract or a Permit, neither Sellers nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor shall the Closing be delayed in respect of the Assumed Contracts or the Permits; provided, however, if the Closing occurs, then, with respect to any Assumed Contract or Permit for which consent or approval is required but not obtained, for a period of sixty (60) days from and after the Closing, Sellers shall cooperate, without further consideration, with Buyer in any commercially reasonable arrangement Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Assumed Contract or applicable Permit, including enforcement for the benefit of Buyer of any and all rights of Sellers against any party to the applicable Assumed Contract or applicable Permit arising out of the breach

14

or cancellation thereof by such party; provided, however, to the extent that any such arrangement has been made to provide Buyer with the benefits of, or under, the applicable Assumed Contract or applicable Permit, from and after Closing, Buyer shall be responsible for, and shall promptly pay all payment and other Liabilities under such Assumed Contract or Permit (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Assumed Contract or Permit had been assigned or transferred at Closing with respect to Assumed Contracts and Permits, and at such applicable later date specified in this Section 2.05(e) with respect to any additional Assumed Contracts. Any assignment to Buyer of any Assumed Contract or Permit that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained.

SECTION 2.06.  *Purchase Price*.

(a)    On the terms and subject to the conditions contained herein, the purchase price (the "**Purchase Price**") for the Purchased Assets shall consist of:

(i)    the release of Sellers and any guarantors (and their respective successors and assigns) under the Existing Credit Agreement and the DIP Credit Agreement of any and all Liabilities arising under, or otherwise relating to the Existing Credit Agreement in an amount equal to $[30,000,000.00] and the DIP Credit Agreement in the amount outstanding under the DIP Credit Agreement on the closing date (the "**Credit Bid and Release**"); provided that the Credit Bid and Release shall be reduced dollar-for-dollar to the extent that Buyer assumes any portion of the indebtedness under the Existing Credit Agreement or the DIP Credit Agreement;

(ii)    the payment or other satisfaction of all Cure Costs; and

(iii)    the assumption of the Assumed Liabilities.

(b)    At the Closing, Buyer shall pay or satisfy all Cure Costs as contemplated by Section 5.03, and assume the Assumed Liabilities.

SECTION 2.07. *The Closing*.  The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder (the "**Closing**") will take place remotely via the exchange of electronic documents and signatures by electronic mail on the date that is two (2) Business Days after the satisfaction (or waiver, as applicable) of the conditions to Closing set forth in Article 7 herein, including the entry of the Sale Order (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another place, date or time is agreed to in writing by Sellers and Buyer.  At the Closing:

(a)    Buyer shall deliver to Sellers:

(i)    each of the Transaction Documents to which Buyer is a party, duly executed by Buyer;

(ii)    the certificates of Buyer to be received by Sellers pursuant to Sections 7.01(a) and 7.01(b);

(iii)    releases and termination statements sufficient for Buyer to receive the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances);

(iv)    a Waiver, duly executed by Buyer;

(v)    an instrument (the "**Credit Bid and Release Instrument**") providing for the Credit Bid and Release in form and substance reasonably acceptable to Sellers, duly executed by Buyer; and

(vi)    such other documents as Sellers may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

(b)    Sellers shall deliver to Buyer:

(i)    possession of the Purchased Assets and the Business;

(ii)    each of the Transaction Documents to which Sellers are a party, duly executed by Sellers;

(iii)    instruments of assignment of the Copyrights, Patents, and Trademarks and other Intellectual Property that are owned by Sellers and included in the Purchased Assets, if any, duly executed by Sellers, in form for recordation with the appropriate Governmental Authorities, in customary form and reasonably acceptable to the Parties;

(iv)    a certified copy of the Sale Order;

(v)    the certificates of Sellers to be received by Buyer pursuant to Sections 7.02(a) and 7.02(b); [and]

(vi)    [certificates executed by Sellers, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Sellers are not a foreign person within the meaning of Section 1445(f)(3) of the Code; and][1]

(vii)    such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

---

[1] **NTD**:  Remove if no real property leases are to be assumed

16

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF SELLERS[2]

Sellers represents and warrants to Buyer:

SECTION 3.01. *Organization and Qualification*.  Each Seller has been duly organized and is validly existing and is in good standing under the laws of such Seller's jurisdiction of organization, with the requisite power and authority to own such Seller's properties and conduct such Seller's business as currently conducted in all material respects.  Each Seller, as applicable, has been duly qualified as a foreign corporation or other organization for the transaction of business and is in good standing under the laws of each other jurisdiction in which such Seller owns or leases properties or conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.02. *Authorization*.  The execution, delivery, and performance by Sellers of this Agreement and the consummation of the transactions contemplated hereby are within Sellers' respective corporate or limited liability company powers, as applicable, and, subject to the Bankruptcy Court's entry of the Sale Order, have been duly authorized by all necessary corporate or limited liability company action on the part of each Seller.

SECTION 3.03. *Enforceability*.  This Agreement has been duly and validly executed and delivered by each Seller, and, subject to the Bankruptcy Court's entry of the Sale Order, will constitute the valid and binding obligation of each Seller, enforceable against each such Seller in accordance with its terms.

SECTION 3.04. *Noncontravention*.  Except as set forth in <u>Schedule 3.04</u>, neither the execution and delivery by any Seller of this Agreement or any other Transaction Document to which it is (or will be) a party nor after giving effect to the Sale Order, the consummation of the transactions contemplated hereby or thereby nor, after giving effect to the Sale Order, compliance by it with any of the provisions hereof or thereof will (i) conflict with or result in a violation of (A) any provision of the certificate of incorporation or bylaws (or other organizational or governing documents) of any Seller or (B) any material Order binding upon such Seller or by which the Business or any Purchased Assets are subject or bound, (ii) violate, conflict with, or result in a material breach of any of the terms of, or constitute a material default under, or give rise to any right of termination, modification, cancellation or acceleration under (A) any material Contract, or (B) any material license or Permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority, or (iii) result in the creation of any material Lien upon the properties or assets of Sellers being sold or transferred hereunder.

