**<u>Annex 2</u>**

**DIP Note**

## DEBTOR-IN-POSSESSION
## DELAYED DRAW TERM LOAN PROMISSORY NOTE

$9,900,000

Wilmington, Delaware
Dated as of July 8, 2025

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, My Job Matcher, Inc., a Delaware corporation, Job.com-HV, Inc., a Delaware corporation, Job.com-Fortus, Inc., a Delaware corporation, Job.com-Endevis, Inc., a Delaware corporation, Job.com-QCI Inc., a Delaware corporation, PrincetonOne-Job.com, Inc., a Delaware corporation, Princeton Search L.L.C, a New Jersey limited liability company, and Job.com-HV, Inc., a Florida corporation, (each a "Borrower" or "Debtor" and, collectively, the "Borrowers" or the "Debtors"), hereby unconditionally promise to pay to the order of Ankura Trust Company, LLC, a Delaware limited liability company ("Agent") for the benefit of Lenders, the aggregate of any and all amounts Lenders have disbursed to the Borrowers pursuant to this Debtor-in-Possession Delayed Draw Term Loan Promissory Note (as the same may be amended, modified, renewed, restated, or supplemented from time to time, this "Note"), not to exceed the aggregate principal amount at any time outstanding of nine million, nine hundred thousand dollars ($9,900,000), together with all accrued and unpaid interest (including all interest added to the outstanding principal amount hereof pursuant to Section 4(a) below and all interest thereon) and fees thereon, as provided in this Note. On July 6, 2025 (the "Petition Date"), Debtors filed voluntary petitions for reorganization ("Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., as amended (the "Bankruptcy Code"). The Chapter 11 Cases are being jointly administered. Debtors continue to operate Debtors' businesses and manage Debtors' properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Borrower has requested that Lender make loans from time to time on the terms, and subject to the conditions set forth, in this Note and the Interim Order or Final Order, as applicable, which are incorporated herein upon entry by the Bankruptcy Court. Borrower intends to utilize such loans to fund working capital requirements, costs, and expenses of administration of the Chapter 11 Cases, and fees and expenses relating to the DIP Facility during the pendency of the Chapter 11 Cases.

1.    Loans.

(a)    Subject to the terms and conditions hereof, Lenders shall make available to the Borrowers, from time to time until the Maturity Date[1], loans (each, a "Loan") in an aggregate principal amount not to exceed the Commitment. The aggregate principal amount of all Loans made hereunder shall not exceed at any time the amount of the Commitment, plus all interest added to the outstanding principal amount hereof pursuant to Section 4(a) below (the "Maximum Amount"). Until the Maturity Date, Borrowers may, subject to the satisfaction of the conditions

---

[1]    Capitalized terms used herein and not otherwise defined herein shall have the meaning ascribed thereto in Section 20 of this Note, in the DIP Motion, or in the Interim Order or the Final Order, as applicable.

as set forth in <u>Section 2</u> herein, from time to time borrow Loans under this <u>Section 1</u>, <u>provided</u> that (i) the aggregate principal amount of Loans made hereunder shall not exceed the Commitment, (ii) each disbursement of Loans shall be in a minimum amount of $500,000, (iii) no more than two (2) disbursements of Loans shall be made in any calendar month, unless otherwise agreed by Lenders in their sole discretion, and (iv) the aggregate amount of Loans made prior to the entry of the Final Order shall not exceed two million ($2,000,000), which initial Loans shall be made in a single disbursement.  Each Loan (including any Loan funded in connection with entry of the Interim Order) shall be made pursuant to a notice sent by the Borrowers to Agent at the address specified in <u>Section 23</u> hereof given no later than 12:00 p.m. (prevailing Eastern time) on the date that is at least three (3) Business Days prior to the funding date of the proposed Loan; <u>provided</u> that the initial Loan may be made within one (1) Business Day after entry of the Interim Order. Each such notice (a "<u>Notice of Loan</u>") shall be given in writing (by electronic transmission or overnight courier) specifying (i) the amount of such Loan requested, (ii) the proposed date of such Loan, which must be a Business Day, and (iii) such other information as may be reasonably required by Lender or Agent.  Upon receipt of a Notice of Loan, subject to the satisfaction of the conditions set forth in this Note, Lender shall make the proceeds of such Loan available to the Borrowers on the applicable date of funding of such Loan by transferring immediately available funds equal to such proceeds to the Borrowers' Designated Account.  Any amounts of principal repaid or prepaid hereunder may not be re-borrowed.  The entire unpaid balance of the Loans and all other Obligations shall be immediately due and payable in full in immediately available funds on the Maturity Date.

(b)    Notwithstanding the provisions of <u>Section 1(a)</u> above, upon entry of the Final Order and without further action of Borrowers, Agent, or Lenders, Borrowers shall be deemed to have delivered a Notice of Loan for an amount equal to the Interim Loan Obligations, and Lenders shall be deemed to have made certain bridge financing Loans incurred from and after April 25, 2025 in an aggregate principal amount equal to $3,865,148 (the "<u>Roll-Up Loan</u>"), and the Prepetition Secured Obligations shall be reduced by an amount equal to the Roll-Up Loan.

(c)    Agent and Lenders shall be entitled to rely upon, and shall be fully protected in relying upon, any Notice of Loan or similar notice believed by Agent to be genuine.  Agent and Lenders may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon has actual knowledge to the contrary.

(d)    Borrowers shall utilize the proceeds of Loans (i) to fund general corporate or working capital requirements, costs and expenses of administration of the Chapter 11 Cases, fees and expenses relating to the DIP Facility during the pendency of the Chapter 11 Cases in accordance with the Approved Budget and (ii) subject to entry of the Final Order, repayment of the Interim Loan Obligations.

(e)    <u>Register</u>. The Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain a register (the "<u>Register</u>") in which it shall record the names and addresses of the Lenders and the principal amount of the Loan (and stated interest thereon) owed to each Lender from time to time. The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Agent, and the Lenders shall treat each Person whose name is recorded therein as a Lender for all purposes of this Note notwithstanding any notice to the

contrary. The Register shall be available for inspection by the Borrowers and any Lender at any reasonable time and from time to time upon reasonable prior notice.

2.    <u>Certain Conditions to Each Loan</u>.  Lenders shall not be obligated to fund any Loan, if, as of the date thereof:

(a)    Borrowers have not paid any amount then payable hereunder or under any other Loan Document or shall not have performed any of Borrowers' obligations hereunder or under any other Loan Document;

(b)    Borrowers have not duly executed and delivered this Note;

(c)    Borrowers have not delivered corporate resolutions, incumbency certificates, and similar documents, in form and substance satisfactory to Lenders in Lenders' reasonable discretion, with respect to this Note and the other Loan Documents and the transactions contemplated hereby and thereby;

(d)    Borrowers have not (i) duly paid any and all fees, costs, and expenses then payable hereunder or under any other Loan Documents (including, without limitation, the reasonable and documented fees, costs, and expenses of counsel to Agent and Lenders) and (ii) fully performed all of Borrowers' obligations hereunder or under any other Loan Documents;

(e)    (i) the Bankruptcy Court has not entered the Interim Order within three (3) Business Days of the Petition Date or (ii) the Interim Order has been stayed, vacated, reversed, modified, or amended (other than as a result of being superseded by the Final Order) without Lenders' consent in Lenders' reasonable discretion;

(f)    on any such date that is on or after the date that is thirty (30) calendar days after the Petition Date, (i) the Bankruptcy Court has not entered the Final Order or (ii) the Final Order has been stayed, vacated, reversed, modified, or amended without Lenders' consent in Lenders' reasonable discretion;

(g)    Borrowers have not delivered to Lenders the Approved Budget that is in form and substance satisfactory in Lenders' reasonable discretion, or shall not have updated the Approved Budget in accordance with this Note;

(h)    a Bankruptcy Court order has been entered (i) authorizing Borrowers to obtain financing or credit pursuant to section 364 of the Bankruptcy Code from any Person other than Lenders or (ii) providing adequate protection to any Person under sections 361 through 364 of the Bankruptcy Code other than as authorized pursuant to the Interim Order, the Final Order, or with the consent and approval of Lenders;

(i)    any representation or warranty by Borrowers contained herein or in any other Loan Documents shall be untrue or incorrect as of such date in any material respect;

(j)    (i) any Event of Default shall have occurred and be continuing or would result after giving effect to any requested Loan or (ii) any Default shall have occurred and

3

be continuing or would result after giving effect to any requested Loan, and Lenders in Lenders' sole discretion shall have determined not to make any Loan so long as such Default is continuing;

(k)     except as occasioned by the commencement of the Chapter 11 Cases and the actions, proceedings, investigations, and other matters related thereto, any event or circumstance having a Material Adverse Effect shall have occurred since the date hereof and Lenders shall have determined not to make any Loan so long as such Material Adverse Effect is continuing;

(l)     (i) the Sale Motion in form and substance reasonably acceptable to Lenders is not filed within five (5) days after the Petition Date or (ii) after the Sale Motion is filed, the Sale Motion has been withdrawn or orders approving bid procedures in connection with the sale and the Sale Motion (which orders must be in form and substance reasonably acceptable to Lenders) have not been entered by the dates set forth in the Interim Order;

(m)     on any date after the Sale Order has been entered, the Sale Order is vacated, reversed, modified (without Lenders' consent), or successfully appealed; or

(n)     after giving effect to any Loan, the outstanding principal amount of all Loans would exceed the lesser of (i) the Maximum Amount, (ii) the amount then authorized by the Interim Order or Final Order as applicable, and (iii) the amount permitted to be borrowed for the applicable period as set forth in the Approved Budget, subject to Permitted Variances.

The request and acceptance by Borrowers of the proceeds of any Loan shall be deemed to constitute, as of the date of such request, acceptance, or incurrence, (i) a representation and warranty by Borrowers that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by Borrowers of the granting and continuance of Agent's Liens for the benefit of Lenders, pursuant to the Collateral Documents.

3.     Payment of Principal.  FOR VALUE RECEIVED, Borrowers, jointly and severally, promise to pay to Lenders, in the manner and at the place hereinafter provided, the unpaid principal amount of all Loans made by Lenders pursuant to this Note to the Borrowers on the Maturity Date.

4.     Payment of Interest.

(a)     The unpaid principal amount of Loans shall bear interest from the date when made until paid in full at a rate equal to thirteen and one-half percent (13.5%) per annum, payable on each applicable Interest Payment Date.  All interest on the Loans shall be calculated upon a year of 360 days and actual days elapsed.  All payments of interest hereunder shall be made by adding the amount of interest payable on any Interest Payment Date to the outstanding principal amount of Loans, and such amount shall thereafter constitute principal amount of Loans bearing interest in accordance herewith.