---

[2] **NTD**:  Reps and warranties subject to review by Corliss for accuracy.

SECTION 3.05.  *Intellectual Property*.

(a)     Schedule 3.05(a) sets forth a true and complete list of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; and (iii) registered Copyrights and pending applications for Copyrights, in each case that are owned by Sellers as of the Execution Date and that are material to the Business. Except as set forth on Schedule 3.05(a), Sellers are the sole owner of all of the applications and registrations set forth on Schedule 3.05(a), and all such applications and registrations are in effect and subsisting.

(b)     Except as disclosed on Schedule 3.05(b), and except as would not, individually or in the aggregate, have a Material Adverse Effect, to the Knowledge of Sellers, (i) the conduct of the Business by Sellers as currently conducted (including the products and services currently sold or provided by Sellers) does not infringe or otherwise violate any Person's intellectual property rights, and no such claims are pending or threatened in writing against Sellers and (ii) no Person is infringing or otherwise violating any Intellectual Property owned by Sellers and no such claims are pending or threatened in writing against any Person by Sellers.

(c)     Except as set forth on Schedule 3.05(c), the Purchased Assets and any rights provided to Buyer pursuant to the Transaction Documents include all material and unavailable "off-the-shelf" third party intellectual property rights used by Sellers to conduct the Business as it is presently being conducted by Sellers.

SECTION 3.06. *Contracts*.    Schedule 3.06 sets forth a complete list of all material Contracts, involving aggregate consideration in excess of $[NUMBER] or requiring performance by any party more than one year from the date hereof, which, in each case, cannot be cancelled without penalty or without more than [180/[NUMBER]] days' notice, to which Sellers are a party and Sellers' calculation of the Cure Costs with respect to each material Contract. Except as set forth on Schedule 3.06, Sellers have not assigned, delegated or otherwise transferred to any third party any of their rights or obligations with respect to any such Contract. Each material Contract is in full force and effect and is a valid and binding obligation of Sellers in accordance with its terms and conditions, in each case except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws now or hereafter in effect relating to creditors' rights generally and general principles of equity, (y) as set forth on Schedule 3.06 ,and (z) as would not, individually or in the aggregate, have a Material Adverse Effect. Upon entry of the Sale Order and payment of the Cure Costs, (i) Sellers will not be in breach or default of their obligations under any Assumed Contract, (ii) to the Knowledge of Sellers, no condition exists that with notice or lapse of time or both would constitute a default by Sellers under any Assumed Contract, and (iii) to the Knowledge of Sellers, no other party to any Assumed Contract is in breach or default thereunder, except in the case of clauses (i), (ii), and (iii) for any breaches or defaults that would not, individually or in the aggregate, have a Material Adverse Effect. The Cure Cost amounts calculated by Sellers and specified in the Cure Notices submitted by Sellers with respect to each of the Assumed Contracts and each Contract listed or described in Schedule 3.06 to the

counterparty or counterparties thereto pursuant to the Bidding Procedures Order are, to the Knowledge of Sellers, true and correct.

SECTION 3.07. *Litigation*. Except as disclosed in Schedule 3.07, and other than the Chapter 11 Cases and the matters that may arise therein, as of the date hereof, there is no action, suit, investigation, or proceeding against, or to the Knowledge of Sellers, pending or threatened against or affecting, the Purchased Assets before any Governmental Authority that is reasonably likely to have a Material Adverse Effect or that in any manner challenges or seeks to prevent, enjoin, alter, or materially delay the transactions contemplated by this Agreement.

SECTION 3.08. *Properties*.

(a)   Schedule 3.08(a) contains a list of all Leased Real Property held or used by Sellers for the operation of the Business. Sellers have made available copies of all Leases to Purchaser. Other than as set forth on Schedule 3.08(a), Sellers are not in breach of any material term or in "default" under any Lease and, to the Knowledge of Sellers, no party to any Lease has given Sellers written notice of or made a claim with respect to any breach or default thereunder. To the Knowledge of Sellers, there are no conditions that currently exist or with the passage of time will result in a default or breach of any material term by any party to a Lease. None of the Leased Real Property is subject to any sublease or grant to any Person of any right to the use, occupancy, or enjoyment of the Leased Real Property or any portion thereof that would materially impair the use of the Leased Real Property in the operation of the Business. To the Knowledge of Sellers, the Leased Real Property is not subject to any Encumbrances (other than Permitted Encumbrances) that were placed on the Leased Real Property through the action or inaction of Sellers and materially impact the use of the Leased Real Property in the Business. The Leased Real Property is not subject to any use restrictions, exceptions, reservations or limitations that in any material respect interfere with or impair the present use thereof in the ordinary course of business. There are no pending or, to the Knowledge of Sellers, threatened condemnation or other proceedings or claims relating to any of the Leased Real Property. The Leases will continue to be legal, valid, binding, enforceable and in full force and effect on the same material terms immediately following the consummation of the transactions contemplated hereby. Schedule 3.08(b) designates the Permits relating to Sellers's operations on the Leased Real Property set forth on such schedule.

(b)   To the Knowledge of Sellers, all buildings, structures, and Improvements located on, fixtures contained in, and appurtenances attached to the Leased Real Property conform in all material respects to any Legal Requirements, including without limitation, those related to zoning, use, or construction, and the Leased Real Property is zoned for the purposes for which the Leased Real Property is presently used by Sellers.