(b)     If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the time for payment thereof will be extended to the next succeeding

Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)     All computations of fees and interest shall be made by Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by Agent of any interest hereunder shall be final, binding, and conclusive on Borrower (absent manifest error).

(d)     So long as an Event of Default shall have occurred and be continuing, and at the election of Lenders confirmed by written notice from Agent to the Borrowers, the interest rate applicable to the Obligations shall be increased by two percentage points (2.00%); per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.  Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(e)     Notwithstanding anything to the contrary set forth in this Section 4, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; provided that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Lenders is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this Section 4(e)) the interest rate payable since the closing date as otherwise provided in this Note.  Thereafter, interest hereunder shall be paid at the rate(s) of interest and in the manner provided in Sections 4(a) through (d), unless and until the rate of interest again exceeds the Maximum Lawful Rate, and at that time this paragraph shall again apply.  If the Maximum Lawful Rate is calculated pursuant to this Section 4(e), such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made.  If, notwithstanding the provisions of this Section 4(e), a court of competent jurisdiction shall finally determine that Lenders have received interest hereunder in excess of the Maximum Lawful Rate, Lenders shall, to the extent permitted by applicable law, promptly apply such excess to the payment of other outstanding Obligations and thereafter shall refund any excess to the Borrowers or as a court of competent jurisdiction may otherwise order.

5.     Payments.  Except as expressly provided in Section 4(a), all payments of principal and interest in respect of this Note shall be made in Dollars in same day funds to Agent to such account or accounts as shall be designated in a written notice delivered by Agent to the Borrowers. Each payment made hereunder shall be credited first, to fees and reimbursable expenses of Agent and Lenders then due and payable pursuant to any of the Loan Documents; second, to interest then due and payable on the Loans; third, to the principal balance of the Loans until the same has been paid in full; and fourth, to all other Obligations.  Any amounts of principal repaid or prepaid hereunder may not be re-borrowed.

Borrower hereby authorizes Agent to, and Agent may, from time to time, upon prior notice to the Borrower, charge the Loan Account of Borrower with any amount due and payable by Borrower under any Loan Documents.  Borrower agrees that Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing. Any amount charged to the Loan Account of Borrower shall be deemed a Loan hereunder made by Lenders to the Borrowers.  Borrower confirms that any charges that Agent may so make to the Loan Account of Borrower as herein provided will be made as an accommodation to the Borrowers and solely at Lenders' discretion.

6.      Optional Prepayments.  Borrower shall have the right at any time and from time to time to prepay the principal of the Loans in whole or in part without penalty or premium.  Any prepayment or repayment hereunder shall be accompanied by accrued interest on the principal amount of the Loans being prepaid or repaid to the date of prepayment or repayment.

7.      Mandatory Prepayments.

(a)      Asset Dispositions.  Immediately upon receipt by Borrowers of cash proceeds of any asset disposition, unless Lenders agrees otherwise, Borrowers shall prepay the Loans, together with accrued interest thereon, in an amount equal to 100% of such proceeds, net of (i) reasonable commissions and other reasonable and customary transaction costs, fees, and expenses properly attributable to such transaction and payable by Borrowers in connection therewith as approved by the Bankruptcy Court (in each case, paid to non-affiliates), (ii) transfer or sales taxes, and (iii) amounts required to be applied to the repayment of debt secured by such assets sold, to the extent such debt or such liens are senior in priority to the payment of the Obligations or Agent's Liens on behalf of Lenders securing the Obligations.  Any such prepayment shall be applied in accordance with Section 5.

(b)      Extraordinary Receipts.  Upon the receipt by Borrowers of any Extraordinary Receipts, Borrowers shall prepay the outstanding principal of the Loans in an amount equal to 100% of such Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts.  Any such prepayment shall be applied in accordance with Section 5.

(c)      Excess Cash. Borrower shall prepay the Loans to the extent Borrowers have excess cash above amounts reasonably necessary or anticipated to pay all expenses and other obligations (including any mandatory prepayments under this Section 7) then due and payable and taking into account the prospective funding needs in the Approved Budget, with any such prepayment to be in an amount equal to such excess cash amount and to be payable within two (2) business days after any such excess cash amount is obtained by Borrowers.  Any such prepayment shall be applied in accordance with Section 5.

(d)      No Implied Consent.  Nothing in this Section 7 shall be construed to constitute Lenders' consent to any transaction that is not permitted by other provisions of this Note or the other Loan Documents.  For the avoidance of doubt, no reinvestment of the proceeds of any Extraordinary Receipts, asset sales or other proceeds of Collateral shall be permitted without the prior written consent of Lenders in Lenders' sole and absolute discretion.

8.     <u>Security</u>. The DIP Facility shall be secured by the following:

(a)     Pursuant to section 364(d)(1) of the Bankruptcy Code, first priority (subject to liens permitted under the Loan Documents) priming liens on the Prepetition Collateral, senior in priority to the Prepetition Liens.

(b)     Pursuant to section 364(c)(2) of the Bankruptcy Code, first priority liens on any unencumbered assets.

(c)     Pursuant to section 364(c)(3) of the Bankruptcy Code, junior priority liens on all assets that are subject to valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date or that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

The liens and security agreements securing the DIP facility shall be effective and perfected as of the entry of the Interim Order and without necessity of the execution, filing or recording of control agreements financings statements or other agreements.

9.     <u>Expense Reimbursement</u>.  Borrowers shall reimburse Agent and Lenders for all reasonable and documented out-of-pocket expenses incurred (whether incurred prior or subsequent to the Petition Date) in connection with the negotiation and preparation of the Loan Documents and the obtaining of approval of the Loan Documents by the Bankruptcy Court (including the reasonable and documented fees and expenses of Geoffrey T. Raicht, PC ("<u>Raicht</u>"), counsel for Lenders, Allen Overy Shearman Sterling US LLP ("<u>A&O Shearman</u>"), counsel for Agent, all of Lenders' and Agent's special counsel, advisors, consultants, and auditors retained in connection with the preparation and negotiation of the Loan Documents and advice in connection therewith). In addition, Borrowers shall reimburse Agent and Lenders for all reasonable fees, costs, and expenses, including the reasonable fees, costs, and expenses of counsel (including Raicht and A&O Shearman) or other advisors for advice, assistance, or other representation, whether incurred prior or subsequent to the Petition Date, in connection with:

(a)     any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the Loan Documents or advice in connection with the administration of the Loans made pursuant hereto or Agent's and Lenders' respective rights hereunder or thereunder;

(b)     the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 cases, attendance at meetings or hearings related to the Chapter 11 Cases and any subsequent Chapter 7 cases, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 cases solely as they relate to the Loans made hereunder;

(c)     any litigation, contest, dispute, suit, proceeding, or action (whether instituted by Agent, Lenders, Borrowers, or any other Person, and whether as a party, witness, or otherwise) in any way relating to the Collateral, any of the Loan Documents, or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding, or action, and any appeal or review thereof, in connection with a case commenced by or against Borrowers or any other Person that may be

obligated to Agent or Lenders by virtue of the Loan Documents, including any such litigation, contest, dispute, suit, proceeding, or action arising in connection with any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

       (d)     any attempt to enforce any remedies of Agent or Lenders against Borrowers, or any other Person that may be obligated to Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

       (e)     any work-out or restructuring of the Loans during the pendency of one or more Events of Default; and

       (f)     solely as they relate to the Loans made hereunder, any efforts to (i) monitor the Loans or any of the other Obligations, (ii) evaluate, observe or assess Borrowers, or their respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate, or otherwise dispose of any of the Collateral;

including, as to each of subsections (a) through (f) above, all documented and reasonable attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges, and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this <u>Section 8</u>, all of which shall be payable, on demand, by Borrowers to Lenders.  Without limiting the generality of the foregoing, such documented and reasonable expenses, costs, charges, and fees may include: fees, costs, and expenses of accountants, appraisers, investment bankers, management, and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs, and expenses; long distance telephone charges; air express charges; facsimile charges; secretarial overtime charges; and expenses for travel, lodging, and food paid or incurred in connection with the performance of such legal or other advisory services.  For the avoidance of doubt, all of the foregoing fees, costs, and expenses shall be Obligations under this Note.

      10.    <u>Indemnity</u>.  Borrowers shall indemnify and hold harmless Agent and Lenders and Agent's and Lender's respective affiliates, members, officers, directors, employees, attorneys, agents, and representatives (each, an "<u>Indemnified Person</u>"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities, and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended, or terminated under this Note and the other Loan Documents or the administration of such credit, or in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, or legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "<u>Indemnified Liabilities</u>"); <u>provided</u> that, Borrowers shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability, or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.  **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PERSON, ANY**

**SUCCESSOR, ASSIGNEE, OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED IN CONNECTION WITH THIS NOTE OR THE LOAN DOCUMENTS, INCLUDING AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED, OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.** For the avoidance of doubt, Borrowers' obligations under this paragraph shall be an Obligation under this Note.

11.     <u>Adjustments for Withholding, Capital Adequacy</u>.  Notwithstanding anything to the contrary contained herein, all payments to Agent for the benefit of Lenders by Borrowers under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges, or withholdings and all related liabilities (all such taxes, duties, levies, imposts, deductions, charges, withholdings, and liabilities being referred to as "<u>Taxes</u>") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either), unless such Taxes are required by applicable law to be deducted or withheld and excluding taxes imposed on Lenders' overall net income by any federal, state, or local laws applicable to any Lender.  If Borrowers shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note, then (a) the amount payable shall be increased (and for greater certainty, in the case of interest, the amount of interest shall be increased) as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) a Lender receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (b) Borrowers, as applicable, shall make such deductions or withholdings, and (c) Borrowers, as applicable, shall immediately pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in, or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge, or withholding on or from payments due from Borrowers (but excluding taxation on the overall net income of a Lender)), or any change therein or in the interpretation or administration thereof by any governmental authority, central bank, or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of s Lender with respect to this Note or to increase the cost to a Lender of making or maintaining amounts available under this Note, Borrowers agree to pay a Lender such additional amount or amounts as will compensate such Lender on an after-tax basis for such reduction or increase.

Borrowers agree to immediately pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes, or similar levies (all such taxes, charges, duties, and levies being referred to as "<u>Other Taxes</u>") that arise from any payment made by Borrowers under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

Borrowers shall indemnify Lenders and Agent for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on

amounts payable by Borrower hereunder) paid by Lenders and any liability (including penalties, interest, and expenses) arising from or with respect to such Taxes or Other Taxes, whether or not they were correctly or legally asserted, excluding taxes imposed on a Lender's overall net income. Payment under this indemnification shall be made upon demand.  A certificate as to the amount of such Taxes or Other Taxes submitted to the Borrowers by a Lender shall be conclusive evidence, absent manifest error, of the amount due from Borrower to such Lender.