SECTION 3.09. *Title to the Purchased Assets*. Immediately prior to Closing, Sellers will have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 2.07, and upon entry of the Sale Order, Sellers will thereby transfer to Buyer and Buyer will be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good, valid, and marketable title to, or, in the case of property leased or licensed by Sellers, a valid leasehold or licensed interest in, all of the Purchased Assets, free and clear of all Encumbrances, except (a) for the Assumed Liabilities and (b) for Permitted Encumbrances. The Purchased Assets consisting of personal property are in good operating condition and repair

19

(reasonable wear and tear excepted). To the Knowledge of Sellers, Sellers have not taken any action, or failed to take any action, which action or failure would preclude or prevent Buyer as a legal matter from conducting the Business as currently conducted in all material respects. No Purchased Asset is subject to any agreement, written or oral, for its sale or use by any Person other than Sellers, other than as expressly contemplated under the Leases or the Lessor Leases.

SECTION 3.10.  *Tax Matters*.  Each Seller has filed all Tax Returns that it was required to file, and has paid all Income Taxes shown thereon as owing, except where the failure to file Income Tax Returns or to pay Income Taxes would not have a Material Adverse Effect.  Except as set forth in Schedule 3.10, the Sellers have not received written notice that any action, suit, proceeding, or audit is pending against or with respect to any Seller regarding Taxes.  No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.  No Seller is a party to any Income Tax allocation or sharing agreement.

SECTION 3.11.  *Compliance with Laws*.  To the Knowledge of Sellers, none of Sellers nor any of their Subsidiaries (a) is in violation of any applicable laws, rules, regulations, executive orders, or codes (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

SECTION 3.12.  *[Intentionally Omitted]*.

SECTION 3.13.  *Employee Benefits*.

(a)      Except as set forth on Schedule 3.13(a), neither Sellers nor any of Sellers' ERISA Affiliates maintains or contributes to any Benefit Plan.

(b)      To the Knowledge of Sellers, Sellers and each of Sellers' ERISA Affiliates has complied in all material respects with ERISA, the Code, and all applicable laws regarding each Benefit Plan.

(c)      To the Knowledge of Sellers, each Benefit Plan is, and has been, maintained, in material compliance with ERISA, the Code, all applicable laws, and the terms of each such Benefit Plan.  No Actions have been filed or are pending against any Assumed Benefit Plan, and, to the Knowledge of Sellers, no such Actions have been threatened against any Assumed Benefit Plan (in each case, other than routine claims for benefits).

(d)      Each Benefit Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service or an application for such letter is currently being processed by the Internal Revenue Service.  To the Knowledge of Sellers nothing has occurred which would prevent, or cause the loss of, such qualification.

(e)      No liability to the Pension Benefit Guaranty Corporation (other than for the payment of current premiums that are not past due) by Sellers or any of Sellers' ERISA Affiliate

20

has been incurred or is expected by Sellers or any of Sellers' ERISA Affiliate to be incurred with respect to any Benefit Plan. Neither the Sellers nor any of Sellers' ERISA Affiliate sponsors, maintains, contributes to (or is obligated to contribute to) or otherwise has any liability with respect to: (i) an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA, Section 412 of the Code, Section 430 of the Code or Section 302 of ERISA (including any "multiemployer plan" within the meaning of Section 3(37) of ERISA); (ii) a "multiple employer plan" as defined in Section 413(c) of the Code; or (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(f)    Neither Sellers nor any of Sellers' ERISA Affiliate sponsors, maintains, or contributes to, or otherwise has any liability with respect to, any Benefit Plan, including, without limitation, any such plan maintained to provide benefits to former employees of such entities that may not be terminated by Sellers or any of Sellers' ERISA Affiliates in their sole discretion at any time without material liability, including any post-employment health or welfare benefits.

(g)    None of Sellers or any of Sellers' ERISA Affiliates has provided any security under Section 436 of the Code.

(h)    Except as set forth on Schedule 3.13(h), neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement could reasonably be expected to (either alone or in conjunction with any other event): (i) result in any payment becoming due to any current or former employee, director or individual independent contractor of Sellers, any of Sellers' Affiliates or Subsidiaries; (ii) increase any benefits otherwise payable to any current or former employee, director or individual independent contractor of Sellers or any of their Affiliates or Subsidiaries; (iii) result in any acceleration of the time of payment, funding, or vesting of any such benefits to any current or former employee, director, or individual independent contractor of Sellers, any of their Affiliates or Subsidiaries; or (iv) result in any payment or benefit that would constitute an "excess parachute payment" under Code Section 280G. No employee, director, or individual independent contractor of the of Sellers, any of Sellers' Affiliates or Subsidiaries has a right to receive a gross-up payment with respect to any excise Taxes that may be imposed upon such individual pursuant to Code Section 409A or Code Section 4999.

SECTION 3.14. *Environmental Condition*.  Except as set forth on Schedule 3.14, (a) to the Knowledge of Sellers, none of Sellers' nor any of their Subsidiaries' properties or assets has ever been used by Sellers, their Subsidiaries, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, release or transport was in violation of any applicable Environmental Law, that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect, (b) to the Knowledge of Sellers, none of Sellers's nor any of their Subsidiaries' properties or assets has ever been designated or identified on a list prepared by a Governmental Authority pursuant to any environmental protection statute as a Hazardous Materials disposal site, which designation or identification, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect, (c) neither Sellers nor any of their Subsidiaries has received written notice within the last three (3) years that an Encumbrance arising under any Environmental Law has attached to any revenues for which the liability giving rise to such Encumbrance is unresolved, or to any Real Property currently owned or operated by Sellers or their Subsidiaries as of the date hereof, and (d) none of Sellers nor any

21

of their Subsidiaries nor any of their respective facilities or operations is subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law or Environmental Liability that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

SECTION 3.15.  *Employee and Labor Matters*.