Borrowers shall furnish to Agent the original or a certified copy of a receipt evidencing payment of Taxes or Other Taxes made by Borrower within thirty (30) days after the date of any payment of Taxes or Other Taxes.

12.   <u>Priority of Obligations and Lender's Liens</u>.  The priority of Agent's Liens on the Collateral and of the Obligations, including adequate protection liens and superpriority claims granted to Agent under the Interim Order and the Final Order shall be as set forth in the Interim Order or Final Order (as applicable).  As more fully described in the Interim Order or Final Order (as applicable), to the fullest extent allowed pursuant to the Bankruptcy Code and subject to any limitations set forth in the Interim Order or the Final Order (as applicable), Agent's Liens on the Collateral and the Obligations shall be senior to all other liens, claims, interests, and other obligations of Borrowers, including but not limited to all Liens provided to the Prepetition Secured Parties pursuant to the Prepetition Financing Documents.

13.   <u>Further Assurances</u>.  Borrowers represent that no other Indebtedness of Borrowers exists other than this Note and the Permitted Indebtedness.  Borrowers agree that they shall, at Borrowers' expense and upon request of Agent, duly execute and deliver or cause to be duly executed and delivered, to Agent such further instruments and do and cause to be done such further acts as may be necessary or proper in the opinion of Agent and Lenders to carry out more effectively the provisions and purposes of this Note or any other Loan Documents, including, upon Agent's written request and in form and substance reasonably satisfactory to Agent, security agreements, UCC-l financing statements, and other Collateral Documents granting to Lender, first priority Liens in the Collateral to secure the Obligations.

14.   <u>Reports and Notices</u>.

(a)   On or before Wednesday of each calendar week commencing on the second full week after the Petition Date, Borrower hereby agrees to deliver to Agent (i) a report of total receipts and total disbursements and (ii) a statement setting forth in reasonable detail the cash balance for each deposit account of Debtors as of the previous Friday.

(b)   Borrowers will provide Agent with the following by no later than 5:00 p.m. (prevailing Eastern time) on Tuesday of each calendar week, commencing on July 8, 2025: a comparison of actual cash disbursements and cash receipts for the most recently ended Applicable Period to the Approved Budget for such Applicable Period and an explanation in reasonable detail of the variances between actual results and the Approved Budget for such Applicable Period and verifying whether or not such variances constitute Permitted Variances.

(c)   Borrower hereby agrees to deliver to Agent as soon as available, and in any event, by no later than the fifth (5th) Business Day of each month (commencing July 8, 2025), an

update to the Approved Budget for the 13-week period commencing on the first day of each such month, in form and substance satisfactory to Agent in Agent's sole and absolute discretion.

(d)      Borrowers hereby agree to deliver, or cause to be delivered to Agent, each of the following, which shall be in form and detail acceptable to Agent in its sole discretion:

(i)      promptly (and in any event within twenty-four (24) hours) after any officer of Borrowers obtains knowledge of the occurrence of any Default or Event of Default under any Loan Document, notice of such occurrence, together with a detailed statement by a responsible officer of Borrowers of the steps being taken by Borrowers to cure the effect of such Default or Event of Default;

(ii)      promptly (and in any event within twenty-four (24) hours) upon any officer of Borrowers obtaining knowledge thereof, notice of any material loss of or damage to any Collateral or of any material adverse change in any Collateral or the prospect of payment thereof, or of the occurrence or existence of any other event or circumstance which has had or could reasonably be expected to have a Material Adverse Effect;

(iii)      with respect to any filings by Borrowers in the Chapter 11 Cases, as soon as reasonably practicable and in any event at least two (2) calendar days prior to filing, copies of any motion, pleading, or other filing by or on behalf of any Debtor that would materially and negatively impact the Collateral or, if granted, would constitute a Material Adverse Effect;

(iv)      (A) promptly (and in any event within twenty-four (24) hours) after submission to any governmental authority, (1) all documents and information furnished to such governmental authority in connection with any investigation of Borrowers, as applicable, other than routine inquiries by such governmental authority and (2) copies of any periodic or special reports filed by Borrowers, as applicable, with any governmental authority, other than routine reports filed in the ordinary course of business and (B) as soon as available and in any event within three (3) days of the execution, receipt, or delivery thereof, copies of notices and other communications received from or sent to any governmental authority that specifically relate to the Borrowers other than routine communication with the Office of the United States Trustee;

(v)      promptly (and in any event within twenty-four (24) hours) upon any officer of Borrowers obtaining knowledge thereof, notice of Borrowers' violation of any law, rule, or regulation that could reasonably be expected to have a Material Adverse Effect; and

(vi)      promptly upon request, such other information concerning the condition or operations, financial or otherwise, of Borrowers as Agent may reasonably request.

(e)      Borrowers authorize Agent to communicate directly with Borrowers' independent certified public accountants, advisors, and chief restructuring officer (the "CRO"), if any, and authorizes and shall instruct those accountants, advisors, and CRO to reasonably disclose

11

and make reasonably available to Agent, as requested by Agent, any and all financial statements and other supporting financial documents, schedules, and information relating to the Borrowers or any of Borrowers' respective subsidiaries (including copies of any issued management letters) with respect to the business, financial condition, and other affairs of Borrowers or any of Borrowers' respective subsidiaries.

15.    Affirmative Covenants.

Borrowers agree that:

(a)    Borrowers will keep accurate books of record and account pertaining to the Collateral and pertaining to the Borrowers' businesses and financial condition and such other matters as Agent may from time to time request, in which true and complete entries will be made in accordance with GAAP and, upon request of Agent, will permit any officer, employee, attorney, accountant, or agent of Agent to audit, review, make extracts from, or copy, at Borrowers' expense, any and all corporate and financial and other books and records of Borrowers at all times during ordinary business hours, to send and discuss with account debtors and other obligors requests for verification of amounts owed to the Borrowers, and to discuss Borrowers' affairs with any of Borrowers' respective directors, officers, employees, attorneys, accountants, or the CRO. Borrowers will permit Agent, or any of Agent's officers, employees, accountants, attorneys, or agents, to examine and inspect any Collateral or any other property of Borrowers at any time during ordinary business hours. The provisions of the forgoing Section 14(a) are subject, in all respects, to reasonable confidentiality restrictions, Borrowers may deem appropriate under the circumstances and any applicable attorney-client, attorney work product, or similar privilege in favor of Borrowers.

(b)    (i) Borrowers will (A) comply with all requirements of law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (B) use and keep the Collateral, and require that others use and keep the Collateral, only for lawful purposes, without violation of any federal, foreign, state, or local law, statute, or ordinance and (ii) Borrowers will obtain, maintain in effect, and comply with all permits, licenses, and similar approvals necessary for the operation of Borrowers' respective businesses as now or hereafter conducted.

(c)    Borrowers will pay or discharge, when due (except for any pre-petition taxes), (i) all taxes, assessments, and governmental charges levied or imposed upon Borrowers or upon Borrowers' income or profits, upon any properties of Borrowers (including, without limitation, the Collateral), or upon or against the creation, perfection, or continuance of any security interest of Agent, prior to the date on which penalties attach thereto, (ii) all federal, foreign, state and local taxes required to be withheld by Borrowers, and (iii) all lawful claims for labor, materials, and supplies that, if unpaid, might by law become a lien or charge upon any properties of Borrowers.

(d)    (i) Borrowers will keep and maintain the Collateral and all of Borrowers' other properties necessary or useful in Borrowers' respective businesses in good condition, repair, and working order (normal wear and tear excepted) and will from time to time replace or repair any worn, defective, or broken parts and (ii) Borrowers will defend the Collateral against all claims

or demands of all Persons (other than Agent and, if applicable and authorized by the Interim Order or Final Order, the Prepetition Secured Parties) claiming the Collateral or any interest therein.

(e)     Borrowers will conduct Borrowers' businesses and affairs without knowingly infringing on or interfering with any intellectual property of any other Person in any respect and shall comply in all respects with the terms of the written agreements governing Borrowers' use of any intellectual property licenses.

(f)     Borrowers will keep all Collateral free and clear of all security interests, liens, and encumbrances, except Permitted Encumbrances.

(g)     Borrowers will obtain and at all times maintain insurance with responsible and reputable insurers, in such amounts and against such risks as may from time to time be reasonably required by Agent, but in all events in such amounts and against such risks as is usually carried by companies engaged in a similar business and owning similar properties in the same general areas in which Borrowers operate.  Without limiting the generality of the foregoing, Borrowers will at all times keep all tangible Collateral insured against risks of fire (including so-called extended coverage), theft, collision (for Collateral consisting of motor vehicles), and such other risks and in such amounts as Agent may reasonably request, with any loss payable to Agent to the extent of Agent's interest.  As provided in the Interim Order or the Final Order, as applicable, Agent shall be named as a loss payee or an additional insured, as applicable, on each insurance policy maintained by Debtors that in any way relates to the Collateral.  Upon request of Agent, Borrowers shall cause all policies of insurance maintained by any Debtor to contain a loss payable endorsement or an additional insured endorsement, as applicable, in favor of Agent, in form and substance acceptable to Agent.

(h)     Borrowers will preserve and maintain Borrowers' existences and all of Borrowers' rights, privileges, and franchises necessary or desirable in the normal conduct of Borrowers' businesses and shall conduct Borrowers' businesses in an orderly, efficient, and regular manner.

(i)     Borrowers shall operate Borrowers' businesses in a manner consistent with the Approved Budget subject only to Permitted Variances, however Borrowers may retain corporate counsel, as contemplated in the Approved Budget, only with the written agreement of the Agent, and the Borrowers may not use the funds specifically allocated in the Approved Budget for corporate counsel for any other purpose absent the written agreement of the Agent.

(j)     Borrowers shall comply with all terms, conditions, requirements, and obligations set forth in the Interim Order or the Final Order, as applicable.

(k)     Borrowers shall maintain Borrowers' cash management systems in accordance with the cash management order authorizing Debtors' use of the cash management system entered in the Chapter 11 Cases, which order shall be in form and substance reasonably satisfactory to Agent.

16.     <u>Negative Covenants</u>.

13

Borrowers agree that, without the prior written consent of Lenders in Lenders' reasonable discretion:

(a)     Borrowers shall not directly or indirectly merge or consolidate with, acquire all or substantially all of the assets or capital Stock of, or otherwise combine with, any Person.

(b)     Borrowers shall not create, incur, assume, or permit to exist any Indebtedness, except (without duplication), to the extent not prohibited by the Bankruptcy Code, Permitted Indebtedness.

(c)     Borrowers shall not assert any right of subrogation or contribution against any other Debtor until all borrowings under the DIP Facility and the Prepetition Facility are paid in full or the commitments are terminated.

(d)     Borrowers shall not make any changes in Borrowers' capital structures or amend Borrowers' organizational documents in a manner that would adversely affect Lenders.