(a)      Except as listed on <u>Schedule 3.15(a)</u>, there is (i) no unfair labor practice complaint pending or, to the Knowledge of Sellers, threatened against any Seller or its Subsidiaries before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Seller or its Subsidiaries which arises out of or under any collective bargaining agreement and that could reasonably be expected to result in a Material Adverse Effect, or (ii) no strike, labor dispute, slowdown, stoppage, or similar action or grievance pending or, to the Knowledge of Sellers, threatened in writing against any Seller or any Subsidiaries that could reasonably be expected to result in a Material Adverse Effect.  The hours worked and payments made to employees of each Seller have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  All material payments due from any Seller or any Subsidiaries on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the applicable Seller, except where the failure to do so could not, individually or in aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)      Except as set forth on <u>Schedule 3.15(b)</u>, Sellers are not party to a settlement agreement with a current or former officer, employee or independent contractor of any of Sellers that involves allegations relating to discrimination, harassment (including sexual harassment) or retaliation by an employee of the Sellers.  To the Knowledge of Sellers, (i) there are no material allegations of sexual harassment are pending against an employee of the Sellers and (ii) no employee has engaged in any conduct, is being investigated for any conduct, or aided or assisted any other Person to engage in any conduct or cover-up of such conduct, that could cause or has caused any material damage to the reputation or business of Sellers or their respective employees, including, but not limited to, any conduct constituting sexual misconduct, harassment (including sexual harassment), discrimination or retaliation.

Except as specifically provided in <u>Section 3.1</u> through <u>Section 3.15</u> above, Sellers will convey the Purchased Assets to Buyer on an "As-Is, Where-Is" and "With All Faults" basis, without representations, warranties, or covenants, express or implied, of any kind or nature.  Buyer hereby waives and relinquishes all rights and privileges arising out of, or with respect or in relation to, any representations, warranties, or covenants, whether express or implied, that may have been made or given, or that may have been deemed to have been made or given, by Sellers or their Representatives, except for those expressly set forth in this Agreement.  Upon the Closing, Buyer agrees to assume all risk and liability (and agree that Sellers will not be liable for any special, direct, indirect, consequential, or other damages) resulting or arising from or relating to the ownership, use, condition, location, maintenance, repair, or operation of the Purchased Assets.  None of Sellers nor any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to any Seller (including, but not limited to, any relating to financial condition, results of operations, assets, or liabilities of such

Seller), except as expressly set forth in this Article 3 and the attached Schedules, and each Seller hereby disclaims any such other representations or warranties.

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller that:

SECTION 4.01. *Organization and Qualification*.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and have all requisite powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on their businesses as now conducted.

SECTION 4.02. *Authorization*.  The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby are within the corporate powers of Buyer and have been duly authorized by all necessary corporate action on the part of Buyer.

SECTION 4.03. *Enforceability*.  This Agreement has been duly and validly executed and delivered by Buyer, and constitutes the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

SECTION 4.04. *Noncontravention*.  The execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the transactions contemplated hereby shall not, with or without the giving of notice or lapse of time, (a) violate any provision of the organizational documents of Buyer, (b) violate any law to which Buyer is subject, or (c) conflict with, or result in a breach or default under, any term or condition of any other agreement or other instrument to which Buyer is a party or by which Buyer is bound.

SECTION 4.05. *Adequate Assurances Regarding Assumed Contracts*.  Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts and has and will have at Closing immediately available funds sufficient for satisfaction of all of Buyer's obligations under this Agreement, including the payment of the Cure Costs and all fees, expenses of, and other amounts required to be paid by Buyer in connection with the transactions contemplated hereby.

SECTION 4.06. *Inspections; No Other Representations*.  Buyer (a) is purchasing the Purchased Assets based solely on Buyer's own investigation of the Purchased Assets and (b) except as set forth in this Agreement, neither Sellers nor any director, officer, manager, employee, agent, consultant, or representative of Sellers have made any warranties, representations, or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets, any part of the Purchased Assets, the financial performance of the Purchased Assets, or the physical condition of the Purchased Assets.  Except as set forth in this Agreement, Buyer has relied, and shall rely, solely upon Buyer's own investigation of all such matters and Buyer assumes all risks with respect thereto.

23

BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE TRANSACTION DOCUMENTS, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

ARTICLE 5

COVENANTS

SECTION 5.01.  *Commercially Reasonable Efforts; Further Assurances*.  Subject to the terms and conditions of this Agreement, Buyer and Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated by this Agreement.  Sellers, on the one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using commercially reasonable efforts to accomplish the following: (i) taking all reasonable acts necessary to cause the conditions precedent set forth in Article 7 to be satisfied; (ii) obtaining, at the earliest practicable date, of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority; (iii) defending of any Proceedings challenging this Agreement or the consummation of the transaction contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed; and (iv) executing and delivering any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement. At and after the Closing, and without further consideration therefor, Sellers shall execute and deliver to Buyer such further instruments and certificates as shall be necessary or desirable (x) to vest, perfect, or confirm ownership (of record or otherwise) in either or both Buyer and one or more Buyer Designees, Sellers's right, title, or interest in, to or under any or all of the Purchased Assets and Business, including the Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances) or (y) to otherwise effectuate the purposes and intent of this Agreement and the other Transaction Documents or for aiding, assisting, collecting, and reducing to possession any of the Purchased Assets and exercising rights with respect thereto. Sellers shall take, or cause to be taken, all actions, do or cause to be done all things as may be reasonably requested by Buyer in order to vest, perfect, or confirm any and all right, title, and interest in, to and under such rights, properties, or assets in Buyer or one of more Buyer Designees or otherwise to carry out this Agreement, and shall execute and deliver all additional deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions, and assurances as may be reasonably required to consummate the transactions contemplated by this Agreement.

24

SECTION 5.02. *Public Announcements*.  Absent the prior written consent of the other Parties, such consent to not be unreasonably withheld, delayed, or conditioned, neither Sellers nor Buyer shall make any press release, public announcement, securities filing, or public statement concerning this Agreement or the transactions contemplated hereby, except as and to the extent that any such party shall be required to make any such disclosure by applicable law, and then only after giving the other Parties hereto an opportunity to review, if possible under the circumstances, such disclosure and consider in good faith the comments of the other Parties hereto.  For the avoidance of doubt, nothing herein shall be construed to prohibit or restrict any filings, disclosure, or announcement that Sellers make in connection with the Chapter 11 Cases.