(e)     Borrowers shall not create, incur, assume, or permit to exist any Lien on or with respect to any of their properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances.  In addition, Borrowers shall not become a party to any agreement, note, indenture, or instrument or take any other action that would prohibit the creation of a Lien on any of Borrowers' properties or other assets in favor of Agent, as collateral for the Obligations.

(f)     Except in the ordinary course of the operation of Borrowers' businesses and consistent with past practice, Borrowers shall not enter into any material contractual agreement or any amendment thereto after the Petition Date, other than the Loan Documents, unless approved by Lenders.

(g)     Borrowers shall not maintain any deposit account or securities account that is not subject to a first priority security interest in favor of Agent pursuant to the Interim Order or the Final Order, as applicable.

(h)     Borrowers shall not consent to any amendment, supplement, or other modification of any of the terms or provisions contained in, or applicable to, the Interim Order or the Final Order, as applicable.

(i)     Borrowers shall not make any changes in any of Borrowers' business objectives, purposes, or operations that could materially adversely affect the repayment of the Loans or any of the other Obligations or could reasonably be expected to have or result in a Material Adverse Effect.  Borrowers shall not engage in any business other than the businesses currently engaged in by Borrowers or businesses reasonably related thereto.

(j)     Borrowers will not assume, guarantee, endorse, or otherwise become directly or contingently liable in connection with any obligations of any other Person, except the endorsement of negotiable instruments by Borrowers for the deposit or collection or similar transactions in the ordinary course of business.

(k)     Except for Stock in any subsidiary of Borrowers held on the date hereof, Borrowers will not purchase or hold beneficially any Stock or other securities or evidences of indebtedness of, make or permit to exist any Loans or advances to, or make any investment or acquire any interest whatsoever in, any other Person, including specifically, but without limitation, any partnership or joint venture.

(l)     Borrowers will not permit any breach, default, or event of default to occur under any note, loan agreement, indenture, mortgage, or other security agreement binding upon Borrowers, except for breaches, defaults or events of default existing on the date of commencement of the Chapter 11 Cases or resulting therefrom.

(m)     Borrowers will not (i) other than as provided in the Approved Budget, pay salaries, bonuses, commissions, consultant fees, or other compensation or (ii) increase the salary, bonus, commissions, consultant fees, or other compensation of any directors, stockholders, or consultants, or any member of their respective families, other than as may be provided in the Approved Budget.

(n)     Borrowers will not convey, sell, lease, assign, transfer, or otherwise dispose of any of Borrowers' property, business, or assets, whether now owned or hereinafter acquired other than in the ordinary of course of business or pursuant to the terms of the Stalking Horse APA.

(o)     Borrowers shall not cancel any claim or debt owing to any Borrower, except for reasonable consideration negotiated on an arm's-length basis and in the ordinary course of Borrowers' respective businesses consistent with past practices.

17.     <u>Events of Default</u>.  Notwithstanding the provisions of section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, but subject to the provisions of the Interim Order or the Final Order (as applicable), the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "<u>Event of Default</u>" hereunder:

(a)     Borrowers (i) shall fail to make any payment of principal or interest on, or fees owing in respect of the Loans or any of the other Obligations within two (2) Business Days of when due and payable or (ii) shall fail to pay or reimburse Agent or Lenders for any expense reimbursable hereunder or under any other Loan Document in accordance with the Interim Order or Final Order, as applicable.

(b)     Any representation or warranty in this Note or in any other Loan Document or in any written statement, report, financial statement, or certificate made or delivered to Agent or Lenders by Borrowers is untrue or incorrect in any material respect as of the date when made or deemed made.

(c)     Any provision of any Loan Document shall for any reason cease to be valid, binding, and enforceable in accordance with the terms of such Loan Document (or any Borrower shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any Loan Document has ceased to be or otherwise is not valid, binding, and enforceable in accordance with terms of such Loan Document), or any Lien created under any Loan Document shall cease to be a valid and

15

perfected first priority Lien (except as otherwise permitted herein or therein) in any of the Collateral purported to be covered thereby.

(d)     There shall be a change in the business, assets, operations, or financial condition of Borrowers that results in a Material Adverse Effect, other than those customarily caused by commencing a case under chapter 11 of the Bankruptcy Code and other than a sale pursuant to the terms of the Stalking Horse APA that, if made to a Person other than Lenders or Lenders' assignee or designee, results in the indefeasible payment in full in cash of the Obligations.

(e)     A line-item deviation in actual cash disbursements or receipts from the Approved Budget in excess of such line item's Permitted Variance shall occur.

(f)     Any event constituting an event of default or termination event as set forth in the Interim Order or Final Order (as applicable) (each, a "Termination Event") shall occur.

(g)     Any of the following shall occur:

(i)     Any milestone set forth on Annex 4 to the Interim Order or Annex 4 to the Final Order, as applicable, shall not have been satisfied.

(ii)     The Stalking Horse APA is terminated.

(iii)     A motion or other pleading is filed in any of the Chapter 11 Cases to dismiss or convert such Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, which motion or pleading is not withdrawn, overruled, or dismissed by the Bankruptcy Court within fourteen (14) calendar days.

(iv)     A motion or other pleading is filed in any of the Chapter 11 Cases for entry of an order authorizing the appointment of an interim or permanent trustee in such Chapter 11 Case or the appointment of an examiner (other than a fee examiner) in such Chapter 11 Case, which motion or pleading is not withdrawn, overruled or dismissed by the Bankruptcy Court within fourteen (14) calendar days.

(v)     Any Borrower moves in the Chapter 11 Cases (or fails to contest in good faith a motion brought by any other Person) to approve a sale or other disposition of substantially all of Debtors' assets that does not provide for the indefeasible payment in full in cash of the Obligations and termination of commitment of Lenders to make Loans without the consent of Lenders in Lenders' sole discretion.

(vi)     Any Borrower moves for (or fails to contest in good faith a motion brought by any other Person), or the Bankruptcy Court enters, an order confirming a chapter 11 plan, which plan is not in form and substance acceptable to Lenders in Lenders' sole discretion.

(vii)     Any Borrower moves in the Chapter 11 Cases (or fails to contest in good faith a motion brought by any other Person or such motion succeeds): (A) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral other than in connection with any replacement credit facility that provides for indefeasible

16

payment in full of all Obligations; (B) to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code; or (C) to authorize any other action or actions adverse to Lenders, or Agent's or Lenders' rights and remedies hereunder or Agent's or Lender's interests in the Collateral, that would, individually or in the aggregate, have a Material Adverse Effect.

        (viii)   The allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

        (ix)   The Interim or Final Order is reversed, vacated, revoked, stayed, amended, supplemented, or otherwise modified in any manner without the prior written consent of Lenders in Lenders' sole discretion.

        (x)   The occurrence of any post-petition judgments, liabilities or events that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

        (xi)   The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner (other than a fee examiner) in the Chapter 11 Cases.

        (xii)   The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code without the consent of Lenders.

        (xiii)   The entry of an order in the Chapter 11 Cases avoiding or requiring repayment of any portion of the payments made to Lenders on account of the Obligations owing under this Note or the other Loan Documents.

        (xiv)   The entry of an order in the Chapter 11 Cases granting any other superpriority administrative claim or Lien equal to or superior to that granted to agent for the benefit of Lenders, unless consented to by Lenders in Lenders' sole discretion.

        (xv)   The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (A) to allow any creditor (other than Lenders) to execute upon or enforce a Lien on any Collateral or (B) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority that could reasonably be expected to have a Material Adverse Effect.

        (xvi)   There shall commence any suit or action against Lenders by or on behalf of (A) any Borrower or (B) the Committee, in each case, that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of Agent for the benefit of Lenders and, if such suit or action is commenced by any Person other than a Borrower, such suit or action shall not have been dismissed or stayed within ten (10) calendar days after service thereof on Agent and Lenders, and, if stayed, such stay shall have been lifted.

(h)    Borrowers shall fail or neglect to perform, keep, or observe any of the provisions of this Note that is not the subject of any other clause of this <u>Section 16</u>, and such failure remains uncured for five (5) Business Days after notice.

18.    <u>Rights and Remedies Upon Event of Default</u>.

(a)    If any Event of Default shall have occurred and be continuing, then Agent and Lenders may, upon written notice (a "<u>Termination Notice</u>") to the Borrowers subject to the terms of the Interim Order or Final Order, as applicable: (i) terminate this Note and the DIP Facility contemplated by this Note with respect to further Loans; (ii) declare all or any portion of the Obligations, including all or any portion of any Loan, to be forthwith due and payable; (iii) revoke Borrowers' rights to use cash collateral in which Agent or Lenders have an interest; and (iv) exercise any rights and remedies under the Loan Documents, the Interim Order or the Final Order, as applicable, or at law or in equity.

(b)    Except as otherwise provided for in this Note or by applicable law, Borrowers waive:  (i) presentment, demand, protest, and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Agent for the benefit of Lenders on which any Borrower may in any way be liable, and hereby ratifies and confirms whatever Agent or Lenders may do in this regard; (ii) all rights to notice and a hearing prior to Agent's or Lenders' taking possession or control of, or Agent's  replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent or Lenders to exercise any of Agent's or Lenders' remedies; and (iii) the benefit of all valuation, appraisal, marshaling, and exemption laws.

(c)    Subject to the terms of the Interim Order and Final Order, as applicable, in addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, Agent is hereby authorized at any time or from time to time, without notice to the Borrowers or to any other Person, any such notice being hereby expressly waived, to offset and to appropriate and to apply any and all balances held by it at any of its offices for the account of Borrowers (regardless of whether such balances are then due to the Borrowers) and any other properties or assets at any time held or owing by Agent or Lenders to or for the credit or for the account of Borrowers against and on account of any of the Obligations that are not paid when due.

(d)    To the extent permitted by law and subject in all respects to the terms of the Interim Order or the Final Order, as applicable, Agent's sole duty with respect to the custody, safekeeping, and physical preservation of the Collateral in Agent's possession shall be to deal with such Collateral in the same manner as Agent deals with similar securities and property in Agent's possession as agent for Lenders.  Agent's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if Agent exercises reasonable care in the selection of the bailee or other third person, and Agent need not otherwise preserve, protect, insure, or care for any Collateral, and Agent shall not be obligated to preserve any rights Borrowers may have against prior parties.

19.    <u>Reference Agreements</u>.  This Note evidences the Loans that may be made to the Borrowers from time to time in the aggregate principal amount at any time outstanding up to the Maximum Amount and is issued pursuant to and entitled to the benefits of the Interim Order and Final Order (as applicable) to which reference is hereby made for a more complete statement of the terms and conditions under which the Loans evidenced by this Note are made and are to be repaid.

20.    <u>Regarding Agent</u>.