SECTION 5.03. *Assurances Regarding Assumed Contracts; Payment of Cure Costs; Performance of Assumed Contracts*.  With respect to each Assumed Contract, Buyer shall provide adequate assurance of the future performance by Buyer of such Assumed Contract.  Buyer shall, at or prior to the Closing, pay or otherwise satisfy all Cure Costs under the Assumed Contracts so that such Assumed Contracts may be assumed by Sellers and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

SECTION 5.04. *Bankruptcy Court Matters*.

(a)    In connection with the transactions contemplated by this Agreement, Sellers shall file with the Bankruptcy Court after the execution of this Agreement by each of the Parties, within two (2) days after the Petition Date, the Sale Motion, including the Bidding Procedures Order and Sale Order, and appropriate supporting declarations, in each case, in form and substance reasonably acceptable to Sellers and Buyer and which identifies Buyer as the "stalking horse" for the Purchased Assets. Sellers shall affix a copy of this Agreement to the Sale Motion filed with the Bankruptcy Court (which shall be, subject to the approval of the Bankruptcy Court, without schedules).

(b)    No later than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order, in form and substance acceptable to Sellers and Buyer. In the event that Buyer is not the Winning Bidder, Buyer agrees to serve as a Backup Bidder solely for a period of thirty days after the entry of the Sale Order if designated as the Backup Bidder in accordance with the terms of the Bidding Procedures Order.

(c)    No later than eighty-six (86) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to Sellers and Buyer.

(d)    On or before four (4) days after entry of the Sale Order, the Closing Date shall have occurred.

(e)    Each Seller shall serve on all non-Seller counterparties to all of their Contracts a notice specifically stating that such Seller is or may be seeking the assumption and assignment of such Contracts and shall notify such non-Seller counterparties of the deadline for objecting to the Cure Costs, if any, which deadline shall not be less than ten (10) Business Days prior to the Sale Hearing.

25

(f)      From and after the date of this Agreement and until the Closing Date, each Seller shall deliver to Buyer, at least two (2) Business Days in advance, drafts of any and all material pleadings, motions, notices, statements, schedules, applications, reports, and other papers to be filed or submitted in connection with this Agreement for Buyer's prior review and comment, including any Tax motions, and such filings shall be reasonably acceptable to Buyer to the extent they relate to the Purchased Assets, any Assumed Liabilities or any of Buyer's obligations hereunder. Each Seller agrees to diligently prosecute the entry of the Bidding Procedures Order and the Sale Order. In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, Sellers and Buyer shall use their commercially reasonable efforts to defend such appeal. Sellers shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice, or motion to be filed in connection herewith.

SECTION 5.05.  *Conduct of the Business.*

(a)      Except as may be required by the Bankruptcy Court and the Chapter 11 Cases, from the date hereof until the Closing Date, Sellers shall use commercially reasonable efforts to (i) conduct Sellers' respective businesses in the ordinary course consistent with past practice and preserve intact the Business and relationships with third parties and to keep available the services of the present employees of Sellers, (ii) continue to collect and accrue Accounts Receivable in the ordinary course of business consistent with past practice, and shall take no action to accelerate collection of such Accounts Receivable, including, without limitation, the offering of discounts outside of the ordinary course to collect such Accounts Receivable, and (iii) continue to perform Sellers' obligations in the ordinary course of business consistent with past practice, including, subject to any limitations and restrictions in the DIP Credit Agreement, timely payment of accounts payable, and shall take no action to delay collection of such accounts payable.  Without limiting the generality of the foregoing, from the date hereof until the Closing Date, except as disclosed on Schedule 5.05, Sellers will not:

(i)      acquire a material amount of assets from any other Person except in the ordinary course of business;

(ii)      sell, lease, license, or otherwise dispose of any Purchased Assets except (A) pursuant to existing contracts or commitments or (B) otherwise in the ordinary course consistent with past practice;

(iii)      terminate, cancel, or materially amend or modify any Assumed Contract;

(iv)      grant to any employee of Sellers any increase in compensation except in the ordinary course of such Seller's business and consistent with past practice;

(v)      take any action that would reasonably be expected to cause the failure of the conditions contained in Section 7.02(a); or

(vi)      agree or commit to do any of the foregoing.

SECTION 5.06. *Access to Information*.

(a)    From the date hereof until the Closing Date, Sellers will (i) give Buyer, Buyer's counsel, financial advisors, auditors and other authorized representatives reasonable access to the offices, properties, books and records of Sellers; (ii) furnish to Buyer, Buyer's counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information relating to Sellers' business as such Persons may reasonably request; and (iii) instruct the employees, counsel, and financial advisors of Sellers to cooperate in a commercially reasonably manner with Buyer in Buyer's reasonable investigation of the Business; provided, however, that any such investigation shall be conducted during normal business hours upon reasonable advance notice to Seller, under the supervision of Sellers' personnel and in such a manner as not to interfere with the conduct of the Business or any other businesses of Sellers.

(b)    On and after the Closing Date, Sellers on one hand, and Buyer on the other hand, will each afford promptly to the other Party, and their agents, reasonable access to their books of account, financial and other records (including, without limitation, accountant's work papers), information, employees and auditors to the extent necessary or useful for the other Party in connection with any audit, investigation, dispute or litigation, or any other reasonable business purpose relating to the Purchased Assets, including, without limitation, Sellers' administration of the Chapter 11 Cases; provided, that any such access shall not unreasonably interfere with the conduct of the business of any Party.  Each party shall bear their own out-of-pocket costs and expenses reasonably incurred in connection with the foregoing.

SECTION 5.07. *Notices of Certain Events*.  Sellers shall promptly notify Buyer of any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(a)    any written notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(b)    any actions, suits, claims, investigations or proceedings commenced relating to any Seller that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 3.07.