(a)    <u>Appointment</u>. Each Lender hereby designates Ankura to act as Agent for such Lender under this Note and the Loan Documents. Each Lender hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Note and the Loan Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest, fees (except the Agency Fees and any other fees set forth in this Note which are specifically payable to Agent for its sole and separate account), charges, and collections received pursuant to this Note, for the ratable benefit of Lenders. Agent may perform any of its duties hereunder or under the Loan Documents by or through its agents, sub-agents, employees, or attorneys-in-fact. As to any matters not expressly provided for by this Note (including collection), Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of Required Lenders, and such instructions shall be binding; provided, however, that Agent shall not be required to take any action or refrain from any action (i) that, in Agent's discretion, exposes Agent to liability or that is contrary to this Note, the Loan Documents, or Applicable Law or (ii) unless Agent is furnished with an indemnification satisfactory to Agent, in its sole discretion, with respect thereto.

(b)    <u>Nature of Duties</u>. (i) Agent shall have no duties or responsibilities except those expressly set forth in this Note and the Loan Documents, (ii) neither Agent nor any of its officers, directors, employees, agents, subagents, or attorneys-in-fact shall be (A) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross negligence, willful misconduct, or material breach of an enforceable contractual obligation (as determined by a court of competent jurisdiction in a final non-appealable judgment) or (B) responsible in any manner for (1) any recitals, statements, representations, or warranties made by any of the Borrowers in this Note, in any of the other Loan Documents, or in any certificate, report, statement, or other document referred to or provided for in, or received by Agent under or in connection with, this Note or any of the other Loan Documents, (2) the value, validity, effectiveness, genuineness, due execution, enforceability, perfection, or sufficiency of this Note or any of the other Loan Documents, or (3) for any failure of any Borrowers to perform such Borrower's obligations hereunder. Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Note or any of the other Loan Documents, or to inspect the properties, books or records of any Borrowers.

(c)    <u>Duties</u>.  The duties of Agent as respects the Loans to the Borrowers shall be mechanical and administrative in nature; Agent shall not have by reason of this Note a fiduciary

relationship in respect of any Lender; and nothing in this Note, expressed or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Note or the transactions described herein except as expressly set forth herein. It is understood that wherever any consent or direction from Agent is required, Agent may act or refrain from action at the direction of Required Lenders, notwithstanding any requirements that (x) Agent's consent must be given, must not be unreasonably withheld, conditioned, or delayed, (y) must be taken in Agent's sole discretion, or (z) subject to similar requirements.  Agent shall have no liability for any action or inaction taken in accordance with the instructions of Required Lenders, notwithstanding any other guidance contained herein pertaining to Agent's consent rights or any delay occasioned by Agent seeking direction from Lenders.

(d)      Subagent.  Agent may execute any of its duties under this Note and the other Loan Documents by or through agents, sub-agents, employees or attorneys-in-fact (each, a "Subagent") and shall be entitled to advice of counsel concerning all matters pertaining to such duties and each such Subagent shall have all of the rights and benefits of Agent as though such Subagent were an Agent hereunder; provided, however, that no such Subagent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by Agent.  Agent shall not be responsible for the negligence or misconduct of any Subagents selected by it with due care.

(e)      Lack of Reliance on Agent.  Independently and without reliance upon Agent or any other Lender, each Lender has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Borrowers in connection with the making and the continuation of the Loans hereunder and the taking or not taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of the Borrowers. Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before making of the Loans or at any time or times thereafter except as shall be provided by Borrowers pursuant to the terms hereof.  Agent shall not be responsible to any Lender for any recitals, statements, information, representations, or warranties herein or in any agreement, document, certificate, or statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectability, or sufficiency of this Note or any other Loan Document, or of the financial condition of the Borrowers, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Note, the other Loan Documents, or the financial condition or prospects of the Borrowers, or the existence of any Event of Default or any Default.  Each Lender, by delivering its signature page to this Note and funding its Loans as applicable, shall be deemed to have acknowledged receipt of, and consented to and approved, this Note and each other Loan Document required to be delivered to, or be approved by or satisfactory to, Agent or the Lenders subject to entry of the Interim Order.

(f)      Resignation of Agent; Successor Agent.  Agent may resign on thirty (30) days written notice to each Lender and Borrowers.  Upon any such resignation, Required Lenders will promptly designate a successor Agent reasonably satisfactory to Borrowers (provided that no such approval by Borrowers shall be required (x) in any case where the successor Agent is one of the Lenders or (y) after the occurrence and during the continuation of any Event of Default). Any such successor Agent shall succeed to the rights, powers and duties of Agent, and shall in particular

succeed to all of Agent's right, title and interest in and to all of the Liens in the Collateral securing the Obligations created hereunder or any other Loan Document (including any mortgage and all account control agreements). The term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent. Notwithstanding the foregoing, if at the time of the effectiveness of a successor agent's appointment, (i) any further actions need to be taken in order to provide for the legally binding and valid transfer of any Liens in the Collateral from former Agent to a successor agent or for the perfection of any Liens in the Collateral as held by such successor agent, or (ii) it is otherwise not then possible for such successor agent to become the holder of a fully valid, enforceable and perfected Lien as to any of the Collateral, existing Agent shall continue to hold such Liens solely as agent for perfection of such Liens on behalf of successor agent until such time as successor agent can obtain a fully valid, enforceable and perfected Lien on all Collateral; provided, however, that Agent shall not be required to or have any liability or responsibility to take any further actions after such date as such agent for perfection to continue the perfection of any such Liens (other than to forego from taking any affirmative action to release any such Liens). After any Agent's resignation as Agent, the provisions of this Section 20, and Sections 5, 9, 10, 11, 21, and 23 and any other indemnification rights under this Note, shall inure to Agent's benefit as to any actions taken or omitted to be taken by it while it was Agent under this Note (and in the event resigning Agent continues to hold any Liens pursuant to the provisions of the immediately preceding sentence, the provisions of this Section 20 and Sections 5, 9, 10, 11, 21, and 23 any other indemnification rights under this Note, shall inure to its benefit as to any actions taken or omitted to be taken by it in connection with such Liens).

　　　　　(g)　　Certain Rights of Agent. If Agent shall request instructions from Lenders with respect to any act or action (including failure to act) in connection with this Note or any other Loan Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from Required Lenders; and Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, Lenders shall not have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of Required Lenders. Agent shall not be liable for any action taken or not taken by it with the consent of or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as Agent shall believe in good faith to be necessary, under the circumstances as provided in this Note or any of the other Loan Documents) or in the absences of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final and non-appealable judgement, provided, however, that no action taken or not taken by Agent with the consent of or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as Agent shall believe in good faith to be necessary, under the circumstances as provided in this Note or any of the other Loan Documents) shall be considered gross negligence or willful misconduct of Agent.

　　　　　(h)　　Reliance. Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, email, facsimile message, order, Loan Document, or telephone message believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person, and, with respect to all legal matters pertaining to this Note and the Loan Documents and its duties hereunder, upon advice of counsel selected by

it. Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

(i)     Notice of Default. Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the other Loan Documents, unless Agent has received written notice from a Lender or Borrowers referring to this Note or the other applicable Loan Documents, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that Agent receives such a notice from Borrowers, Agent shall give notice thereof to Lenders. Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by Required Lenders; provided, however, that unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable and in the best interests of Lenders.

(j)     Indemnification. To the extent Agent or any of its officers, directors, Affiliates, attorneys, employees and agents are not timely and indefeasibly reimbursed and indemnified by Borrowers, each Lender will reimburse, indemnify and hold harmless Agent, and any of its officers, directors, Affiliates, attorneys, employees and agents, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against Agent or any of their respective officers, directors, Affiliates, attorneys, employees and agents in performing its duties hereunder, or in any way relating to or arising out of this Note, or any other Loan Document, or any action taken by or inaction of Agent under or in connection with any of the foregoing; provided, however, that Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's gross negligence, willful misconduct, or material breach of an enforceable contractual obligation (as determined by a court of competent jurisdiction in a final non-appealable judgment). For purposes of this Section 20(j), a Lender's "pro rata share" shall be determined based upon such Lender's share of the sum of the outstanding Loans, in each case, at the time (or if such indemnity payment is sought after the date on which the Loans have been paid in full and the Commitments are terminated in accordance with such Lender's pro rata share immediately prior to the date on which the Loans are paid in full and the Commitments are terminated). The agreement in this Section 20(j) shall survive the repayment of all Loans, fees, and other Obligations and termination of the Commitments and this Note. In the event that the Lenders transfer their interest in the Loans, Lenders shall remain liable for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be incurred prior to the date of such transfer, regardless of whether such indemnity payment is sought after the date of such transfer.

(k)     [Reserved]

(l)     [Reserved]

(m)     [Reserved]

(n)    <u>No Reliance on Agent's Customer Identification Program</u>. To the extent the Loans or this Note is, or becomes, syndicated in cooperation with other Lenders, each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on Agent to carry out such Lender's, Affiliate's, participant's, or assignee's customer identification program or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR §103.121 (as hereafter amended or replaced, the "<u>CIP Regulations</u>"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of Borrowers, Borrowers' Affiliates or Borrowers' agents, the Loan Documents or the transactions hereunder or contemplated hereby: (i) any identity verification procedures; (ii) any recordkeeping; (iii) comparisons with government lists; (iv) customer notices; or (v) other procedures required under the CIP Regulations or any Anti-Terrorism Laws.

(o)    <u>Other Agreements</u>. Each of the Lenders agrees that it shall not, without the express consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the request of Agent, set off against the Obligations, any amounts owing by such Lender to Borrowers or any deposit accounts of Borrowers now or hereafter maintained with such Lender. Anything in this Note to the contrary notwithstanding, each of the Lenders further agrees that it shall not, unless specifically requested to do so by Agent, take any action to protect or enforce its rights arising out of this Note or the other Loan Documents, it being the intent of Lenders that any such action to protect or enforce rights under this Note and the other Loan Documents shall be taken in concert and at the direction of or with the consent of Agent or Required Lenders.

(p)    <u>Erroneous Payments</u>.

(i)    If the Agent notifies a Lender or any Person who has received funds on behalf of a Lender (any such Lender or other recipient (and each of their respective successors and assigns), a "<u>Payment Recipient</u>") that the Agent has determined, in its sole discretion and whether or not after receipt of any notice under <u>Section 20(p)(ii)</u>, that any funds, as set forth in such notice from Agent, received by such Payment Recipient from the Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "<u>Erroneous Payment</u>") and demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Agent.  A Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days after delivery of notice of the Erroneous Payment, return to the Agent the amount of any such Erroneous Payment as to which such a demand was made, in same day funds and in the currency so received, together with interest thereon in respect of each day from and including the date such Erroneous Payment was received by such Payment Recipient to the date such amount is repaid to the Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Agent to any Payment Recipient under this <u>Section 20(p)(i)</u> shall be conclusive, absent manifest error.