SECTION 5.08. *Sale Free and Clear*.  The Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances (including, for the avoidance of doubt, all successor liability, including without limitation, any successorship obligations with respect to any Benefit Plan that is not an Assumed Benefit Plan) of, against or created by any Seller or its bankruptcy estate, shall be fully released from and with respect to the Purchased Assets. On the Closing Date, the Purchased Assets shall be transferred to the Buyer and/or one or more Buyer Designees, as applicable, free and clear of all obligations, Liabilities and Encumbrances (including, for the avoidance of doubt, all successor liability, including without limitation, any successorship obligations with respect to any Benefit Plan that is not an Assumed Benefit Plan), other than the Permitted Encumbrances and the Assumed Liabilities.

27

SECTION 5.09.  *Casualty Loss*.  Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Purchased Assets is (a) condemned or taken by eminent domain, or (b) is damaged or destroyed by fire, flood, or other casualty, Sellers shall notify Buyer promptly in writing of such fact (i) in the case of condemnation or taking, Sellers shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing and (ii) in the case of fire, flood, or other casualty, Sellers shall assign the insurance proceeds therefrom to Buyer at Closing. Notwithstanding the foregoing, the provisions of this Section 5.09 shall not in any way modify Buyer's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

SECTION 5.10.  *No Successor Liability*.  The Parties intend that, except where expressly prohibited under applicable Legal Requirement, upon the Closing, Buyer shall not be deemed to: (i) be the successor of Sellers, including without limitation, with respect to any Benefit Plans, except for Assumed Benefit Plans, (ii) have, de facto, or otherwise, merged with or into Sellers, (iii) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers, or (iv) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Purchased Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that Buyer shall not be liable for any Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) against any Seller or any of such Seller's predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any Liabilities of Sellers arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this Section 5.10 shall be reflected in the Sale Order.

ARTICLE 6

EMPLOYEE MATTERS

SECTION 6.01.  *Buyer Employee*s.  Within two (2) days after entry of the Sale Order, Buyer shall offer employment, effective as of the Closing, to substantially all of the Employees on terms and conditions set in Buyer's sole discretion; provided, however, that Buyer's offer of employment will be at a level of compensation and benefits that, in the aggregate, Buyer determines in good faith is reasonably comparable to the compensation and benefits of such Employee immediately prior to the Petition Date, without giving effect to any key employee retention plan and any compensation or bonus plan, agreement or arrangement designed to retain employees during the pendency of the Chapter 11 Cases.  Each such offer shall include a waiver of any costs related to the termination of employment of such Employees by Sellers in connection with the transactions contemplated by this Agreement, (including without limitation any severance), as against Buyer, Sellers and their respective Affiliates. If the Closing occurs, any such Employees who accept any such offer no later than seven (7) Business Days after the Closing Date are hereinafter referred to as the "**Buyer Employees**".

SECTION 6.02. *Employment Tax Reporting*.   With respect to Buyer Employees, Buyer and Sellers shall use the alternate procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, for purposes of employment Tax reporting.

SECTION 6.03. *Benefits*.   From and after the Closing (or with respect to any Buyer Employee who is on an approved leave of absence as of the Closing, from and after such Buyer Employee's return to work), Buyer shall, or shall cause an Affiliate of Buyer to, provide (whether under existing or newly-established Buyer benefits plans or under any Assumed Benefit Plans assumed under this Agreement (collectively, the "**Buyer Plans**")) to each Buyer Employee and their eligible dependents benefits under any Assumed Benefit Plans that are reasonably equivalent in the aggregate than the practice, plans or policies in effect for such Buyer Employee immediately prior to the Closing.   If applicable, for purposes of eligibility, vesting and the calculation of the eligibility for and amount of vacation, sick pay, severance, or other benefits under Buyer Plans providing benefits to Buyer Employees, Buyer shall credit each Buyer Employee with such Buyer Employee's years of service with Sellers to the same extent as such Buyer Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan; provided, however, that no such service recognition shall result in any duplication of benefits or apply to any defined benefit pension plans.   In addition, to the extent it has the right to do so, Buyer shall use commercially reasonable efforts to (a) waive under any health or welfare plans maintained by Buyer for Buyer Employees any pre-existing condition limitations and eligibility waiting periods for Buyer Employees and their eligible dependents (but only to the extent such pre-existing condition limitations, eligibility waiting periods and evidence of insurability requirements were satisfied under Sellers's comparable health plans as of the Closing Date), and (b) provide that dollar amount of all eligible expenses incurred by Buyer Employees and their eligible dependents during the calendar year in which the Closing Date occurs shall be taken into account for purposes of satisfying the applicable deductibles, co-payments or out-of-pocket limitations for such calendar year under the relevant Buyer's health or welfare plans.

SECTION 6.04. *Third Party Beneficiary*.   No provision of this Article 6 shall (a) create any third party beneficiary or other rights in any Employee or former employee (including any beneficiary or dependent thereof) of Sellers, Buyer or any other Person, (b) constitute or create, or be deemed to constitute or create, a Benefit Plan, a Buyer Plan or any other an employment agreement or employee benefit plan, (c) constitute or be deemed to constitute an amendment to any Benefit Plan, Buyer Plan, or any other employee benefit plan sponsored or maintained by Sellers or Buyer, or (d) alter or change the employment at-will status of Employees or in any way limit the right of the Sellers, the Buyer or any of their respective Subsidiaries or Affiliates to terminate the employment or service of any such Employees.

ARTICLE 7

CONDITIONS TO CLOSING

SECTION 7.01. *Conditions to the Obligations of Sellers*.   The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (unless waived in writing by Sellers) of each of the following conditions on or prior to the Closing Date:

17410114/5

(a)    the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date. Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof;

(b)    Buyer shall have performed and complied in all material respects with all covenants and obligations under this Agreement to be performed or complied with by it on or prior to the Closing Date.  Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof;

(c)    no Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the Closing; and

(d)    the Bankruptcy Court shall have entered the Sale Order and such Sale Order shall not be subject to a stay pending appeal; provided, however that Buyer may, in Buyer's sole discretion, deem the condition in this subclause (d) to be satisfied notwithstanding any such stay pending appeal.