(ii)     Without limiting Section 20(p)(i), each Lender, for itself and on behalf of any other Payment Recipient who has received funds on behalf of a Lender, hereby further agrees that if Lender or such other Payment Recipient receives a payment, prepayment, or repayment of principal, interest, fees, distribution, or otherwise from the Agent or any of its Affiliates (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Agent or any of its Affiliates with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Agent or any of its Affiliates, or (z) that such Lender or other Payment Recipient, otherwise becomes aware was transmitted, or received, in error or by mistake, in whole or in part, in each case:

(A)_   acknowledges and agrees that (1) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from the Agent to the contrary) or (2) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(B)_   such Lender shall (and shall cause any other Payment Recipient that receives funds on such Lender's behalf to) promptly and, in all events, within one (1) Business Day of its knowledge of such error, notify the Agent of its receipt of such payment, prepayment, or repayment, the details thereof (in reasonable detail), and that it is so notifying the Agent pursuant to this Section 20(p)(ii).

(iii)    Each Lender hereby authorizes the Agent to set off, net, and apply any and all amounts at any time owing to such Lender under this Note or under any other Loan Document, or otherwise payable or distributable by the Agent to such Lender from any source, against any amount due to the Agent under Section 20(p)(i) or under the indemnification provisions of this Note.

(iv)    In the event that an Erroneous Payment or any portion thereof is not recovered by the Agent for any reason, after demand therefor by the Agent in accordance with immediately preceding Section 20(p)(i), from any Payment Recipient that has received such Erroneous Payment (such unrecovered amount, an "Erroneous Payment Return Deficiency"), upon the Agent's notice to such Lender at any time, (A) such Lender shall be deemed to have assigned its Loans (but not its commitments) with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Loans") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Agent may specify (such assignment of the Loans (but not commitments) of the Erroneous Payment Impacted Loans, the "Erroneous Payment Deficiency Assignment") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an assignment and assumption with respect to such Erroneous Payment Deficiency Assignment, (B) such Lender shall deliver any Notes evidencing such Loans to the Borrower or the Agent, (C) the Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (D) upon such deemed acquisition, the Agent as the assignee Lender shall become a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the

indemnification provisions of this Note and its applicable commitments which shall survive as to such assigning Lender, and (E) the Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. The Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Agent shall retain all other rights, remedies and claims against the applicable Payment Recipient. For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the commitments of any Lender and such commitments shall remain available in accordance with the terms of this Note. In addition, each party hereto agrees that, except to the extent that the Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Agent may be equitably subrogated, the Agent shall be contractually subrogated to all the rights and interests of the applicable Lender hereunder or under any Loan Document with respect to each Erroneous Payment Return Deficiency.

(v)       To the extent permitted by Applicable Law, no Payment Recipient shall assert any right or claim to an Erroneous Payment and hereby waives, and is deemed to waive, any claim, counterclaim, defense, or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(vi)       Each party's obligations, agreements, and waivers under this Section 20(p) shall survive the resignation or replacement of the Agent, the termination of the Loan Commitments, and the repayment, satisfaction, or discharge of all Obligations (or any portion thereof) under the Note or under any other Loan Document.

(q)       Withholding Tax. To the extent required by any Applicable Law, Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. If the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Agent did not properly withhold tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective), such Lender shall indemnify Agent (to the extent that Agent has not already been reimbursed by any applicable Borrowers and without limiting the obligation of any applicable Borrowers to do so) fully for all amounts paid, directly or indirectly, by Agent as Tax or otherwise, including penalties and interest. Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under this Note or any other Loan Document against any amount due to Agent under this Section 20(q).

21.     Definitions.  The following terms used in this Note shall have the following meaning (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"Affiliate" of any Person shall mean (a) any Person that directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director, manager, member, managing member, general partner, or officer (i) of such Person,

(ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the power, directly or indirectly, (x) to vote 50% or more of the Equity Interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for any such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by ownership of Equity Interests, contract, or otherwise.

"Agency Fee Letter" shall mean the fee letter of the Agent, accepted by the Borrowers as of the date hereof.

"Agency Fees" shall mean all fees payable to the Agent by the Borrowers in accordance with the Agency Fee Letter.

"Anti-Terrorism Laws" shall mean: (a) the economic sanctions Laws and regulations enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control, 31 C.F.R. Part 500 *et seq*., and the U.S. Department of State; (b) the Export Administration Regulations, 15 C.F.R. §§ 730-774; (c) the International Traffic in Arms Regulations; (d) the anti-money laundering laws enforced by the U.S. Department of the Treasury's Financial Crimes Enforcement Network, 31 C.F.R. Chapter X and the U.S. Department of Justice to the extent applicable to a Covered Entity; (e) the U.S. Foreign Corrupt Practices Act of 1977, as amended; and (f) any regulation, order, or directive promulgated, issued, or enforced pursuant to the aforementioned Laws, all as amended, supplemented, or replaced from time to time.

"Applicable Law" shall mean all Laws applicable to the Person, conduct, transaction, covenant, Loan Document, or contract in question, all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations, treaties, directives, ordinances, and orders of any Governmental Body, and all orders, judgments, and decrees of all courts and arbitrators.

"Applicable Period" means each of the First Applicable Period, the Second Applicable Period, the Third Applicable Period and each Rolling Applicable Period, as applicable.

"Approved Budget" means a detailed budget that sets forth projected cash receipts and cash disbursements on a weekly basis by line item for the time period from and including the Petition Date through the conclusion of the initial Approved Budget period set forth therein, in form and substance acceptable to Lenders in Lenders' sole discretion prior to the hearing to consider the authorization of Borrowers' entry into this Note, a copy of which is attached hereto as Exhibit A, as the same may be updated, modified, or supplemented from time to time with the written consent of Lenders in Lenders' sole discretion.

"Bankruptcy Code" shall have the meaning set forth in in the recital to this Note.

"Bankruptcy Court" shall have the meaning set forth in in the recital to this Note.

"Borrower(s)" shall have the meaning set forth in in the recital to this Note.

26

"Business Day" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of Delaware or any other day on which banking institutions located in the State of Delaware are authorized or required by law or other governmental action to close.

"Chapter 11 Cases" shall have the meaning set forth in in the recital to this Note.

"Collateral" shall mean the assets and property covered by the Interim Order and Final Order (as applicable) and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of Agent, to secure the Obligations. Without limiting the foregoing, the Collateral shall include all proceeds of any of the foregoing and all present and future assets and property of the estates of Borrowers under section 541(a) of the Bankruptcy Code (including, without limitation, the proceeds of claims and causes of action under chapter 5 of the Bankruptcy Code).

"Collateral Documents" shall mean any agreement entered into pursuant to Section 12 hereof and all similar agreements entered into guaranteeing payment of or granting a Lien upon property as security for payment of, the Obligations, including the Interim Order or the Final Order (as applicable).

"Committee" shall mean any official committee of unsecured creditors appointed in the Chapter 11 Cases.

"Commitment" means the commitment of Lenders to make the Loans to the Borrowers in the aggregate principal amount not to exceed $9,900,000, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (ii) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (iii) any obligation of such Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (C) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, or (D) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may

be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"CRO" shall have the meaning set forth in in Section 13(e) of this Note.

"Debtor" and "Debtors" shall have the meaning set forth ins in the recital to this Note.

"Default" means an event that, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning set forth in in Section 4(d) of this Note.

"Designated Account" shall mean account number 3137152, ABA routing number 031302971 maintained by Borrower with Customers Bank, a Pennsylvania state-chartered bank, or such other deposit account of Borrower (located in the United States) that has been designated as such in writing by Borrower to Agent.

"DIP Facility" shall mean this Note and the extensions of credit made hereunder.

"DIP Motion" shall mean the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Scheduling a Final Hearing, and (VII) Granting Related Relief filed on the Petition Date.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Equity Interests" shall mean, with respect to any Person, any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, member interests, or any participation or other equivalents of or interest in (regardless of how designated) equity of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act), including in each case all of the following rights relating to such Equity Interests, whether arising under the Organizational Documents of the Person issuing such Equity Interests (for purposes of this definition, the "issuer") or under the Applicable Laws of such issuer's jurisdiction of organization relating to the formation, existence and governance of corporations, limited liability companies, partnerships, business or statutory trusts, or other legal entities, as the case may be: (a) all economic rights (including all rights to receive dividends and distributions) relating to such Equity Interests; (b) all voting rights and rights to consent to any particular action(s) by the applicable issuer; (c) all management rights with respect to such issuer; (d) in the case of any Equity Interests consisting of a general partner interest in a partnership, all powers and rights as a general partner with respect to the management, operations and control of the business and affairs of the applicable issuer; (e) in the case of any Equity Interests consisting of the membership or limited liability company

28

interests of a member in a limited liability company, all powers and rights as a member with respect to the management, operations, and control of the business and affairs of the applicable issuer; (f) all rights to designate, appoint, or vote for or remove any officers, directors, manager, general partner, or managing member of such issuer or any members of any board of managers, directors or similar governing body that may at any time have any rights to manage and direct the business and affairs of the applicable issuer under its Organizational Documents as in effect from time to time or under Applicable Law; (g) all rights to amend the Organizational Documents of such issuer; (h) in the case of any Equity Interests in a partnership or limited liability company, the status of the holder of such Equity Interests as a "partner", general or limited, or "member", as applicable, under the applicable Organizational Documents and Applicable Law; and (i) all certificates evidencing such Equity Interests.

"Event of Default" shall have the meaning set forth in in Section 16 of this Note.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Extraordinary Receipts" means any cash received by Borrowers not in the ordinary course of business (and not consisting of proceeds described Section 7(a) hereof), including, without limitation, (i) foreign, United States, state, or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements, or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments, and (vii) any purchase price adjustment received in connection with any purchase agreement.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary to the next 1/100th of 1.00%) of the quotations for the day for such transactions received by the Agent from three federal funds brokers of recognized standing selected by it.

"Final Order" shall mean an order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to Lenders in Lenders' sole discretion, and reasonably satisfactory to Agent, together with all extensions, modifications, and amendments thereto, (i) authorizing Borrowers to obtain credit, incur Indebtedness, and grant Liens under this Note and the other Loan Documents, (ii) granting adequate protection, (iii) modifying the automatic stay, and (iv) granting related relief, all as set forth in such order.

"First Applicable Period" means the period from the Petition Date to the last day of the Fiscal Week that is two Fiscal Weeks after the Petition Date.

"Fiscal Week" means a calendar week commencing on Sunday and ending on the following Saturday.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Governmental Body" shall mean any domestic or foreign national government, any state or other political subdivision thereof, or any entity, authority, agency, division, or department exercising the executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of or pertaining to a government, including any supra-national bodies such as the European Union or the European Central Bank, and any group or body charged with setting financial accounting or regulatory capital rules or standards, including, without limitation, the Financial Accounting Standards Board, the Bank for International Settlements, the Basel Committee on Banking Supervision, or any successor or similar authority to any of the foregoing.