SECTION 7.02. *Conditions to the Obligation of Buyer*.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (unless waived in writing by Buyer) of each of the following conditions on or prior to the Closing Date:

(a)    the representations and warranties of Sellers contained in this Agreement shall be true and correct, except for any failure to be true and correct that, together with all other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect. Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof;

(b)    each Seller shall have performed and complied with all covenants and obligation under this Agreement, except for any failure to perform and comply that, together with all other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect.  Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof;

(c)    no Governmental Authority shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation or non-appealable judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the Closing; and

(d)    the Bankruptcy Court shall have entered the Sale Order and such Sale Order shall not be subject to a stay pending appeal.

ARTICLE 8

TAX MATTERS

SECTION 8.01.  *Tax Cooperation; Allocation of Taxes*.

(a)    Buyer and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets (including, without limitation, access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax.  Sellers and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets.

(b)    To the extent not exempt under Section 1146(a) of the Bankruptcy Code in connection with the Chapter 11 Cases, all excise, sales, use, value added, registration stamp, recording, documentary, conveyance, franchise, property, transfer and similar Taxes, levies, charges and fees, including any interest and penalties incurred in connection with the transactions contemplated by this Agreement (collectively, "**Transfer Taxes**") shall be borne by Buyer when due, and Buyer will, at Buyer's own expense, file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes.  If any Seller, as agent for any Taxing Authority, is required to collect such Transfer Taxes, Buyer shall pay the aggregate amount of such Transfer Taxes to Sellers on demand and in such case Sellers shall remit such amount to the appropriate Taxing Authorities in accordance with applicable legislation.  Buyer and Sellers shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation, relating to Transfer Taxes.

SECTION 8.02. *Purchase Price Allocation*.  Buyer shall prepare and deliver to Sellers a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder (such statement, the "**Allocation Statement**"), and the Allocation Statement shall be finalized upon reasonable consultation with Sellers. Unless otherwise required by law, the IRS or any other Taxing Authority, the allocation of the Purchase Price pursuant to the Allocation Statement shall be final and binding on the Parties, and the Parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not take any position inconsistent therewith. If the IRS or any other taxation authority proposes a different allocation, Sellers or Buyer, as the case may be, shall promptly notify the other party of such proposed allocation. Sellers or Buyer, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this Section 8.02. Except as otherwise required by any Legal Requirement or pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by Article 2 of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this Section 8.02; and (ii) neither Party (nor any of their Affiliates) will take any position inconsistent with this Section 8.02 in any Tax Return, in any refund claim, in any litigation or otherwise. Notwithstanding the

31

allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Purchased Assets or the allocation of the value of the Purchased Assets in any plan or reorganization or liquidation that may be proposed.

ARTICLE 9

SURVIVAL

SECTION 9.01. *Survival*.  The (a) representations and warranties of the parties, and (b) covenants and agreements of the parties that by their terms are to be performed prior to the Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith shall not survive the Closing.  The covenants and agreements contained herein that by their terms are to be performed after the Closing shall survive the Closing for the period contemplated by its terms except the covenants, agreements, representations and warranties contained in Article 8 shall survive until expiration of the statute of limitations applicable to the matters covered thereby (giving effect to any waiver, mitigation or extension thereof).

ARTICLE 10

TERMINATION

SECTION 10.01. *Grounds for Termination*.  This Agreement may be terminated at any time prior to the Closing:

(a)     by either Sellers or Buyer:

(i)     upon mutual written consent of Sellers and Buyer;

(ii)     if the Closing shall not have occurred on or prior to [September 30, 2025] (the "**Outside Date**"); provided, however, that the Parties may extend the Outside Date by mutual agreement;

(iii)     if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated hereby; or

(iv)     if the Bankruptcy Court shall have entered an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under chapter 11 of the Bankruptcy Code and compromising part of the Chapter 11 Cases;

(b)     by notice from Buyer to Sellers:

(i)     if any of the events set forth in clauses (a) through (d) of Section 5.04 shall not have occurred by the respective dates set forth therein;

(ii)     if (A) an Alternative Transaction is approved by the Bankruptcy Court and Buyer has not been designated as the Backup Bidder in accordance with the Bidding

Procedures Order, or (B) any Seller seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under chapter 11 of the Bankruptcy Code comprising part of the Chapter 11 Cases, or appointing a trustee in the Chapter 11 Cases or appointing a responsible officer or an examiner with enlarged powers (other than a fee examiner) relating to the operation of Sellers' businesses pursuant to Section 1104 of the Bankruptcy Code, or such an order of dismissal, conversion or appointment is entered for any reason and is not be reversed or vacated within fourteen (14) days after the entry thereof;

(iii)    if Buyer is not then in material breach of any provisions of this Agreement, in the event of any breach of, or failure to perform, any agreements, covenants, representations, or warranties of Sellers contained herein or in the Sale Order;

(iv)    if, for any reason, Buyer (other than as a result of their own breach of this Agreement) is unable, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid in payment of all or any portion of the Purchase Price as set forth in Section 2.06 (other than the Assumed Liabilities);

(v)    if at the end of the auction for the Purchased Assets, Buyer is not determined by Sellers to be either the (A) Winning Bidder or (B) Backup Bidder; or

(vi)    upon the occurrence of any Termination Event (as defined in the DIP Credit Agreement).

(c)    by notice from Sellers to Buyer:

(i)    if Sellers are not then in material breach of any provisions of this Agreement, in the event of any breach of, or failure to perform, any agreements, covenants, representations, or warranties of Buyer contained herein or in the Sale Order; or

(ii)    if at the end of any auction for the Purchased Assets, Buyer is not either the (A) Winning Bidder or (B) Backup Bidder.