"Indebtedness" shall mean, without duplication, with respect to any Person, (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person for the deferred purchase price of property or services (other than trade payables, payables to vendors or other account payables incurred in the ordinary course of such Person's business and not past due for more than ninety (90) days after the date such payable was created), (iii) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments or upon which interest payments are customarily made, (iv) all obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used or acquired by such Person, even though the rights and remedies of the lessor, seller, and Agent thereunder are limited to repossession or sale of such property, (v) all capitalized lease obligations of such Person, (vi) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances, and similar facilities, (vii) all obligations and liabilities, calculated on a basis reasonably satisfactory to Lenders and in accordance with accepted practice, of such Person under interest rate or currency swaps and other derivatives, (viii) all Contingent Obligations, (ix) all other items which, in accordance with GAAP, would be included as liabilities on the liability side of the balance sheet of such Person, and (x) all obligations referred to in clauses (i) through (ix) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.  The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer.

"Indemnified Person" shall have the meaning set forth in in Section 9 of this Note.

"Interest Payment Date" shall mean the first Business Day of each month to occur while any Loans are outstanding; provided that, in addition to the foregoing, each of (x) the date upon which all of the Loans have been paid in full and (y) the Maturity Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued hereunder.

"Interim Loan Obligations" means loans in an aggregate amount of $2,000,000 made by Lenders to the Borrowers after July 6, 2025, pursuant to the Prepetition Loan Documents without regard to existing defaults thereunder.

"Interim Order" shall mean an order of the Bankruptcy Court entered in the Chapter 11 Cases pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, satisfactory in form and substance to Lenders in Lenders' reasonable discretion, together with all extensions, modifications, and amendments thereto, (i) authorizing Borrowers, on an interim basis, to obtain credit, incur Indebtedness, and grant Liens under this Note and the other Loan Documents,

(ii) granting adequate protection, (iii) modifying the automatic stay, (iv) setting a final hearing, and (v) granting related relief, all as set forth in such order, that is substantially in the form of attached Exhibit B.

"Law" shall mean any law (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, release, ruling, order, executive order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award of or any settlement arrangement, by agreement, consent, or otherwise, with any Governmental Body.

"Lenders" shall mean GT Partner Private Credit Finance LLC, a Delaware limited liability company, GT Monterey Cypress Finance LLC, a Delaware limited liability company, Serengeti Multi-Series Master LLC – Series ARR, as series of a Delaware Limited Liability Company, and any other Person who subsequently becomes a lender under this Note.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement, encumbrance, or preference, priority, or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Loan" shall have the meaning set forth in in Section 1 of this Note.

"Loan Account" means an account maintained hereunder by Agent on Agent's books of account with respect to the Borrowers, in which Borrower will be charged with all Loans made to, and all other Obligations incurred by, Borrower.

"Loan Documents" shall mean this Note, the Interim Order, the Final Order, the Collateral Documents, the Agency Fee Letter and all other agreements, instruments, documents, and certificates executed and delivered to, or in favor of, Agent and Lenders and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of Borrowers, or any employee of Borrowers, and delivered to Agent or Lenders in connection with this Note or the transactions contemplated thereby.  Any reference in this Note or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements, or other modifications thereto, and shall refer to such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business assets, or properties or condition (financial or otherwise) of Borrowers (other than those resulting solely from the commencement of the Chapter 11 Cases), (ii) the ability of Borrowers to perform any of Borrowers' obligations under any Loan Document to which any Borrower is a party (other than those resulting solely from the commencement of the Chapter 11 Cases), (iii) the legality, validity, or enforceability of this Note or any other Loan Document, (iv) the rights and remedies of Agent and Lenders under any Loan Document, or (v) the validity, perfection, or priority of a Lien in favor of Agent for the benefit of Lenders on any of the Collateral.

"Maturity Date" means the earliest of: (i) Stated Maturity Date; (ii) the closing on the Stalking Horse APA or a competing transaction entered into by Debtors in accordance with a Sale Order; (iii) the date on which the Obligations are declared to be, or otherwise become, due and payable in full due to the occurrence of an Event of Default; and (iv) the date of delivery of a Termination Notice.

"Maximum Amount" shall have the meaning set forth in in Section 1 of this Note.

"Maximum Lawful Rate" shall have the meaning set forth in in Section 4(e) of this Note.

"Mortgage" shall mean any mortgage in favor of Agent on any Real Property securing all or any portion of the Obligations.

"Note" shall have the meaning set forth in in the recitals of this Note.

"Notice of Loan" shall have the meaning set forth in in Section 1 of this Note.

"Obligations" shall mean all loans, advances, debts, liabilities, and obligations for the performance of covenants, tasks, or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrowers to Lenders, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under this Note or any of the other Loan Documents.  The term "Obligations" includes all principal, interest, fees, charges, expenses, attorneys' fees, and any other sum chargeable to the Borrowers under this Note or any of the other Loan Documents.

"Organizational Documents" shall mean, with respect to any Person, any charter, articles or certificate of incorporation, certificate of organization, registration or formation, certificate of partnership or limited partnership, bylaws, operating agreement, limited liability company agreement, or partnership agreement of such Person and any and all other applicable documents relating to such Person's formation, organization or entity governance matters (including any stockholders' or equityholders' agreement or voting trust agreement) and specifically includes, without limitation, any certificates of designation for preferred stock or other forms of preferred equity.

"Other Taxes" shall have the meaning set forth in in Section 10 of this Note.

"Permitted Encumbrances" shall mean any pre-existing liens and security interests as of the Petition Date on the Collateral, but solely to the extent that such liens and security interests were, as of the Petition Date, valid, enforceable, perfected, and non-avoidable liens, or were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

"Permitted Indebtedness" shall mean:  (a) current Indebtedness maturing in less than 90 days and incurred in the ordinary course of business for supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Note and the other Loan Documents; (c) Prepetition Indebtedness; (d) deferred taxes and other expenses incurred in the ordinary course

of business; (e) other Indebtedness listed in the Approved Budget; and (f) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment.

"Permitted Variances" shall mean, for any Applicable Period, any variance that does not result in (x) the total actual disbursements for any Applicable Period being greater than 110% of what is projected in the Approved Budget as "Total Disbursements" for such period and (y) the total actual receipts for any Applicable Period being more than 15% less than what is projected in the Approved Budget as "Total Receipts" for such period. Total actual disbursements and total receipts shall be determined in a manner consistent with the determination of "Total Disbursements" and "Total Receipts" in the Approved Budget.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity, or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body, or department thereof).

"Petition Date" shall have the meaning set forth in in the recitals of this Note.

"Prepetition Collateral" shall mean all encumbered assets, subject to a valid and perfected lien as of the Petition Date under the Prepetition Facility.

"Prepetition Facility" shall mean that certain Credit and Security Agreement, dated as of November 4, 2022, as amended by the First Amendment thereto, dated as of December 13, 2022, and as further amended by the Second Amendment dated as of April 12, 2023, and the Third Amendment dated as of March 31, 2025.

"Prepetition Financing Documents" shall have the meaning set forth in the Interim Order or the Final Order, as applicable.

"Prepetition Indebtedness" shall mean all Indebtedness of Borrowers incurred or assumed prior to the Petition Date, which for the avoidance of doubt shall include the Prepetition Secured Obligations.

"Prepetition Liens" shall mean the liens granted under the Prepetition Facility.

"Prepetition Loan Documents" shall mean the documents entered into in connection with the Prepetition Facility.

"Prepetition Loan Obligations" shall mean the obligations under the Prepetition Facility.

"Prepetition Secured Obligations" shall have the meaning set forth in in the Interim Order or the Final Order, as applicable.

"Prepetition Secured Parties" shall have the meaning set forth in in the Interim Order or the Final Order, as applicable.

"Real Property" shall mean all of real property leased by any Borrower.

"Required Lenders" shall mean all Lenders holding Loans with an outstanding principal amount.

"Roll-Up Loan" shall have the meaning set forth in Section 1(b) of this Note.

"Rolling Applicable Period" means each period of four (4) Fiscal Weeks, beginning with the period of four Fiscal Weeks ending on the last day of the Fiscal Week immediately following the Third Applicable Period and each Fiscal Week thereafter (which shall be reported on the last day of such week), in each case, on a rolling four-week basis.

"Sale Motion" means Debtors' Motion for Entry of (A) an Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities and Permitted Encumbrances, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, and (III) Granting Related Relief; and (B) an Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities and Permitted Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief filed on the Petition Date.

"Sale Order" means the entry by the Bankruptcy Court of an order approving a sale as requested in the Sale Motion.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Second Applicable Period" means the period from the Petition Date to the last day of the Fiscal Week that is three Fiscal Weeks after the Petition Date.

"Stalking Horse APA" means that certain Asset Purchase Agreement by and among Debtors and Lenders (or their designee), executed on or about the Petition Date, and submitted as an exhibit to the Sale Motion.

"Stated Maturity Date" the first Business Day that is one hundred twenty (120) days after the Petition Date or such later date agreed to by Lenders in Lenders' sole discretion.

"Stock" means all shares, options, warrants, general or limited partnership interests or other equivalents (regardless of how designated) of or in a corporation, partnership or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act).

"Subsidiary" shall mean, with respect to any Person, any other Person whose Equity Interests having ordinary voting power (other than Equity Interests having such power only by

reason of the happening of a contingency) to elect a majority of the directors or such other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person.

"Taxes" shall have the meaning set forth in in Section 10 of this Note.

"Termination Event" shall have the meaning set forth in in Section 16 of this Note.

"Termination Notice" shall have the meaning set forth in in Section 16 of this Note.

"Third Applicable Period" means the period from the Petition Date to the last day of the Fiscal Week that is four Fiscal Weeks after the Petition Date.

22.     Representations and Warranties.  Borrowers represent as follows:

(a)     Borrowers are each duly organized, validly existing and in good standing under the laws of Borrowers' respective jurisdictions of incorporation or formation, as applicable;

(b)     subject to entry of the Interim Order, the execution and delivery of this Note and the other Loan Documents and the performance by Borrowers of Borrowers' respective obligations under this Note and under the other Loan Documents (i) are within Borrowers' respective organizational powers and, have been duly authorized by all necessary corporate or limited liability company, as applicable, action of Borrowers, (ii) have been authorized by all necessary bankruptcy, insolvency or governmental approvals, and (iii) do not and will not contravene or conflict with any provisions of applicable law or of Borrowers' respective organizational documents or any agreements binding upon or applicable to the Borrowers or any of Borrowers' properties;

(c)     the Chapter 11 Cases have been duly authorized by all necessary corporate or limited liability company, as applicable, action by or on behalf of Borrowers and have been duly and properly commenced;

(d)     subject to entry of the Interim Order, this Note and each other Loan Document is a legal, valid, and binding obligation, enforceable against Borrowers in accordance with the terms of this Note and such other Loan Documents except as limited by equitable principles relating to enforceability;

(e)     Borrowers have good and marketable title to, or valid leasehold interests in, all of Borrowers' respective properties and assets; none of the properties and assets of Borrowers are subject to any Liens other than Permitted Encumbrances, and (giving effect to the protections provided by the Chapter 11 Cases) there are no facts, circumstances, or conditions that may result in any Liens other than Permitted Encumbrances;

(f)     no information contained in this Note, any of the other Loan Documents, any projections, financial statements, or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of Borrowers to Agent or Lenders pursuant to the terms of this Note, any Loan Document, or otherwise contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the

35

circumstances under which they were made.  Subject to entry of the Interim Order and the Final Order (as applicable), the Liens granted to Agent for the benefit of Lenders pursuant to the Collateral Documents will at all times be fully perfected first priority Liens in and to the Collateral described;

(g)    except for proceedings in the Chapter 11 Cases, no action, claim, lawsuit, demand, investigation, or proceeding is now pending or, to the knowledge of Borrowers, threatened against Borrowers before any governmental authority or before any arbitrator or panel of arbitrators that (i) challenges Borrowers' right or power to enter into or perform any of their respective obligations under the Loan Documents to which each is a party, or the validity or enforceability of any Loan Document or any action taken thereunder or (ii) (giving effect to the protections provided by the Chapter 11 Cases) has a reasonable risk of being determined adversely to the Borrowers and that, if so determined, could have a Material Adverse Effect;

(h)    each of Borrowers' respective accounts, contracts, contract rights, tangible chattel paper, intangible or electronic chattel paper, documents, instruments, general intangibles, supporting obligations and other rights, remedies, obligations, or other intangibles of any kind (i) is and will be genuine, and in all respects what it purports to be, and is not and will not be evidenced by a judgment, an instrument or chattel paper (unless such judgment shall have been assigned to Agent or Lenders in such manner as Lenders shall deem necessary or appropriate to perfect and preserve Agent's first priority security interest therein and unless, if so requested by Lenders, such instrument shall have been endorsed and delivered to or at the direction of Lenders and, in the case of tangible chattel paper, if so requested by Lenders, delivered to Agent); (ii) represents and will represent a bona fide transaction completed or in progress in accordance with the terms and provisions contained in the invoices and purchase orders relating thereto, and the underlying transactions giving rise thereto do not and will not in any way violate any requirements of law; and (iii) is and will be in the amount shown on Borrowers' records, which amount is and will be actually and absolutely owing to the Borrowers and not contingent or subject to any rights of set-off or reduction for any reason other than regular discounts, credits or adjustments allowed by Borrowers in the ordinary course of their business;

(i)    the execution, delivery, and performance of this Note and the other Loan Documents will not (immediately or with the giving of notice or passage of time, or both) (i) violate the organizational documents of Borrowers, or violate any law or regulation or (ii) result in the creation or imposition of any Lien upon any of the property of Borrowers, except in favor of Agent for the benefit of Lenders; and

(j)    except for the Chapter 11 Cases and giving effect to the protections provided by the Chapter 11 Cases, there is no order, notice, claim, litigation, proceeding, or investigation pending or threatened against or in any way affecting (i) Borrowers, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect or (ii) this Note or any other Loan Document.

23.    <u>Miscellaneous</u>.

(a)    All notices and other communications provided for hereunder shall be in writing (including by electronic mail) and mailed, electronically mailed, or delivered by nationally recognized overnight courier service as follows:

If to the Borrowers:

MyJobMatcher Inc.
1743 Sidewinder Drive, 1st Floor
Park City, Utah 84060

Email: rjcorliss@corlissmoore.com

With a copy (that shall not constitute notice) to:

Morris James LLP
500 Delaware Ave, Suite 1500
Wilmington, Delaware 19801
Attention:    Jeffrey R. Waxman
E-mail:    jwaxman@morrisjames.com

If to Lenders:

Serengeti Multi-Series Master LLC—Series ARR
c/o Serengeti Asset Management, LP
623 Broadway, Suite 901
New York, New York 10012
Attention:    A.J. Martinez
Email:    amartinez@serengeti-am.com

With a copy (that shall not constitute notice) to:

Geoffrey T. Raicht, PC
99 Biltmore Ave
Rye, New York 10580
Attention:    Geoffrey T. Raicht
Email:    graicht@raichtlawpc.com

GT Partners Private Credit Finance LLC
GT Monterey Cypress Finance LLC
18952 MacArthur Blvd., Suite 100-101
Irvine, California 92612
Attention:  [●]
Email:    swarner@gt-gp.com

With a copy (that shall not constitute notice) to:

Geoffrey T. Raicht, PC

99 Biltmore Ave
Rye, New York 10580
Attention:     Geoffrey T. Raicht
Email:          graicht@raichtlawpc.com

If to Agent:

Ankura Trust Company, LLC
140 Sherman Street, 4th Floor
Fairfield, Connecticut 06824
Attention:     Michael J. Fey, Beth Micena, Krista Gulalo
Email:          michael.fey@ankura.com; beth.micena@ankura.com;
                 krista.gulalo@ankura.com

With a copy (that shall not constitute notice) to:

A&O Shearman
599 Lexington Ave.
New York, New York 10022
Attention:     Sara Coelho, Esq.
                 Joseph Badtke-Berkow, Esq.
Email:          sara.coelho@aoshearman.com
                 joseph.badtke-berkow@aoshearman.com

All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or, when sent by electronic mail, shall be effective when confirmation is received.

(b)      No failure or delay on the part of Agent, Lenders, or any other holder of this Note (or any portion thereof) to exercise any right, power or privilege under this Note and no course of dealing of Borrowers, Agent, and Lenders shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.  The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that Agent and Lenders would otherwise have.  No notice to or demand on Borrowers in any case shall entitle Borrowers to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of Agent or Lenders to any other or further action in any circumstances without notice or demand.

(c)      Borrowers, and any endorser of this Note, hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand, and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(d)     If any provision in or obligation under this Note shall be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(e)     This note and the rights and obligations of Borrowers Lenders hereunder shall be governed by, and shall be construed and enforced in accordance with, the internal laws of the State of Delaware, without regard to conflict of laws principles.

(f)     **BORROWERS, BY THEIR ACCEPTANCE OF THIS NOTE, AGENT AND LENDERS AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BORROWERS, AGENT, AND LENDERS AND ANY SUBSEQUENT HOLDER OF THIS NOTE RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED**. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Note and transactions contemplated by this Note, including, without limitation, contract claims, tort claims, breach of duty claims, and all other common law and statutory claims. Borrowers and, by their acceptance of this Note, Agent and Lenders and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS OF THIS NOTE**. In the event of litigation, this provision may be filed as a written consent to trial by the court. Each party hereto hereby submits to the exclusive jurisdiction of the Bankruptcy Court for purposes of all legal proceedings arising out of or relating to this Note or the transactions contemplated hereby.

(g)     Borrowers hereby waive the benefit of any statute or rule of law or judicial decision that would otherwise require that the provisions of this Note be construed or interpreted most strongly against the party responsible for the drafting thereof.

(h)     Borrowers shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of Lenders. A Lender may assign to one or more entities all or any part of, or may grant participation's to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as such assignee or participant would have if such assignee or participant were a Lender hereunder. Any assignment shall be on a form reasonably acceptable to the Agent and shall include agreement to the terms of this Note. A Lender shall notify Agent and Borrowers of any such assignment which notice shall include a description of the assignment and include

customary instructions from such Lender and such Lender's assignee with respect to the making of payments and other communications with such Lender and such assignee.

(i)     No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by Borrowers, Agent, and Lenders.

(j)     If any provision of this Note is held invalid, illegal, or unenforceable, the parties shall negotiate in good faith so as to replace each invalid, illegal, or unenforceable provision with a valid, legal, and enforceable provision that will, in effect, from an economic viewpoint, most nearly and fairly approach the effect of the invalid, illegal, or unenforceable provision and the intent of the parties in entering into this Note.

(k)     This Note, the other Loan Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other Loan Documents shall be binding upon Borrowers, the estates of Borrowers, and any trustee or successor in interest of Borrowers in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to section 365 of the Bankruptcy Code.  This Note and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Agent, each Lender, and Agent's and each Lender's respective assigns, transferees, and endorsees.  The Liens created by this Note, and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any of the Chapter 11 Cases or any other bankruptcy case of Borrowers to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lender files financing statements or otherwise perfect its security interests or Liens under applicable law.

(l)     In the event of any inconsistency between the provisions of the Interim Order or Final Order (as applicable) and this Note or any other Loan Document, the provisions of the Interim Order or Final Order (as applicable) shall govern.

(m)     THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

[Signature Pages Follow]

IN WITNESS WHEREOF, Borrowers and Lenders have caused this Note to be executed and delivered by their duly authorized officer as of the day and year and at the place first above written.

**BORROWERS:**                          **MY JOB MATCHER, INC.**


By:_____
　　　　Name:
　　　　Title:


**JOB.COM-HV, INC.**


By:_____
　　　　Name:
　　　　Title:


**JOB.COM-FORTUS, INC.**


By:_____
　　　　Name:
　　　　Title:


**JOB.COM-ENDEVIS, INC.**


By:_____
　　　　Name:
　　　　Title:

**JOB.COM-QCI, INC.**


By:_____
      Name:
      Title:


**PRINCETONONE-JOB.COM, INC.**


By:_____
      Name:
      Title:


**PRINCETON SEARCH L.L.C**

By:  PrincetonOne-Job.com, Inc., its member


By:_____
      Name:
      Title:

[SIGNATURE PAGE TO DEBTOR-IN-POSSESION DELAYED DRAW TERM LOAN PROMMISSORY NOTE]

**LENDERS:**                          **SERENGETI MULTI-SERIES**
                                      **MASTER LLC—SERIES ARR**


                                      By:_____
                                            Name: A.J. Martinez
                                            Title:   Director


                                      **GT PARTNERS PRIVATE CREDIT**
                                      **FINANCE LLC**


                                      By:_____
                                            Name:
                                            Title:


                                      **GT MONTEREY CYPRESS**
                                      **FINANCE LLC**


                                      By:_____
                                            Name:
                                            Title:


**AGENT:**                            **ANKURA TRUST COMPANY, LLC**


                                      By:_____
                                            Name:
                                            Title:

<u>Exhibit A</u>

Approved Budget


*Attached*

<u>Exhibit B</u>

Interim Order

*Attached*