The party desiring to terminate this Agreement pursuant to this Section 10.01 shall give notice of such termination to the other party in accordance with Section 11.01.

SECTION 10.02. *Effect of Termination*.   If this Agreement is terminated as permitted by Section 10.01, such termination shall be without liability of any party (or any stockholder, director, officer, employee, agent, consultant or representative of such party) to the other parties to this Agreement, the provisions of which shall represent the sole and exclusive rights of the parties upon a termination of this Agreement under Section 10.01.   The provisions of Section 10.02 and Article 11 shall survive any termination pursuant to Section 10.01.

33

ARTICLE 11

MISCELLANEOUS

SECTION 11.01.  *Notices*.  All notices, requests and other communications to any party hereunder shall be in writing (including email transmission with delivery confirmation) and shall be given,

if to Buyer:

Job.com Acquisition Co., LLC
Attention:  [●]
Email: [●]

With a copy (that shall not constitute notice) to:

Geoffrey T. Raicht, PC
99 Biltmore Ave
Rye, New York 10580
Email: graicht@raichtlawpc.com

GT Partners Private Credit Finance LLC
GT Monterey Cypress Finance LLC
18952 MacArthur Blvd., Suite 100-101
Irvine, California 92612
Attention: Scott Warner
Email: swarner@gt-gp.com

if to Sellers, to:
My Job Matcher, Inc.
c/o CorlissMoore & Associates
1959 N. Peace Haven Rd. #301
Winston-Salem, NC 27106
Attention:  Robert Corliss
Email:  rjcorliss@corlissmoore.com

with a copy (that will not constitute notice) to:
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Attention: Vincent J. Cannizzaro
Attention: Jeffrey R. Waxman
Fax:  302-571-1750
Email:  VCannizzaro@morrisjames.com
Email:  JWaxman@morrisjames.com

34

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day at the place of receipt.

SECTION 11.02.  *Amendments and Waivers*.

(a)     Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement or, in the case of a waiver, by the party against whom the waiver is to be effective.

(b)     No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 11.03.  *Successors and Assigns*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, that no party may assign, delegate or otherwise transfer any of their rights or obligations under this Agreement without the written consent of each other party hereto; provided further that, Buyer shall be permitted to assign all or part of Buyer's rights or obligations hereunder to one or more Buyer Designees without the prior consent of Sellers and, in such event, Buyer shall remain liable for payment of all Assumed Liabilities assigned to such one or more Buyer Designees.

SECTION 11.04.  *Governing Law*.  This Agreement shall be governed by and construed in accordance with the law of the State of Delaware, without regard to the conflict of laws rules of such state.

SECTION 11.05.  *Jurisdiction*.  The parties hereto agree that, during the period from the date hereof until the date on which the Chapter 11 Cases are closed or dismissed (the "**Bankruptcy Period**"), any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court.  The parties further agree that, following the Bankruptcy Period, any suit, action or proceeding with respect to this Agreement or the transactions contemplated hereby shall be brought against any of the parties exclusively in either the United States District Court for the District of Delaware or any state court of the State of Delaware located in such district, and each of the parties hereby irrevocably consents to the jurisdiction of such court and the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the such courts or that any such suit, action or proceeding which is brought in such courts has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without

the jurisdiction of the Bankruptcy Court, the United States District Court for the District of Delaware or any state court of the State of Delaware.

SECTION 11.06. *WAIVER OF JURY TRIAL.* EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 11.07. *Counterparts; Third Party Beneficiaries.* This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. No provision of this Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

SECTION 11.08. *Specific Performance.* It is understood and agreed by Buyer that money damages would be an insufficient remedy for any breach of this Agreement by Buyer and as a consequence thereof, after the Bankruptcy Court's entry of the Sale Order, Sellers shall be entitled to specific performance and injunctive or other equitable relief as a remedy for such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer to comply promptly with all of their obligations hereunder.

SECTION 11.09. *Entire Agreement.* This Agreement, the Sale Order and the Transaction Documents constitute the entire agreement between the parties with respect to the subject matter of this Agreement and supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

SECTION 11.10. *Bulk Sales Laws.* Buyer hereby waives compliance by Sellers and Sellers hereby waives compliance by Buyer with the provisions of the "bulk sales", "bulk transfer" or similar laws of any jurisdiction other than any laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

SECTION 11.11. *No Strict Construction.* Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

SECTION 11.12. *Non-Recourse.* No past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any party hereto shall have any liability for any Liabilities of the parties under this Agreement or any other document related to the transactions contemplated hereby, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby, and each party hereby covenants not to sue any

past, present or future director, manager, officer, employee, incorporator, member, unitholder, partner or equityholder of any other party for any such claim.

SECTION 11.13. *Severability*.   The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

SECTION 11.14. *Fees and Expenses*.   Except as otherwise expressly set forth in this Agreement, each party will bear their own costs and expenses incurred in connection with the preparation, execution and performance of this Agreement, the Transaction Documents and the transactions contemplated hereby and thereby.

[Remainder of page intentionally left blank.]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLERS:**

**MY JOB MATCHER, INC.**

By:_____
Name:
Title:

**JOB.COM - HV, INC. (DE)**

By:_____
Name:
Title:

**JOB.COM-FORTUS, INC.**

By:_____
Name:
Title:

**JOB.COM-ENDEVIS, INC.**

By:_____
Name:
Title:

**JOB.COM-QCI, INC.**

By:_____
Name:
Title:

**PRINCETON ONE - JOB.COM, INC.**

By:_____
Name:
Title:

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**JOB.COM - HV, INC. (FL.)**

By:_____
Name:
Title:

**PRINCETON SEARCH L.L.C.**

By:_____
Name:
Title:

**BUYER:**                    **JOB.COM ACQUISITION CO., LLC**

By:_____
Name:
Title:

Title: